Frances C. Bassett, *Pro Hac Vice Admission*
Jeremy J. Patterson, *Pro Hac Vice Admission*
Kamran K. Zafar, *Pro Hac Vice Admission*
**FREDERICKS PEEBLES & MORGAN LLP**
1900 Plaza Drive
Louisville, CO  80027-2314
Telephone:  (303) 673-9600
Facsimile:  (303) 673-9155
Email:  fbassett@ndnlaw.com
Email:  jpatterson@ndnlaw.com
Email:  kzafar@ndnlaw.com

J. Preston Stieff (4764)
**J. PRESTON STIEFF LAW OFFICES, LLC**
110 South Regent Street, Suite 200
Salt Lake City, Utah  84111
Telephone:  (801) 366-6002
Email: jps@StieffLaw.com

*Attorneys for Plaintiff*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH & OURAY RESERVATION,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY D. MCKEE; T & L LIVESTOCK, INC.; MCKEE FARMS, INC.; AND GM FERTILIZER, INC.,<br><br>Defendants. | **APPENDIX TO THE**<br>**UTE INDIAN TRIBE'S**<br>**VERIFIED MOTION TO RECUSE**<br><br><br>Civil Case No. 2:18-cv-00314-CW<br><br>Judge Clark Waddoups |

## TABLE OF CONTENTS

**Document**                                                                                    **Page**

Declaration of Frances C. Bassett, Esq. ........................................................................ 1

Docket entry in *Ute Tribe v. Ute Distribution Corp.*, case number 2:06-cv-557, directing the Tribe's counsel to show cause why Judge Waddoups should not sanction the Tribe's counsel for filing a motion for reconsideration ................................................... 19

Ute Tribe's response to Judge Waddoups' sua sponte order to show cause in case number 2:06-cv-557 ............................................................................................ 20

Judge Waddoups ruling on the order to show cause in case number 2:06-cv-557 ...... 38

Excerpts from transcript of TRO hearing in *Becker v. Ute Indian Tribe*, case number 2:16-cv-958 ................................................................................................ 39

Tenth Circuit order of 12/30/2016 staying Judge Waddoups' entry of a preliminary injunction in case number 2:16-cv-958 ........................................................... 49

Ute Indian Tribal Court's Opinion and Order in *Ute Indian Tribe of the Uintah and Ouray Reservation v. Becker*, case number CV 16-253 ........................................................ 53

U.S. Department of Justice's Implicit Bias Training Announcement ........................... 70

"Implicit Bias, A Primer for Courts," National Center for State Courts, 2009 ............... 74

Implicit Bias Video and Jury Instructions, U.S. District Court for the Western District of Washington ................................................................................................... 87

American Bar Association's Implicit Bias Initiative ..................................................... 88

"Disparities in Discipline: A Look at School Disciplinary Actions for Utah's American Indian Students," May 2015, Public Policy Clinic at the University of Utah S.J. Quinney College of Law ............................................................................................... 91

2010 Utah population data, 2010 Census, U.S. Census Bureau ............................... 124

Excerpts from transcript of injunction hearing in *Ute Indian Tribe v. Lawrence*, case number 2:16-cv-579 ..................................................................................... 126

Judge Terry Pechota's website biography .................................................................. 130

NARF Attorneys Among "The First Thirteen"  ........................................................... 132

"Lawyering for Groups: The Case of American Indian Tribal Attorneys," Kristen A. Carpenter and Eli Wald, 81 FORDHAM L. REV. 30185 (2013)  ...................................... 134

Frances C. Bassett, *Pro Hac Vice Admission*
Jeremy J. Patterson, *Pro Hac Vice Admission*
Kamran K. Zafar, *Pro Hac Vice Admission*
**FREDERICKS PEEBLES & MORGAN LLP**
1900 Plaza Drive
Louisville, CO  80027-2314
Telephone:  (303) 673-9600
Facsimile:  (303) 673-9155/9839
Email:  fbassett@ndnlaw.com
Email:  jpatterson@ndnlaw.com
Email:  kzafar@ndnlaw.com

J. Preston Stieff (4764)
**J. PRESTON STIEFF LAW OFFICES, LLC**
110 South Regent Street, Suite 200
Salt Lake City, Utah  84111
Telephone:  (801) 366-6002
Email: jps@StieffLaw.com

*Attorneys for Plaintiff*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH & OURAY RESERVATION,<br><br>        Plaintiff,<br><br>    v.<br><br>GREGORY D. MCKEE; T & L LIVESTOCK, INC.; MCKEE FARMS, INC.; AND GM FERTILIZER, INC.,<br><br>        Defendants. | **DECLARATION IN SUPPORT OF UTE INDIAN TRIBE'S MOTION TO RECUSE**<br><br><br>Civil Case No. 2:18-cv-00314-CW<br><br>Judge Clark Waddoups |

**APPENDIX PAGE 1**

1.  I, Frances C. Bassett, make this declaration in support of the Ute Indian Tribe's *Motion to Recuse* pursuant to 28 U.S.C. §§ 144 and 455(a).  I am familiar with events described herein in relation to both this case and the four other cases in which the Ute Indian Tribe has appeared as a litigant before the Hon. Clark Waddoups (Judge Waddoups).

2.  I have been licensed to practice law since 1980.  I am admitted to practice and am a member in good standing of the state bars of Colorado (attorney reg. no. 11979, currently active) and New Mexico (attorney reg. no. 2210, currently active).  I am also admitted to practice before the United States Supreme Court, the U.S. Circuit Courts of Appeal for the Tenth Circuit and the Federal Circuit, federal district courts in Colorado and New Mexico, and the Ute Indian Tribal Court.

3.  I am a partner in the law firm of Fredericks Peebles & Morgan LLP (FPM), a firm that specializes in the field of Federal Indian law.  Our firm limits its practice to representing American Indian tribes, tribal entities, and individual Indians.  FPM has served as General Counsel for the Ute Indian Tribe of the Uintah and Ouray Reservation since 2009.  Before coming to work for FPM, I was an Assistant Attorney General and a Special Assistant Attorney General for the State of New Mexico.  Before that, I worked in private practice in New Mexico, and as a staff attorney for both the Colorado Court of Appeals and the New Mexico Court of Appeals.

4.  Over the past nine years, the Tribe has appeared as a litigant before Judge Waddoups in four other cases in the U.S. District Court for the District of Utah:

    (1)  *Ute Indian Tribe of the Uintah and Ouray Reservation v. Ute Distribution Corp.*, case number 2:06-cv-557;

    (2)  *Bonnet v. Harvest (US) Holdings, Inc.*, case number 2:10-cv-217;

    (3)  *Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*, case number 2:16-cv-579; and

    (4)  *Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, case number 2:16-cv-958.

I was an attorney of record for the Tribe in each of these cases.

5.  Judge Waddoups ruled against the Ute Tribe in all of these cases.  Further, as detailed below, in each case Judge Waddoups took actions that the Ute Tribe and its attorneys believe to be inconsistent with the actions of a fair and impartial jurist.  The Tribe asks the Court to take judicial notice of the pleadings and other materials that are

**APPENDIX PAGE 2**

contained in the judicial records of the U.S. District Court of Utah in the above-listed cases.[1]

### *Ute Tribe v. Ute Distribution Corp.* – 2:06-cv-557

6.    The Ute Distribution Corporation (UDC) was organized and operates as a non-profit corporation under the Utah Nonprofit Corporation Act, UTAH CODE ANN. §§ 16-6a-101 - 1419.  The Ute Tribe owns approximate twenty percent (20%) of the stock in the UDC.  In 2006, the UDC amended the articles of incorporation to disenfranchise the Ute Tribe and any shareholder "directly or indirectly" affiliated with the Tribe.  The amendments to the UDC articles prohibit members of the Ute Tribe or anyone "directly or indirectly" affiliated with the Tribe from being "nominated, voted upon, or eligible to serve" on the UDC Board of Directors.  The amendments also (*i*) eliminated the ability of UDC shareholders to propose corporate business, and (*ii*) entrenched the existing UDC directors by severely limiting the grounds for a director's removal.

7.    The Ute Tribe sued to invalidate the amendments.  The Tribe moved for summary judgment on grounds, *inter alia*, that UTAH CODE ANN. § 16-6a-1004(2) mandated a class vote on the amendments and that the amendments were unreasonable as a matter of law.  The applicable statute under the Utah Nonprofit Corporation Act had been adopted by the Utah Legislature nearly verbatim from the Revised Model Nonprofit Corporation Code.  The Tribe's motion for summary judgment relied on the Official Comments to the Model Code, together with two cases that were on point and that construed the same statutory provision adopted from the Model Code, *Howe v. Washington Land Yacht Harbor, Inc.*, 459 P.2d 798, 802, 805 (Wash. 1969); *Lake Arrowhead Chalets Timeshare Owners Assn. v. Lake Arrowhead Chalets Owners Assn.*, 59 Cal. Rptr. 2d 875 (Cal. Ct. App. 1996).  Tribe's Supporting Memorandum, ECF 118-2, pp. 13-17.

8.    The UDC moved for summary judgment on other grounds.  The UDC asserted that "*the UDC is a unique corporation, one that was created and decreed by Congress for a specified purpose, which purpose is inconsistent with the participation in management*" of any shareholders directly or indirectly affiliated with the Ute Tribe.  UDC's Supporting Memorandum, ECF 117, p. iv.  The UDC's statement was unfounded and misleading—the UDC was not "created" by the U.S. Congress and there is no federal statute or regulation which states that the UDC has a "specified purpose" that is "inconsistent" with the Ute Tribe's participation in the corporate management of the UDC.  Indeed, the UDC motion and supporting memorandum did not cite a single statute or legal precedent that supported the UDC's assertion.

---

[1] *See, e.g., United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) (federal courts may take judicial notice of matters contained in their own files and records).

**APPENDIX PAGE 3**

9.   At oral argument, the Tribe's attorneys were astonished and taken aback by Judge Waddoups' conduct.  The Judge *sua sponte* began making legal arguments on behalf of the UDC, and—without prior notice to the Tribe—Judge Waddoups required the Tribe to address the application of legal principles and precedents that the UDC had not raised in its pleadings and memoranda.

10.   Judge Waddoups granted summary judgment in favor of the UDC.  He did so by upholding the amendments under the doctrine of corporate loyalty—a theory that had not been advanced by the UDC or briefed by either party.  Memorandum Decision and Order, ECF 135, pp. 9-13.  Furthermore, Judge Waddoups' decision relied on four cases that had not been cited by either party, and that were not even mentioned at oral argument.

11.   The Tribe filed a motion asking Judge  Waddoups to reconsider the ruling.  ECF 138.

12.   Judge Waddoups denied the Tribe's motion for reconsideration.  But Judge Waddoups then went beyond merely denying reconsideration.  Judge Waddoups *sua sponte* ordered the Tribe's counsel to show cause why counsel should not be sanctioned for seeking reconsideration:

> [T]he court hereby DENIES Plaintiff's motion to reconsider and orders Plaintiff's counsel under Fed. R. Civ. P. 11(c)(3) to show cause why they should not be sanctioned and ordered to pay Defendants' costs regarding this motion, pursuant to 11(b)(1)-(3).  Counsel is to respond accordingly within ten days of this order.

ECF 145, p. 5.

13.   The Tribe's 20-page response was filed ten days later.  The response stated, *inter alia*:

> A Rule 59(e) motion is proper when, as here, a trial court has decided a case on grounds "outside the adversarial issues presented to the court by the parties." *United States v. Ibarra*, 920 F.2d 702, 706 n.3 (10th Cir. 1990), *rev'd on other grounds*, 502 U.S. 1 (1991).
>
> * * * *
>
> Under Tenth Circuit precedent a Rule 59(e) motion is also proper when a court has "misapprehended the facts, a party's position, or the controlling law." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

ECF 146, pp. 2-3.

4

**APPENDIX PAGE 4**

14.  Four days later Judge Waddoups entered an order finding that "although the motion to reconsider was not well-founded, it was well-intentioned."  No sanctions were imposed.  ECF 147.

15.  The Tribe's undersigned counsel has practiced law for thirty-eight (38) years and has litigated cases before state and federal courts in Colorado, New Mexico, and Utah, as well as the U.S. District Court for the District of Columbia and the Federal Court of Claims.  Not once in thirty-eight years has any other court ever—before or since—*sua sponte* ordered counsel to show cause why she should not be sanctioned simply for filing a motion to reconsider.

### *Bonnet v. Harvest (US) Holdings, Inc.* – 2:10-cv-217

16.  Robert C. Bonnet, an individual, and Bobby Bonnet Land Services, a sole proprietorship (Bonnet), filed suit against Harvest (US) Holdings, Inc., Branta Exploration & Production, LLC, Ute Energy LLC (Defendants) and various other individuals, alleging the defendants had tortiously interfered with Bonnet's contract with the Ute Tribe. The Tribe was not a party to the suit.

17.  Before conducting discovery on any named defendant, Bonnet served the Tribe with a subpoena duces tecum that sought production of broad categories of internal tribal records and documents.  The Tribe filed a timely motion to quash the subpoena, contending, *inter alia*, that tribal sovereign immunity immunized the Tribe from compelled compliance with the subpoena.  ECF 33 and 34.

18.  Judge Waddoups denied the Tribe's motion to quash the subpoena.  Ruling and Order, ECF 56.  On appeal, the Tenth Circuit reversed Judge Waddoups' ruling.  *Bonnet v. Harvest (US) Holdings, Inc.*, 741 F.3d 1155 (10th Cir. 2014).

### *Ute Tribe v. Lawrence* – 2:16-cv-579 and *Becker v. Ute Tribe* – 2:16-cv-958

19.  *Ute Tribe v. Lawrence* (*Lawrence*), and *Becker v. Ute Tribe* (*Becker*) are companion cases.  Lynn D. Becker was employed by the Ute Tribe inside the boundaries of the Uintah and Ouray Reservation for several years.  The parties are in litigation, the Tribe suing Becker in the Ute Indian Tribal Court, Becker suing the Tribe in a Utah state district court.  Because the "equitable jurisdiction" under 28 U.S.C. § 1331 has been repeatedly "employed to police the boundaries between state and tribal authority,"[2] the dispute between Becker and the Tribe is also before this federal court in these two cases.

---

[2] *Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*, 875 F.3d 539, 543 (10th Cir. 2017).

5

**APPENDIX PAGE 5**

20.   The Tribe contends Judge Waddoups' rulings against the Ute Tribe in both cases is the result of *implicit*, or *explicit*, racial bias and other hostility towards the Ute Tribe.

21.   Studies conducted by legal scholars show that judges harbor the same kinds of implicit biases as other people, and that a judge's biases can affect his or her judgment and treatment of litigants.  *E.g.,* Jeffrety J. Rachlinski et. al., *Does Unconscious Racial Bias Affect Trial Judges?*, 84 NOTRE DAME L. REV. 1195, 1205-08 (2009).  In bench trials, implicit bias can affect the judge's fact-finding and legal analysis, and even the ultimate disposition of the case.  Scholars also report that a judge's implicit bias can influence the outcome of the trial in more subtle ways, such as a judge's rulings on procedural matters and the admissibility of evidence. *Id.*

22.   The Tribe and its attorneys believe Judge Waddoups' bias against the Ute Tribe is evident, as enumerated above, in (*i*) his fact-finding and legal analyses, (*ii*) his comments and disparate treatment of the Ute Tribe and the Tribe's evidence, and (*iii*) his judicial rulings against the Tribe in both *Lawrence* and *Becker*.[3]  Judge Waddoups has demonstrated bias against the Tribe in rulings large and small, both procedural and substantive.

23.   One stunning example of Judge Waddoups' unequal treatment of the Ute Tribe is his handling of the parties' respective motions for injunctive relief in *Lawrence* and *Becker*.

24.   As detailed *infra*, Judge Waddoups acted with unseemly *haste* in granting Becker a TRO and Preliminary Injunction in 2:16-cv-958.  In stark contrast, Judge Waddoups acted with unseemly *delay*—and initially in defiance of the Tenth Circuit—in refusing to even conduct a hearing on the Tribe's emergency motions for injunctive relief in 2:16-cv-579.

25.   Supreme Court and Tenth Circuit precedents mandate that federal district courts must stay their hand and not enjoin suits in Indian tribal courts until the tribal court suit is completed, i.e., until there has been an "exhaustion" of tribal court remedies.[4]  Judge Waddoups, however, has not once, but twice, disregarded the Supreme Court and Tenth Circuit precedents requiring the exhaustion of tribal court proceedings.

26.  On 9/14/2016, at 9:07 a.m., Becker filed a complaint and motion for TRO and a preliminary injunction in 16-cv-00958, seeking to enjoin the Tribe's pending suit against

---

[3] *Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence*, 312 F. Supp. 3d 1219 (D. Utah 2018) (Lawrence); *Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 311 F. Supp. 3d 1284 (D. Utah 2018) (*Becker*).

[4]  *E.g., Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14, 15, 17 (1987); *Norton v. Ute Indian Tribe*, 862 F.3d 1236 (10th Cir. 2017).

**APPENDIX PAGE 6**

him in the Ute Indian Tribal Court.  Becker did not challenge the Tribal Court's subject-matter jurisdiction but, instead, asked Judge Waddoups to enjoin the Tribal Court suit on grounds of comity.  By 1:23 p.m. that same day, 9/14/2016, Judge Waddoups had scheduled a TRO hearing for later that same afternoon.  By 4:56 p.m. that day, Judge Waddoups had issued a TRO to enjoin the Tribe's suit against Becker in the Tribal Court.  As shown by the hearing transcript, Judge Waddoups was aggressively adversarial and combative in his exchanges with the Tribe's attorney.  Judge Waddoups peppered the Tribe's counsel with frequent interruptions and challenges to the Tribe's legal arguments—behavior suggesting that Judge Waddoups had predetermined the outcome.  After granting the TRO within less than 1 hour's time, the following colloquy occurred between Judge Waddoups and the Tribe's attorney, Jeffery Rasmussen:

<u>Judge Waddoups</u>:  [T]he Court will order that the [TRO] ruling take effect immediately, and no further action ought to be taken by the [Tribe] to advance the litigation in the Tribal Court.

<u>Tribe's Attorney</u>:  Your Honor, we have a couple of questions.

<u>Judge Waddoups</u>:  There's a question of security.  Mr. Isom, or I want to hear from both sides as to whether there is a reason to require the issuance of a bond.

<u>Tribe's Attorney</u>:  Yes, Your Honor, there certainly is.  This is a gross affront to the Tribe's sovereign authority and the Tribal Court's sovereign authority, and it is unjustified.  And that if we are to prevail on the appeal of this decision, which we fully expect we would do, there will be substantial damage to the Tribe in the interim.  And now we are talking about hundreds of hours of attorney time, but we are also talking about a court that does not have the authority to do it, enjoining another court, but yet, allowing the [Becker] state court action to proceed.  And so this court is putting its thumbs on the scales and allowing the state court action to proceed but stopping the tribal court action from proceeding when that is an issue of comity.  So –

<u>Judge Waddoups</u>:  Let me make one point very clear, Mr. Rasmussen.  I specifically did not enjoin the Tribal Court.  I only enjoined the [Tribe] from taking any actions before the Tribal Court until this issue is fully resolved.[5]

   27.  Two weeks later to the day, Judge Waddoups entered a preliminary injunction enjoining the suit in Tribal Court.  <u>ECF 49</u>.  On appeal, the Tenth Circuit granted the

---

[5] Appendix 42, excerpt from transcript of TRO hearing in case no. 2:16-cv-958.

**APPENDIX PAGE 7**

Tribe's motion to stay Judge Waddoups' preliminary injunction. ECF 66. The Tenth Circuit later reversed the preliminary injunction, finding that Becker had not shown a substantial likelihood of success on the merits. *Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 868 F.3d 1199, 1204 (10th Cir. 2017).

28.  The mandate in *Becker* issued on 12/21/2017.  On January 5, 2017, Becker renewed his motion for a preliminary injunction, submitting only slightly more evidence than what he had submitted in 2016. ECF 70.  Judge Waddoups once again issued a preliminary injunction, enjoining the Tribal Court suit—once again without allowing for an exhaustion of tribal court remedies. ECF 148.  The Tribe has appealed the ruling to the Tenth Circuit, appeal number 18-4072.  As part of the appeal, the Tribe is also asking the Tenth Circuit to disqualify Judge Waddoups and to reassign the case to a different district court judge on remand.

29.  The Tribe filed suit against Becker in case no. 2:16-cv-579 in order to enjoin Becker's state court suit against the Tribe for lack of state court jurisdiction.  The case was initially assigned to the Honorable Robert J. Shelby.  Judge Shelby dismissed the Tribe's complaint for lack of federal question jurisdiction under 28 U.S.C. § 1331.  On appeal, the Tenth Circuit reversed the dismissal, holding that federal question jurisdiction exists under 28 U.S.C. §§ 1331 and 1362 to rule on the Tribe's claims. *Lawrence*, 875 F.3d at 540, 543.  Following the Tenth Circuit mandate, Judge Shelby recused himself and the case was later assigned to Judge Waddoups. ECF 50 and 51.

30.  The Tenth Circuit mandate in *Lawrence* issued on November 29, 2017. ECF 49. Because Mr. Becker's state court suit against the Tribe had continued in the interim while *Lawrence* and *Becker* were on appeal, a jury trial was set to begin on February 26, 2018 in the state court suit.  Accordingly, on December 6, 2017, the Tribe filed the following motions in 2:16-cv-579:

   a)  Plaintiffs' Expedited Motion for Summary Judgment and for Interim and Permanent Injunctions on Grounds of Federal Preemption, Infringement on Tribal Sovereignty, and Lack of Subject Matter Jurisdiction, ECF 52;

   b)  Plaintiffs' Expedited Motion for Summary Judgment and for Interim and Permanent Injunctions on Grounds of Illegality Under Federal and Tribal Law, Infringement on Tribal Sovereignty, and Federal Preemption, ECF 53;

   c)  Plaintiffs' Verified Emergency and Expedited Motion for Injunctive Relief – a Temporary Restraining Order and/or Preliminary Injunction and a Permanent Injunction Entered Under Fed. R. Civ. P. 56, ECF 54; and

   d)  Plaintiffs' Verified Motion to Expedite Briefing and Rulings on the Ute Tribe's Motions for a Temporary Restraining Order and Preliminary Injunction, ECF 57.

8

**APPENDIX PAGE 8**

31.  Federal law mandates that a district court "shall expedite … any action for temporary or preliminary injunctive relief." 28 U.S.C. § 1657.  Judge Waddoups, however, ignored that directive.

32. In the first week after the Tribe filed its motions for an emergency TRO, the Tribe's attorneys attempted on three separate occasions to schedule a TRO hearing.  Each time the Tribe's counsel contacted Judge Waddoups' chambers, counsel was advised that Judge Waddoups had not yet "decided what to do" about the Tribe's injunction motions.

33.  A week after the Tribe's emergency TRO motion was filed, Judge Waddoups issued an order establishing a one-month briefing schedule for the parties to brief the question of whether the Court "*has supplemental jurisdiction under 28 U.S.C. § 1367 and if so, whether the court should decline to exercise supplemental jurisdiction under subsection (c).*" ECF 58.  Judge Waddoups' order was quite frankly nonsensical given the Tenth Circuit's express ruling in *Lawrence* that there is federal question jurisdiction under 28 U.S.C. §§ 1331 and 1362 for Judge Waddoups to rule on the Tribe's claims for both declaratory judgment and injunctive relief.  *Lawrence*, 875 F.3d at 540, 543.

34.  After responding to the district court's order, ECF 59, the Tribe filed a request for hearing on its pending summary judgment and injunction motions.  ECF 60.  Then, on January 5, 2015—after neither Judge Lawrence nor Mr. Becker had filed timely oppositions to either (*i*) the Tribe's summary judgment motions, or (*ii*) the Tribe's motions for interim and permanent injunctive relief—the Tribe filed a "Request to Submit for Decision," as permitted by the District of Utah's Local Rules, DUCivR56-1(f).  ECF 65.

35.  At a hearing on January 17, 2018, Judge Waddoups was once again aggressively adversarial and combative in his exchanges with the Tribe's attorney.  At the conclusion of the hearing, Judge Waddoups orally ruled from the bench and entered a minute order that essentially, for all practical purposes, purported to reverse the Tenth Circuit's jurisdictional rulings in *Lawrence*.  Alternatively, Judge Waddoups denied the Tribe's emergency motion for interim injunctive relief.  ECF 70.  The Tribe immediately appealed the ruling and asked the Tenth Circuit to issue an emergency injunction.

36.  On February 16, 2018, the Tenth Circuit ordered Judge Waddoups to conduct a hearing on the Tribe's motions for injunctive relief:

> [T]he district court shall exercise its original jurisdiction in accord with the mandate in our decision in *Ute Indian Tribe v. Lawrence*, 875 F.3d 539 (10th Cir. 2017), and decide the Tribe's request for injunctive relief against the state court proceedings.  The district court should obtain briefs from the parties and conduct proceedings on the Tribe's request for injunctive relief forthwith, including holding an evidentiary hearing, if necessary.

ECF 81.

9

**APPENDIX PAGE 9**

37.   In response to the Tenth Circuit order, Judge Waddoups initially issued an order stating that he did not understand the Tenth Circuit's directive.  ECF 83.  The next day, Judge Waddoups vacated that order.  ECF 84.  Thereafter, Judge Waddoups scheduled an evidentiary hearing on February 28, 2018.  ECF 87.

38.   At the hearing on 2/28/2018, the Tribe presented testimony from two expert witnesses. The Tribe also relied on the deposition testimony and declarations of four additional expert witnesses and additional lay witnesses whose testimony was in the court record as part of the Tribe's pending summary judgment motions.[6]   The Tribe's opponents—Mr. Becker and Judge Barry Lawrence—presented no witnesses.

39.   On 4/30/2018, Judge Waddoups entered an 83-page Memorandum Decision and Order denying the Tribe's request for injunctive relief.  ECF 136.   Judge Waddoups rejected the testimony of all six of the Tribe's expert witnesses on the ground that their expert testimony was nothing more than "legal argument."  ECF 136, p. 44.[7]   He did so notwithstanding that two of the Tribe's six experts are not attorneys, and therefore, as non-lawyers, there was no basis for summarily rejecting their testimony as "legal argument."

40.   To rule against the Tribe in 2:16-cv-579, Judge Waddoups had to effectively "rewrite" both a federal statute and a state statute, Public Law 280 ("PL 280"), 25 U.S.C. § 1326 and UTAH CODE ANN. § 9-9-202, to include terms that were never enacted by the U.S. Congress or the Utah Legislature.[8]

41.   Judge Waddoups "judicially rewrote" 25 U.S.C. § 1326 to insert an alternative method of supplying the tribal consent that is mandated by § 1326, as that statute was enacted by Congress.  Judge Waddoups' judicially amendment of § 1326 is indicated by the language highlighted in yellow below:

> State jurisdiction acquired pursuant to this subchapter with respect to criminal offenses or civil causes of action, or with respect to both, shall be

---

[6] The Tribe's expert witnesses included (*i*) Pilar Thomas, Esq., former Deputy Solicitor for Indian Affairs at the U. S. Department of Interior, and former Deputy Director of the Office of Indian Energy Policy and Programs at the U. S. Department of Energy; (*ii*) Kevin Gambrell, former Regional Director of the Federal Indian Minerals Office, U.S. Department of Interior; (*iii*) Michael Wozniak, Esq., an oil-and-gas attorney; (*iv*) Robert J. Miller, professor of law at the Sandra Day O'Connor College of Law at Arizona State University; (*v*) Alexander Skibine, professor of law at the University of Utah S. J. Quinney College of Law; and (*vi*) Ronald L. Seigneur, Seigneur Gustafson LLP, a Certified Public Accountant.

[7] *Lawrence*, 312 F. Supp. 3d at 1247.

[8] The Tribe asks the Court to take judicial notice of the Tribe's briefs to the Tenth Circuit in *Ute Indian Tribe v. Lawrence*, appeal number 18-4013, which is available through Pacer at https://pacer.login.uscourts.gov/ (last visited on 10/8/2018).

**APPENDIX PAGE 10**

applicable in Indian country only where (i) an Indian tribe has waived sovereign immunity, or (ii) the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults.

Judge Waddoups then "judicially rewrote" the Utah analogue to 25 U.S.C. § 1326 to make the same revision, as indicated in the yellow highlighting below:

State jurisdiction acquired … pursuant to this chapter … shall be applicable in Indian country only where (i) an Indian tribe has waived sovereign immunity, or (ii) the enrolled Indians residing with the affected area of the Indian country accept state jurisdiction … by a majority vote of the adult Indians voting at a special election held for that purpose.

42.   Judge Waddoups then ruled that the waiver of sovereign immunity and choice of law clauses under Mr. Becker's contract with the Tribe were the practical equivalent of tribal consent to state court jurisdiction under 25 U.S.C. § 1326 and Utah Code Ann. § 9-9-202, as he had judicially rewritten those two statutes.[9]

43.   By this time, however, the Ute Indian Tribal Court had already invalidated both the Becker contract and the Tribe's purported waiver of sovereign immunity, ruling that the Tribal council's action in approving the Becker contract was illegal and ultra vires in violation of proscriptions contained in the Tribe's constitution, federal corporate charter, and tribal Code.  ECF 108 and 108-1, 2:16-cv-579.

44.   Neither the U.S. Constitution nor any act of Congress authorizes federal judges to adjudicate issues of tribal law.[10]  Nonetheless, Judge Waddoups ignored that constraint on his judicial powers and ruled—in direct contravention of the Ute Indian Tribal Court's ruling—that both the Becker contract and the Tribe's purported waiver of sovereign immunity are legal under the Tribe's tribal law.[11]

---

[9] See ECF 136, p. 81, 2:16-cv-579 ("[T]he state court has subject matter jurisdiction over the parties' claims because Utah accepted the federal government's offer of jurisdiction in 25 U.S.C. § 1322(a), because the Tribe selectively waived its sovereign immunity … under tribal law."

[10] "[N]either, under the Constitution or the laws of Congress, do the Federal courts have jurisdiction of tribal laws or regulations."  Native American Church v. Navajo Tribal Council, 272 F.2d 131, 135 (10th Cir. 1959).

[11] See ECF 136, pp. 62-81, 2:16-cv-579.

11

**APPENDIX PAGE 11**

**Judge Waddoups' Unfounded and Unfair Criticisms of the Tribal Court's**

**American Indian Judge and the Tribe's American Indian Attorneys**

45. Judge Waddoups' 83-page slip opinion in *Lawrence* contains multiple unnecessary and baseless criticisms of the Ute Indian Tribal Court Judge and the Tribe's two female attorneys, all three of whom are American Indians. Tribal Court Judge Terry Pechota is an enrolled member of the Rosebud Sioux Tribe; tribal attorney Frances C. Bassett is an enrolled member of the Cherokee Nation; and tribal attorney Thomasina Real Bird is an enrolled member of the Yankton Sioux Tribe.

46. Tribal Judge Terry Pechota is a former U. S. Attorney for the State of South Dakota, and is among the first thirteen American Indian attorneys to have argued before the U.S. Supreme Court.[12] Kristen A. Carpenter and Eli Wald, *Lawyering for Groups: The Case of American Indian Tribal Attorneys*, 81 FORDHAM L. REV. 3085, 3107 (2013).[13]

47. This declaration will describe herein some, though not all, of Judge Waddoups' unnecessary and baseless criticisms of Judge Pechota and the Ute Tribe's American Indian attorneys in his decision in *Lawrence*.

48. Judge Waddoups denied comity to Judge Pechota's summary judgment rulings on grounds that fail to withstand scrutiny. For instance, *without citation to any authority*, Judge Waddoups asserted that Tribal Court Judge Pechota erred in deciding the issue of tribal court jurisdiction based on the Tribe's 2013 jurisdiction ordinance:

> [T]he February 28 [tribal court] Opinion is silent on the fact that Ordinance 13-010 was not enacted until March 27, 2013 …. [record cite omitted] While Ordinance 13-010 could be relevant if the issue was whether the Tribal Court has jurisdiction over a contract with a non-Indian that arose after March 27, 2013, the [tribal court] Opinion does not mention that Ordinance 87-04 governed between November 16, 1987 and March 27, 2013—which includes the time period when Becker worked for the Tribe and the Independent Contractor Agreement was executed. [record cite omitted][14]

---

[12] App. 130-31.  The Tribe asks the Court to take judicial notice of Judge Pechota's website, http://pechotalawrc.com/, (last visited on 10/9/2018), and *NARF Attorneys Among "The First Thirteen,"* available on the website for the Native American Rights Fund, https://www.narf.org/narf-attorneys-among-the-first-thirteen/ (last visited on 10/9/2018).

[13] App. 134 .  Available at http://scholar.law.colorado.edu/articles/95 (last visited on 10/9/2018).

[14] ECF 136, 2:16-cv-579, p. 34; *Lawrence*, 312 F. Supp. 3d at 1241.

**APPENDIX PAGE 12**

49. Judge Waddoups was wrong on both the facts and the law.[15]  The reason why the February 28 [tribal court] Opinion was silent on Ordinance 13-010 was because the Tribal Court had *already* considered, and rejected, Mr. Becker's challenge to the application of Ordinance 13-010.  Judge Waddoups was also incorrect on the law.  It is well established that amendments to jurisdictional statutes are procedural, not substantive.  Therefore, Ordinance 13-010, enacted on 3/27/2013 was *fully applicable* to the Tribe's suit against Becker, which was not filed until August 18, 2016—more than three years *after the Tribe enacted Ordinance 13-010 on 3/27/2013. See, e.g., Andrus v. Charlestone Stone Products Co.*, 436 U.S. 604 (1978) (enactment of jurisdictional statute applied to pending case); *Andrus v. Charlestone Stone Products Co.*, 436 U.S. 604 (1978) (amendment of jurisdictional statute applied to pending case); *Smith v. Putnam*, 250 F. Supp. 1017 (D. Colorado 1965) (1965 amendment to state's long-arm statute applied to accident that occurred prior to the 1965 amendment).

50. Judge Waddoups' published decision in *Lawrence* criticizes the Tribe's attorneys as follows:

> "[I]t has been difficult for the court to rule, on an expedited basis, on a motion supported by over 5,000 pages of generally dense materials without a frank and straightforward explanation of how the materials support the requested relief.  The court has had to scour the dockets of the three other cases for explanations that counsel for the tribal parties, in particular, did not offer here— even when expressly asked to do so at oral argument and despite it being their burden to do so on a motion for preliminary injunction.  Finally, key pages in dispositive documents happen to be missing from the tribal parties' appendix.[16]

51. Each of the foregoing criticisms—all directed at the Tribe's American Indian attorneys—is unwarranted to the mind of the Tribe and its attorneys.  Significantly, nowhere in Judge Waddoups' decision is there *any* similar criticism of the Tribe's non-Indian adversaries and their attorneys.  I will address each of Judge Waddoups' criticisms in turn.

52. The Tribe's motions for injunctive relief in 2:16-cv-579 were filed on December 7, 2017.  ECF nos. 52, 53, 54 and 57.  The Tribe made clear that it sought expedited consideration solely on the TRO component of the motions.  Then, for the next 71 days, Judge Waddoups refused to even consider (nor presumably read), or rule on the Tribe's motions, until after he was ordered to do so by the Tenth Circuit on February 16, 2018.  ECF 81.  Thereafter, on the Tribe's motion, Judge Waddoups entered a TRO pending an evidentiary hearing scheduled for February 28, 2018.  ECF – 85.

---

[15] Parenthetically, the question of applicability of Ordinance 13-010 was a question of tribal law, beyond the reach of Judge Waddoups' constitutional authority under Article III.  U.S. CONST. ART. III, § 2, cl. 1.  *Native American Church v. Navajo Tribal Council*, 272 F.2d at 135.

[16] ECF 136, 2:16-cv-579, pp. 44-45; *Lawrence*, 312 F. Supp. 3d at 1247-48.

**APPENDIX PAGE 13**

53. At the hearing on 2/28/2018, attorneys for all parties stipulated to the TRO remaining in effect until Judge Waddoups had considered and processed the evidentiary materials. The parties' stipulation to a continuation of the TRO was noted in Judge Waddoups' minute entry for the hearing:

> The court ordered and the parties agreed that the temporary restraining order enjoining the state court action would be extended in place until the court can issue its written opinion. … The court reserved the right to request additional briefing. ECF 106.

54. Given the parties' stipulation, there was no need for Judge Waddoups to expedite his decision and ruling. Nor did Judge Waddoups avail himself of the opportunity to request additional briefing from the parties.

55. Judge Waddoups' complaint about "*key pages in dispositive documents*" being missing is especially misleading. The Tribe believed that the only dispositive document in 2:16-cv-579 was the Independent Contractor Agreement between the Tribe and Mr. Becker. In the estimation of the Tribe's attorneys, additional documents—related to oil-and-gas transactions that Becker had negotiated during his work for the Tribe—were merely "background materials." To avoid a voluminous record, the Tribe attached only excerpts from those documents, however, the Tribe **offered to produce a complete copy of any document requested by Judge Waddoups**:

> To avoid an unduly voluminous appendix, some of the exhibits (commercial instruments that pertain to Ute Energy LLC and Ute Energy Holdings LLC), are limited to excerpts from the instruments. If [the] Court wishes to review a complete copy of any commercial instrument that is included in a condensed form in the appendix, Plaintiffs [the Tribe] are happy to provide the Court with a complete copy of that instrument. ECF 53, p. 1.

56. Therefore, Judge Waddoups' complaint of "*key pages in dispositive documents*" being missing is both unfounded and egregiously unfair to the Tribe's attorneys.

### Judge Waddoups' Improper Use of Judicial Notice

57. In the Memorandum Decision and Order in 2:16-cv-579, Judge Waddoups *sua sponte* took judicial notice of *unproven allegations* contained in a complaint filed in a wholly unrelated lawsuit to which the Tribe is not a party, *Newfield Prod. Co. v. Crescent Point Energy U.S. Corp.*, 2:17-cv-1064—a case that was assigned to Judge Waddoups. (*Newfield* case) ECF 136, p. 43 n.33. *Lawrence*, 311 F. Supp. 3d at 1247 n.33.

58. Judge Waddoups's extended discursive flowing from his judicial notice of the *Newfield* case offers valuable insight into Judge Waddoups' profound bias against the

14

**APPENDIX PAGE 14**

Ute Tribe.   Judge Waddoup's discursive—contained within footnote 33—runs to 387 words.

59.   In it, Judge Waddoups stated that the *unproven allegations* in the *Newfield* complaint "*do not give the court confidence in the tribal parties' assertions that the oil and gas ventures begun in the transactions at issue in this action were a failure.*"   ECF 136, p. 43 n.33 (emphasis added).   This statement is troubling on multiple grounds.

60.   First, the only "transaction at issue" in 2:16-cv-579 was the legality of the contract between Becker and the Ute Tribe.   No issue was presented as to the oil/gas transactions to which Ute Energy LLC was a party.

61.   Secondly, the only attribution Judge Waddoups' cited as the source of the "*tribal parties' assertions*" was the Tribe's Expedited Motion for Summary Judgment and for Interim and Permanent Injunctions on Grounds of Illegality under Federal and Tribal law, Infringement on Tribal Sovereignty, and Federal Preemption, ECF 53.   However, nowhere in that motion did the Tribe claim that transactions to which Ute Energy LLC was a party were a "failure."

62.   Third, Rule 201(b)(2) of the Federal Rules of Evidence restricts the scope of information that can be judicially noticed.   Judicial notice is limited to "facts" whose accuracy is "not subject to reasonable dispute," that is, where the accuracy of the facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."   It is axiomatic that unproven allegations contained in a complaint in a lawsuit to which the Tribe is not a party are not "facts" that are properly subject to judicial notice under Evidence Rule 201(b)(2).

63.   Therefore, in footnote 33 in *Lawrence*, Judge Waddoups improperly took notice of materials that are not properly subject to judicial notice.   He did so for the stated purpose of questioning, and thus, undermining, the credibility of the Ute Indian Tribe in a court decision that Judge Waddoups purposefully drafted for publication.

64.   In footnote 37, ECF 136, Judge Waddoups stated that Becker's contract and other transactional documents had been drafted by the Tribe's former attorneys, the Colorado law firm of Davis Graham & Stubbs.   Judge Waddoups then added that, "[t]his is an experienced law firm that specializes in Indian law and oil and gas law."   That statement exceeded the scope of permissible judicial notice under Evidence Rule 201(b)(1) because judicial notice is limited to facts "generally known within the trial court's territorial jurisdiction."   David Graham & Stubbs is a law firm located in Colorado—beyond the territorial scope of facts within Judge Waddoups' purview.[17]

---

[17] See the Davis Graham & Stubbs website, https://www.dgslaw.com/ (last visited on 10/8/2018).

15

**APPENDIX PAGE 15**

## **Judge Waddoups' Apparent Aversion to the term "Federal Indian Law"**

65.  In 1942, the United States Department of Interior published a book captioned Handbook of Federal Indian Law."[18]  The book was authored by legal scholar Felix S. Cohen, who explained that the field of Federal Indian law is defined by:

> … the legal questions that are involved in a case.  Where such questions turn upon rights, privileges, powers, or immunities of an Indian or an Indian tribe or an administrative agency set up to deal with Indian affairs, or where governing rules of law are affected by the fact that a place is under Indian ownership or devoted to Indian use, the case that presents such questions belongs within the confines of [Federal Indian law].[19]

66.  The Handbook of Federal Indian Law has been continually updated and revised, and is quoted frequently by the United States Supreme Court and a host of lower federal and state courts; the Handbook is recognized as the preeminent reference on Federal Indian law.

67.  Judge Waddoups appears to be averse to recognizing Federal Indian law as a distinct field of law, as the following colloquy with the Tribe's counsel at the 2/28/2018 hearing in *Lawrence*, 2:16-cv-579, indicates:

| | |
|---|---|
| Judge Waddoups | So [25 U.S.C.] § 177 really becomes irrelevant because there is no contention that there is a treaty or some other act other than the specific acts you have referred to? |
| Tribe's Counsel | I think the way that our experts have explained it to us, their understanding is that if [federal] approval was not required under IMDA [Indian Mineral Development Act], Mr. Becker's contract would be subject to § 177. |
| Judge Waddoups | That is your legal experts. |
| Tribe's Counsel | Indian law experts, yes, Your Honor. |
| Judge Waddoups | Yeah.  But it wouldn't be a question of Indian Law, it would be a question of federal law. |

---

[18] Felix S. Cohen, Handbook of Federal Indian Law (1st ed. 1942).

[19] *Id.* at 1.

**APPENDIX PAGE 16**

<u>Tribe's Counsel</u>     Dealing with Indians, yes.  Federal law dealing with Indians.[20]

### Judge Waddoups' Curious Inaction on the Tribe's

### Motion for Default Judgment in this case

68.  The Tribe's complaint in this case was filed on April 17, 2018, and the case was assigned to Judge Waddoups.  <u>ECF 2</u>.

69.  Defendants were served with process on May 8, 2018, making their response to the complaint due on May 29, 2018.  Fed.R.Civ.P. 12(a)(1)(A)(1).  Defendants failed to file a timely response, or to seek an extension of time for doing so.

70.  On June 4, 2018, the Tribe made application for entry of a default judgment supported by a requisite affidavit.  <u>ECF 18</u>.  Rule 55(a) of the Federal Rules of Civil Procedure states:

> When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk <u>must enter the party's default</u>.  (underscore added)

71.  No entry of default, or default judgment, was made upon the Tribe's proper application.  The Tribe's attorney called the Court Clerk's Office several times to inquire into the status of the default application.  Each time the Clerk's Office advised the Tribe's attorneys that the default application had been submitted to Judge Waddoups.

72.  On July 10, 2017, Defendants filed an untimely answer to the Tribe's complaint.  ECF 20.  In doing so, Defendants did not file either (*i*) a motion for leave to file an untimely answer, or (*ii*) a response to the Tribe's application for default judgment.

73.  On August 15, 2018, the Court Clerk's Office entered an order denying the Tribe's application for default judgment.  The order states that "there is no prejudice to [the Tribe] as a result of the delay."  However, the record is utterly devoid of any factual support for the Clerk's statement that "there is no prejudice to [the Tribe] as a result of the delay."

---

[20] Appendix 129, excerpt from transcript from the 2/28/2018 injunction hearing in case no. 2:16-cv-579.

**APPENDIX PAGE 17**

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 9th day of October, 2018.

Frances C. Bassett

**APPENDIX PAGE 18**

**Frances Bassett**

| | |
|---|---|
| **From:** | utd_enotice@utd.uscourts.gov |
| **Sent:** | Thursday, November 04, 2010 4:14 PM |
| **To:** | ecf_notice@utd.uscourts.gov |
| **Subject:** | Activity in Case 2:06-cv-00557-CW Ute Indian Tribe of the Uintah and Ouray Reservation et al v. Ute Distribution Corporation et al Order on Motion to Alter Judgment |

**This is an automatic e-mail message generated by the CM/ECF system. If you need assistance, call the Help Desk at (801) 524-6851.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* There is no charge for viewing opinions.**

### Electronic Case Filing System

### District of Utah

### Notice of Electronic Filing

The following transaction was entered on 11/4/2010 at 4:14 PM MDT and filed on 11/4/2010

| **Case Name:** | Ute Indian Tribe of the Uintah and Ouray Reservation et al v. Ute Distribution Corporation et al |
|---|---|
| **Case Number:** | 2:06-cv-00557-CW |
| **Filer:** | |
| **WARNING: CASE CLOSED on 03/25/2010** | |
| **Document Number:** | 145 |

**Docket Text:**
**MEMORANDUM DECISION denying [137] Motion to Alter Judgment/ Reconsiderand ordered Plaintiff's counsel under Fed. R. Civ. P 11(c)(3) to show cause why they should not be sanctioned and ordered to pay Defendant's costs regarding this motion, pursuant to 11(b)(1)-(3). Counsel is to respond accordingly within ten days of this order.** Signed by Judge Clark Waddoups on 11/4/2010. (jtj)

**2:06-cv-00557-CW Notice has been electronically mailed to:**

Shawn E. Draney intakeclerk@scmlaw.com, sdraney@scmlaw.com

J. Preston Stieff jpslaw@qwestoffice.net

Max D. Wheeler intakeclerk@scmlaw.com, mdw@scmlaw.com

Camille N. Johnson cjohnson@scmlaw.com, intakeclerk@scmlaw.com

Judith D. Wolferts intakeclerk@scmlaw.com, jdw@scmlaw.com

Thomas W. Fredericks tfredericks@ndnlaw.com, mdouville@ndnlaw.com

**APPENDIX PAGE 19**

Thomas W. Fredericks (Pro Hac Vice Admission)
Frances C. Bassett (Pro Hac Vice Admission)
Todd K. Gravelle (Pro Hac Vice Admission)
Carla J. Hoke (Pro Hac Vice Admission)
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO  80027
Telephone:  303-673-9600
Fax:  303-673-9155
Email:  tfredericks@ndnlaw.com
          fbassett@ndnlaw.com
          tgravelle@ndnlaw.com
          choke@ndnlaw.com

J. Preston Stieff, Bar No. 4764
J. PRESTON STIEFF LAW OFFICES
136 East South Temple, Ste. 2400
Salt Lake City, UT  84111
Telephone:  (801) 366-6002
Fax:  (801) 366-6007
Email:  jpslaw@qwestoffice.net

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, | |
| Plaintiff, | **PLAINTIFF UTE INDIAN TRIBE'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE** |
| v. | |
| UTE DISTRIBUTION CORPORATION and UTE DISTRIBUTION CORPORATION BOARD OF DIRECTOR MEMBERS LOIS LAROSE, CHARLES DENVER, LYNN MCLURE, PALA NELSON and REBECCA CURRY, in their individual and official capacities, | Civil Case No. 2:06-cv-557-CW-DN<br><br>District Judge Clark Waddoups<br>Magistrate Judge David Nuffer |
| Defendants. | |

The Plaintiff Ute Indian Tribe of the Uintah and Ouray Reservation ("Ute Tribe or the Tribe") respectfully responds to the Court's order to show cause issued on November 4, 2010.  Doc. 145.

## SUMMARY OF THE RESPONSE

The Tribe, through its undersigned counsel, acted in good faith in seeking a reconsideration of the court's Memorandum Decision and Order of March 12, 2010. The Tribe's motion for reconsideration was not filed for any improper purpose, and the grounds on which the Tribe sought reconsideration were not objectively frivolous or unreasonable.  Therefore, sanctions are not warranted under Rule 11.

I.  **THE TRIBE ACTED IN GOOD FAITH IN SEEKING RECONSIDERATION AND THE GROUNDS ON WHICH IT SOUGHT RECONSIDERATION ARE WELL WITHIN ESTABLISHED PARAMETERS FOR MOTIONS TO RECONSIDER.**

Rule 59(e) authorizes a motion to alter or amend a judgment after its entry. Although reconsideration of a judgment is an extraordinary remedy, appellate courts also emphasize that 59(e) motions are an efficient mechanism for correcting an otherwise erroneous judgment without resort to the appellate process.  *E.g., Divane v. Krull Elec. Co.*, 194 F.3d 845, 848 (7th Cir. 1999); *Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.*, 690 F.2d 1240 (9th Cir. 1982).  *See generally* 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (2d ed.).

A Rule 59(e) motion is proper when, as here, a trial court has decided a case on grounds "outside the adversarial issues presented to the court by the parties." *United States of America v. Ibarra*, 920 F.2d 702, 706 n 3 (10th Cir. 1990), *rev'd on other*

2

## APPENDIX PAGE 21

grounds, 502 U.S. 1 (1991); *Gregg v. Am. Quasar Petroleum Co.*, 840 F. Supp. 1394, 1401 (D. Colo. 1993).

Under Tenth Circuit precedent a Rule 59(e) motion is also proper when a court has "misapprehended the facts, a party's position, or the controlling law." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000), *see also Mantle Ranches, Inc. v. U. S. Park Service*, 950 F. Supp. 299, 302 (D. Colo. 1997).

The Tribe sought reconsideration of the court's Memorandum Decision largely because the decision upheld the validity of Amendment Three on grounds other than the adversarial issues advanced by the parties. In addition, the Tribe's motion was premised on what the Tribe perceived to be (*i*) the court's reliance on disputed issues of material fact; (*ii*) the court's misapprehension of applicable statutes, and (*iii*) the court's apparent overlooking of analogous case law and legal analyses that might have materially influenced the judgment. Each of these grounds is well-established and a legitimate basis for reconsideration under Rule 59(e).

### A. 59(e) Motions Are Proper When the Court Has Decided the Case Outside the Adversarial Issues Presented by the Parties

A 59(e) motion is proper when a court has decided the case on grounds "outside the adversarial issues presented to the Court by the parties." *United States of America v. Ibarra*, 920 F.2d at 706 n 3.

Here, the court upheld the validity of Amendment Three under the doctrine of corporate loyalty. Doc. 135, pp. 9-15. However, neither of the parties had litigated the validity of Amendment Three on this ground under either of the cross-motions for summary judgment. Further, in deciding the case on this basis, the court relied on legal

3

authorities that were never cited to the court by either party.  The only opportunity the Ute Tribe had to respond to this new issue—and these new legal authorities—was in a motion to reconsider.[1]  It is axiomatic that notice and an opportunity to be heard are the most basic requisites of procedural due process.

"The Federal Rules of Civil Procedure are designed to further the due process of law that the Constitution guarantees." *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000).  Here, the court never notified the Tribe of the court's intent to validate Amendment Three under the doctrine of corporate loyalty and on the basis of the legal authorities cited in the court's Memorandum Decision and Order.  Doc. 135, pp. 9-15.  Under the proposed amendments to Fed. R. Civ. P. 56,[2] courts on summary judgment motions will be required to provide notice "and a reasonable time to respond" if the court intends to grant summary judgment on grounds other than those advanced by the parties.  While this rule was not in effect on March 10, 2010, when the court's Memorandum Decision and Order was entered, nonetheless the amendment suggests a recognition on the part of the Advisory Committee on Civil Rules that basic due

---

[1] Although this ground was not specifically mentioned in the Tribe's motion to reconsider, undersigned counsel has reviewed the summary judgment pleadings in order to place the arguments the Tribe's attorneys made in the motion to reconsider in proper context.  Undersigned counsel states that upon receiving the Memorandum Decision and Order, Doc. 135, the Tribe's attorneys were surprised to see the basis on which the court had validated Amendment Three, and were also surprised to see the authority cited by the court in that portion of the Decision.  Undersigned counsel verified that neither party litigated the validity of Amendment Three under the doctrine of corporate loyalty; the first time the Tribe's counsel saw the cases cited by the court was in the Memorandum Decision and Order; and undersigned counsel received no notice the court intended to resolve the validity of Amendment Three on this basis.

[2] The amendments to Rule 56 will become effective December 1, 2010, absent contrary Congressional action.

4

process requires that parties be afforded notice and an opportunity to be heard when a court intends to grant summary judgment on grounds not advanced by the parties.

In this case, none of the cases cited by the court in the Memorandum Decision addressed the core adversarial issue the Tribe had advanced in its summary judgment motion—which was whether Article Three could be amended without conducting a class vote on the amendment pursuant to UTAH CODE ANN. § 16-6a-1004.  *See* Doc. 138, pp. 6-7.

The Tribe's motion to reconsider this portion of the court's decision was made in good faith.  Good faith existed because the Tribe never had a meaningful opportunity as contemplated under the proposed revisions to Rule 56, proposed Fed. R. Civ. P. 56(f), to address the cases relied upon by the court or the court's invocation of the doctrine of corporate loyalty to validate Amendment Three.  *United States of America v. Ibarra*, 920 F.2d at 706 n 3; *Gregg v. Am. Quasar Petroleum Co.*, 840 F. Supp. at 1401; proposed Fed.R.Civ.P. 56(f); *Nelson v. Adams USA, Inc.*, 529 U.S. at 465.

### B.   59(e) Motions Are Proper When Summary Judgment is Entered Notwithstanding the Existence of Disputed Issues of Fact

A 59(e) motion is proper when a court has granted summary judgment despite the existence of disputed issues of material fact.  A case in point is *Motor Vehicle Mfrs. Ass'n of the U. S., Inc. v. N.Y. State Dept. of Environmental Conservation*, 831 F. Supp. 57 (N.D.N.Y. 1993), *aff'd in part, rev'd in part on other grounds*, 17 F.3d 521 (2nd. Cir. 1994).  On a motion to reconsider in *Motor Vehicle Mfrs.*, the court agreed that disputed issues of fact precluded summary judgment, and the court conceded that the court had misperceived the factual dispute in its original ruling:

5

**APPENDIX PAGE 24**

Having reviewed the papers submitted on the original cross-motions for summary judgment, the Court finds that this earlier ruling was in error. Affidavits submitted by Defendants' experts disputed the conclusions reached by Plaintiffs' experts as to the degree and nature of the effects which higher levels of sulfur would have on the emission control systems. Although the Court has earlier ruled that the degree of such effect is irrelevant, on reconsideration the Court finds that the **nature and degree** of this effect are significant to, and indeed controlling factors in, a determination on count two of the complaint. Therefore, because there are material questions of fact remaining on count two of the complaint which cannot be resolved on motions for summary judgment, both Defendants' and Plaintiffs' motions for summary judgment should have been denied. (emphasis in original)

*Motor Vehicle Mfrs. Ass'n*, 831 F. Supp. at 61.

Here, in upholding the validity of Amendment Three under the doctrine of corporate loyalty, the court's Memorandum Decision rested on the existence of "conflicts of interest between the Ute Tribe and the UDC." Doc. 135, p. 13. Although the Tribe presented contrary evidence, and although the Tribe disputed the UDC's allegations of "inherent" and irreconcilable conflicts, the court found that "the *UDC has presented* substantial *evidence supporting a rational concern that there have been and continue to be conflicts of interest between the Ute Tribe and the UDC.*" Doc. 135, p. 13 (emphasis added). The court's use of the word "substantial" suggested to the Tribe that the court had weighed the evidence, and it is not the role of a court to weigh the evidence on a motion for summary judgment. *True v. United States*, 190 F.3d 1165, 1176 (10th Cir. 1999).

Summary judgment is also improper when the resolution of a legal issue turns on questions of a party's mental state, motivation, good or bad faith. *See generally* 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL

**APPENDIX PAGE 25**

PRACTICE AND PROCEDURE § 2730 (2d ed.).  Here there was conflicting evidence and conflicting inferences to be drawn on the issue of whether the conflicts between the Tribe and the UDC—as alleged by the UDC—were "*ongoing and serious*"—as found by the court, Doc. 135, p. 7—or whether the conflicting interests were situational and passing, as presented by the Tribe.  In turn, the nature, extent, and degree of the conflicting interests—and the circumstances giving rise to specific conflicts—would obviously determine whether the UDC's concerns were "*rational*"—as found by the court, Doc. 135, p. 13—or whether the UDC's concerns were contrived, exaggerated, or irrational.  *See, e.g., Motor Vehicle Mfrs. Ass'n*, 831 F. Supp. at 61 (where there is a dispute in the evidence concerning the nature, degree, and severity of a condition, the disputed evidence presents a question of material fact for the jury's resolution).

The Tribe had no reasonable opportunity to address questions such as these in relation to the legal doctrine of corporate loyalty because, as explained above, the Tribe did not anticipate that the court would enter summary judgment on a legal theory not advanced by either party.

The Tribe's motion to reconsider this portion of the court's decision was made in good faith.  Good faith existed because the Tribe never had a meaningful opportunity to address the evidence produced by the parties as that evidence related to the doctrine of corporate loyalty and, in turn, whether the doctrine of corporate loyalty provided a legal basis for validating Amendment Three.  *United States of America v. Ibarra*, 920 F.2d at 706 n 3; *Gregg v. Am. Quasar Petroleum Co.*, 840 F. Supp. at 1401; proposed Fed.R.Civ.P. 56(f); *Nelson v. Adams USA, Inc.*, 529 U.S. at 465.

7

**APPENDIX PAGE 26**

## C.  59(e) Motions Are Proper to Correct Legal Error

A 59(e) motion is proper when a judgment is premised upon a misapprehension of applicable law.  *See, e.g., Servants of Paraclete v. Does*, 204 F.3d at 1012; *Pelt v. Utah*, 611 F. Supp.2d 1267, 1276-1277 (D. Utah 2009); *Walker v. McCaughtry*, 72 F. Supp.2d 1025, 1034 (E.D. Wis. 1999).

Sometimes the applicable law is not clear.  Other times a case involves questions of first impression, as the instant case does.  In such cases 59(e) motions are clearly appropriate as illustrated by the case of *Atlantic States Legal Foundation, Inc. v. Krag Bros., Inc.*, 841 F. Supp. 51 (N.D.N.Y. 1993).  The Tribe cites to *Atlantic States* because of the obvious parallels between *Atlantic States* and the case at bar.  Both cases involved cross-motions for summary judgment.  And both cases required the trial court to interpret a controlling statute *as a matter of first impression*.  In the case at bar the court was required to interpret UTAH CODE ANN. §§ 16-6a-102(8)(a) and 16-6a-1004 for the first time; in *Atlantic States* the court was required to interpret provisions of the Clean Water Act as a matter of first impression.

The trial court in *Atlantic States* originally entered summary judgment in favor of the defendant on the ground that the plaintiffs lacked standing.  The plaintiffs sought reconsideration, challenging not only the trial court's ruling on standing, but—like the Ute Tribe here—the *Atlantic States* plaintiffs went further, arguing that summary judgment should have been entered in their favor, instead of the defendant's favor.  The trial court granted the plaintiffs' 59(e) motion on *both* grounds.  The court not only reversed its ruling on standing, but also vacated the summary judgment in the

8

**APPENDIX PAGE 27**

defendant's favor, and instead entered partial summary judgment in favor of the plaintiffs.  The court did so after reevaluating its legal analysis:

> Based upon a clearer understanding of . . . [applicable statutes], the court now finds that it was error to rule that plaintiffs' injuries are not fairly traceable to the defendant's allegedly unlawful conduct. . . . Reconsideration is warranted where, as here, a party demonstrates that the earlier ruling was premised upon a misunderstanding of a relevant regulatory scheme.

*Atlantic States Legal Foundation, Inc.*, 841 F. Supp. at 55.  Like the plaintiffs in *Atlantic States*, the Ute Tribe here requested reconsideration of the court's interpretation of a regulatory statute, UTAH CODE ANN. § 16-6a-1004.  The Tribe did so believing the court's statutory construction was based on a misapprehension of the statutory language and applicable law.  This is an established and legitimate ground for reconsideration.  *Id.* The substance of the Tribe's reconsideration motion is discussed more fully under Section D below.

**D.  59(e) Motions are Proper if the Court Has Overlooked Material Matters or Law**

Motions under Rule 59(e) are also proper if a court has overlooked applicable law or considerations that could have materially influenced the court's decision had they not been overlooked .  A case in point is *Motor Vehicle Mfrs. Ass'n of the U. S., Inc. v. N.Y. State Dept. of Environmental Conservation*, 831 F. Supp. 57, cited under Section B above.  The Tribe cites *Motor Vehicle Mfrs.* because of the obvious parallels between *Motor Vehicle Mfrs.* and the case at bar.  Like both *Atlantic States* and the case here, *Motor Vehicle Mfrs.* is a case in which the parties had filed cross-motions for summary judgment.

The court in *Motor Vehicle Mfrs.* originally granted partial summary judgment in favor of the plaintiffs on some counts, and partial summary judgment in favor of the defendants on other counts. The defendants filed a motion to reconsider the partial summary judgment in the plaintiffs' favor under four of the counts. The *Motor Vehicle* court methodically evaluated reconsideration under each of the four separate counts, and then modified its judgment on two of the four counts. *Motor Vehicle Mfrs. Ass'n v. N.Y.*, 831 F. Supp. at 61-66.

As the Tribe did here, the defendants in *Motor Vehicle Mfrs.* argued for reconsideration on grounds, *inter alia*, that the court had misapprehended the governing statute, which in *Motor Vehicle* was the Clean Air Act and its implementing regulations. *Id.* at 62. In discussing the defendants' arguments for reconsideration, the court said:

> The matter now being raised by Defendants, although not squarely presented on the cross-motions for summary judgment, was one not fully considered by the Court in its original decision, and in retrospect would have materially altered the prior decision.

*Id.* at 63.

Another apposite case is *Ciena Corp. v. Corvis Corp.*, 352 F. Supp.2d 526 (D. Delaware 2005). The plaintiff in *Ciena* asked the court to reconsider its evaluation of the facts on grounds, *inter alia*, that one of the defendant's legal defenses had "no merit." *Id.* at 528. The *Ciena* court granted reconsideration based on the court's admission that the court had indeed misapprehended the legal effect of various actions taken by the defendant. *Id.* at 528-29.

**APPENDIX PAGE 29**

Similarly, in *Walker v. McCaughtry*, 72 F. Supp.2d at 1035, the district court granted a motion to reconsider on grounds the court had not "appreciated" the significance of controlling precedent the movant had earlier argued to the court.

As pertinent here, the Tribe sought reconsideration based, *inter alia*, on what the Tribe perceived to be the court's misapprehension of the legal effect of the UDC amendments, and the court's apparent overlooking—or failure to appreciate—entire segments of the Tribe's legal memorandum and supporting authorities.

The Tribe's motion advanced four separate, alternative legal grounds for summary judgment:

1) that the amended UDC Articles of Incorporation were invalid as a matter of law because the amendments were not adopted in a class election as statutorily mandated under UTAH CODE ANN. § 16-6a-1004, *see* Doc. 118-2, pp. 13-17;

2) that the amendments were invalid as a matter of law because they denied the Tribe of its right to vote and participate in corporate governance, and thereby unlawfully entrenched the existing Board of Directors, *see* Doc. 118-2, pp. 18-19;

3) that the amendment of the director qualifications was unreasonable as a matter of law, *see* Doc. 118-2, pp. 20-22; and

4) that the defendants violated their fiduciary duties as corporate directors by initiating and implementing the amendments to the Articles, *see* Doc. 118-2, pp. 18-19.

11

**APPENDIX PAGE 30**

The first two grounds are discussed separately below.

### 1.   The Tribe's Argument that Utah Law Mandated a Class Vote

In support of its argument that UTAH CODE ANN. § 16-6-a-1004 mandated a class vote on the amendments, the Tribe's memorandum in support of summary judgment cited the following legal authorities:

(*i*)  the Revised Model Nonprofit Corporation Act (1987), and the Official Comments to the Model Act;

(*ii*)  2 WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 283 (perm. ed. rev. vol. 2006);

(*iii*)  *Lake Arrowhead Chalets Timeshare Owners Assn. v. Lake Arrowhead Chalets Owners Ass'n.*, 51 Cal. App.4th 1403, 59 Cal. Rptr.2d 875 (Cal. Ct. App. 1996) (holding that amendment which gave timeshare and condominium owners different voting rights created two separate classes and was invalid for lack of class voting);

(*iv*)  *Howe v. Washington Land Yacht Harbor, Inc.*, 459 P.2d 798, 802, 805 (Wash. 1969) (differences in voting rights afforded lessees and non-lessees "created two classes of membership").

(*v*)  *Durkin v. National Bank of Olyphant*, 772 F.2d 55, 59 (3rd Cir. 1985) ("the unadorned right to cast a ballot . . . is meaningless without the right to participate in selecting the contestants");

(*vi*)  *AHI Metnall, L.P. v. J.C. Nichols Company*, 891 F.Supp. 1352, 1358 (W.D. Mo. 1995) ("the rights to nominate director candidates and propose business are integral components of a shareholder's right to vote"); and

12

**APPENDIX PAGE 31**

(*vii*) *Smith v. Koerber*, 352 F. Supp. 591, 595 (D. Md. 1972), *aff'd* 479 F.2d 1043 (4th Cir. 1973) (a shareholder's right to vote "for the directors . . . is a valuable and vested property right . . . . one of the most important rights incident to stock ownership"). Doc. 118-2, pp. 13-17.

The Tribe's legal argument on this point encompassed five (5) pages of its brief-in-chief. Doc. 118-2, pp. 13-17. The court's rejection of this argument consisted of one paragraph in its Memorandum Decision and Order. Doc. 135, pp. 14-15. The court's paragraph did not distinguish the Tribe's legal authorities. Nor did the court's decision cite any countervailing or opposing legal authorities. In pertinent part, the court's decision read:

> The UDC articles create a single class of stock. All shareholders enjoy the same right to vote on all issues. The UDC does not present a situation where the corporate structure includes different classes, such as common and preferred shares. *In such a case* the Utah statute precludes one class of shareholders from voting on changes to the corporate structure . . . . (emphasis added)

Doc. 135, pp. 14-15. The court therefore construed § 16-6a-1004 as limited in scope to corporations in which there exist multiple classes of stock "such as common and preferred shares." *Id*. The Tribe sought reconsideration on grounds that the court misapprehended the express language and intent and scope of 16-6a-1004. Doc. 138, pp. 5, 8-10. The Tribe sought to show that 16-6a-1004 contains no language limiting the statute to corporations in which there exist multiple classes of stock. Doc. 138, pp. 8-9. The Tribe noted the court's characterization of separate classes under 16-6a-1004 as possibly including classes of "common and preferred shares." Doc. 135, p. 14. The Tribe suggested a misapprehension of the statute based, *inter alia*, on the fact that

13

**APPENDIX PAGE 32**

typically preferred shares are *non-voting* shares that generally would not be voted under § 16-6a-1004.  As authority, the Tribe cited to FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5086 (perm. ed. rev. vol. 2006).  Doc. 138, p. 9.

The Tribe's motion to reconsider this portion of the court's decision was made in good faith.  Good faith existed based on what the Tribe perceived to be the court's overlooking, or misapprehension, of the legal authority cited by the Tribe on this point, Doc. 118-2, pp. 13-17.  In addition, or alternatively, good faith existed based on the omission from the court's Memorandum Decision and Order of any legal authority that opposed or contravened the Tribe's legal authority on this point.  Under these circumstances the Tribe could—and did—infer that the court had overlooked applicable law and/or considerations that might have materially influenced the court's decision if they had not been overlooked.  *Motor Vehicle Mfrs. Ass'n. v. N.Y.*, 831 F. Supp. at 63. The Tribe also inferred that the court had misapprehended the intent and scope of § 16-6a-1004.  These are established and legitimate grounds for a 59(e) motion to reconsider.  *Id.*; *Walker v. McCaughtry*, 72 F. Supp.2d at 1035; *Atlantic States Legal Foundation, Inc.*, 841 F. Supp. at 55; *see Servants of Paraclete v. Does*, 204 F.3d at 1012 (a motion to reconsider is proper if the court has "misapprehended the facts, a party's position, or the controlling law").

### 2. The Tribe's Argument that the Amendments Divested the Tribe of its Franchise and Unlawfully Entrenched the Existing Board of Directors

In support of its argument that the amendments disenfranchised the Tribe and entrenched the existing UDC Board of Directors, the Tribe's memorandum in support of summary judgment cited the following legal authorities:

14

**APPENDIX PAGE 33**

(*i*) 12B WILLIAM M. FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5754 (perm. ed. rev. vol. 2000);

(*ii*) *AHI Metnall, L.P. v. J.C. Nichols Company*, 891 F.Supp. at 1358 ("the rights to nominate director candidates and propose business are integral components of a shareholder's right to vote");

(*iii*) *MM Companies, Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1126, 1132 (Del. 2003) (enjoining the amendment of corporate bylaws because the "primary purpose" of the amendment was to "impede" and "interfere" with the shareholders' ability "to effectively exercise their voting rights");

(*iv*) *Holly Sugar Corp. v. Buchsbaum*, 1981 WL 1708 *7 (D. Colo. 1981) (enjoining a directors election because corporate management was "improperly employing the corporate machinery and by-laws to the advantage of incumbent management"); and

(*v*) *Schnell v. Chris-Craft Industries*, 285 A.2d 437, 439 (Del. 1971) (same as *Holly*).

The Tribe's legal argument under this ground encompassed two (2) pages of its brief-in-chief, Doc. 118-2, pp. 18-19. The court's rejection of this argument consisted of one paragraph in its Memorandum Decision and Order. That paragraph read in pertinent part:

> [T]he amendment does not limit or prescribe the rights of the Ute Tribe any differently than any other shareholder. The Ute Tribe continues to have the same right to nominate and vote as every other stockholder. Requiring persons nominated by any shareholder to meet qualifications does not disenfranchise those shareholders who do not meet the requirements.

15

**APPENDIX PAGE 34**

Doc. 135, pp. 13-14.   The court's paragraph did not distinguish the Tribe's legal authorities.   Nor did the court's decision cite any opposing or countervailing legal authorities.   The Tribe requested reconsideration on the ground that the court misapprehended the standard by which disenfranchisement must be evaluated.   The Tribe's motion suggested the standard employed by the court involved a "false equivalency." Doc. 138, pp. 9-11.  The Tribe argued that the standard employed by the court failed properly to assess the legal impact of Amendment Three by not evaluating the *pre*-amendment franchise rights of the Tribe, its tribal members, and affiliated individuals, as compared to the severe restriction on those shareholders' *post*-amendment franchise rights under the amendment.  Because this consideration is one that could have materially influenced the court's decision, it was a legitimate ground for a 59(e) motion to reconsider.  *E.g., Motor Vehicle Mfrs. Ass'n. v. N.Y.*, 831 F. Supp. at 63.

The Tribe's motion to reconsider this portion of the court's decision was made in good faith.   Good faith existed based on what the Tribe perceived to be the court's overlooking, or misapprehension, of the legal authority cited by the Tribe on this point, Doc. 118-2, pp. 18-19.   In addition, or alternatively, good faith existed based on the omission from the court's Memorandum Decision and Order of any legal authority that opposed or contravened the Tribe's legal authority on this point.   Under these circumstances the Tribe could—and did—infer that the court had overlooked applicable law and/or considerations that might have materially influenced the court's decision had they not been overlooked.  *E.g., Motor Vehicle Mfrs. Ass'n. v. N.Y.*, 831 F. Supp. at 63.

16

**APPENDIX PAGE 35**

The Tribe also inferred that the court had misapprehended the proper standard for evaluating disenfranchisement.   These are established and legitimate grounds for a 59(e) motion to reconsider.  *Id.*; *Pelt v. Utah*, 611 F. Supp.2d at 1276-1277; *Walker v. McCaughtry*, 72 F. Supp.2d at 1035; *Atlantic States Legal Foundation, Inc.*, 841 F. Supp. at 55; *see Servants of Paraclete v. Does*, 204 F.3d at 1012.

## II.   THE TRIBE AND ITS COUNSEL SHOULD NOT BE SANCTIONED UNDER FEDERAL RULE 11

A court may impose sanctions under Rule 11 if a party presents a pleading to the court for any improper purpose, or that, to the best of the party's knowledge, is not well grounded in fact, or warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.  Fed. R. Civ. P. 11(b); *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993).

Applying this standard to the Tribe's motion for reconsideration, the test is whether the Tribe acted with any improper purpose and whether the Tribe had a good faith basis for seeking reconsideration of the Memorandum Decision and Order.  The Tribe did not file its motion for reconsideration out of any improper purpose.  Further, the Tribe articulated above what it believes was a good faith basis for the motion, and the Tribe has cited legal authority for each basis on which reconsideration was requested.

The Tribe's attorneys understand that a good faith belief in the merit of an argument is not sufficient; the attorney's belief must also accord with what a reasonable, competent attorney would believe under the circumstances.  *White v. Gen. Motors Corp., Inc.,* 908 F.2d 675, 680 (10th Cir. 1990).  Therefore, on each of the grounds that

17

## APPENDIX PAGE 36

was not filed for any improper purpose, and the grounds on which the Tribe sought

reconsideration were not objectively frivolous.   Reasonable attorneys in similar

circumstances have filed motions to reconsider on the grounds sought by the Tribe's

attorneys here.   For these reasons, the Tribe's counsel believes sanctions are not

warranted under Rule 11.


Respectfully submitted this 12th day of November, 2010.


FREDERICKS PEEBLES & MORGAN
LLP

/s/ Frances C. Bassett
Thomas W. Fredericks (Pro Hac Vice
Admission)
Frances C. Bassett (Pro Hac Vice
Admission)
Todd K. Gravelle (Pro Hac Vice
Admission)
Carla J. Hoke (Pro Hac Vice Admission)
1900 Plaza Drive
Louisville, CO  80027
Telephone:  303-673-9600
Fax:  303-673-9155
 Email:  tfredericks@ndnlaw.com
        fbassett@ndnlaw.com
        tgravelle@ndnlaw.com
        choke@ndnlaw.com

Attorneys for Plaintiff

J. PRESTON STIEFF LAW OFFICES

J. Preston Stieff, Bar No. 4764
136 East South Temple, Ste. 2400
Salt Lake City, UT  84111
Telephone:  (801) 366-6002
Fax:  (801) 366-6007
Email:  jpslaw@qwestoffice.net

**APPENDIX PAGE 37**

FILED
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

2010 NOV 16  P 2: 05

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION, <br><br> Plaintiff, <br><br> v. <br><br> UTE DISTRIBUTION CORPORATION, et al. <br><br> Defendants. | **ORDER** <br><br> Case No.  2:06-CV-557-CW <br><br> Judge Clark Waddoups |

Having received counsel's brief pursuant to the order dated November 4, 2010, the court finds that although the motion to reconsider was not well-founded, it was well-intentioned. The court will, therefore, not impose sanctions. Motions to reconsider should be based upon a careful consideration of the grounds required for such a motion. The court will not entertain motions that essentially attempt to re-litigate previously considered arguments. To do so unnecessarily drains the resources of both parties, and the court.

DATED this 16th day of November, 2010.

BY THE COURT:

_Clark Waddoups_

Clark Waddoups
United States District Court Judge

1

**APPENDIX PAGE 38**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION


LYNN D. BECKER                    )
        Plaintiff,                )
                                  )
                                  )
     vs.                          )
                                  )
UTE INDIAN TRIBE OF THE           )
UINTAH AND OURAY                  )    Case No:  2:16CV958
RESERVATION, a federally          )
chartered corporation; et         )
al,                               )
                                  )
        Defendant,                )
_____


BEFORE THE HONORABLE CLARK WADDOUPS

September 14, 2016


*Kelly Brown Hicken*
Court Reporter
351 South West Temple, Rm 3.303
Salt Lake City, Utah  84101
(801)-521-7238

**APPENDIX PAGE 39**

```
 1

 2                    A P P E A R A N C E S

 3    FOR THE PLAINTIFFS:    ISOM LAW FIRM PLLC

 4                           BY: DAVID K. ISOM

 5                              Attorney at Law

 6                           299 SOUTH MAIN STREET, SUITE 1300

 7                           SALT LAKE CITY, UTAH  84111

 8

 9    FOR THE DEFENDANT:     J. PRESTON STIEFF LAW OFFICES

10                           BY: PRESTON STIEFF

11                              Attorney at Law

12                           110 SOUTH REGENT STREET, SUITE 200

13                           SALT LAKE CITY, UTAH  84111

14

15                           FREDERICKS PEEBLES & MORGAN LLP

16                           BY:  FRANCIS BASSETT

17                              JEFFREY RASMUSSEN

18                              Attorneys at Law

19                           1900 PLAZA DRIVE

20                           LOUISVILLE, COLORADO  80027

21

22

23

24

25
```

Kelly Brown Hicken, CSR, RPR

**APPENDIX PAGE 40**

```
          1          SALT LAKE CITY, UTAH, WEDNESDAY, SEPTEMBER 14, 2016

          2                         *   *   *   *   *

          3          THE COURT:  Good afternoon.  We are here in the matter

          4     of Becker vs. Ute Indian Tribe and others.  Case 2:16-CV-958.

16:15:48  5          Would counsel, please, state their appearance.

          6          MR. ISOM:  Your Honor, David Isom for the plaintiff Lynn

          7     Becker.

          8          MR. STIEFF:  Good afternoon, Your Honor.  Preston Stieff

          9     for the defendants.  Also for the defendants joining us by

16:16:02 10     phone are Mr. Jeff Rasmussen and Miss Francis Bassett, members

         11     of the law firm of Fredericks Peebles in Colorado.  They

         12     haven't been admitted pro hoc vici at this point, but we're

         13     hoping given the short nature of the proceeding today that the

         14     Court might allow them to participate.

16:16:22 15          THE COURT:  Welcome.  And for purposes of this

         16     proceeding you're admitted.  I hope that you can hear all

         17     right.

         18          MR. RASMUSSEN:  Yes, we can.  Thank you, Your Honor.

         19          THE COURT:  Thank you.

16:16:35 20          Mr. Isom, I have your motion for temporary

         21     restraining order and preliminary injunction.  I've read your

         22     motion.  I've read the verified complaint and the supporting

         23     documentation and some of the cases you've cited.  So you may

         24     proceed.

16:16:47 25          MR. ISOM:  Thank you, Your Honor.  Maybe I can compress
```

Kelly Brown Hicken, CSR, RPR

**APPENDIX PAGE 41**

```
 1                    Mr. Isom, will you undertake the burden of drafting

 2       an appropriate order that implements this?

 3            MR. ISOM:  I will, Your Honor.

 4            THE COURT:  Since the defendants have all appeared and

17:01:55 5       they are on notice of this ruling, the Court will order that

 6       the ruling take effect immediately, and no further action

 7       ought to be taken by the defendants to advance the litigation

 8       in the Tribal court.

 9            MR. RASMUSSEN:  Your Honor, we have a couple of

17:02:11 10      questions.

11            THE COURT:  There's a question of security.

12       Mr. Isom, or I want to hear from both sides as to whether

13       there is a reason to require the issuance of a bond.

14            MR. RASMUSSEN:  Yes, Your Honor, there certainly is.

17:02:27 15      This is a gross affront to the Tribe's sovereign authority and

16       the Tribal court's sovereign authority, and it is unjustified.

17       And that if we are to prevail on the appeal of this decision,

18       which we fully expect we would do, there will be a substantial

19       damage to the Tribe in the interim.  And now we are talking

17:02:52 20      about hundreds of hours of attorney time, but we are also

21       talking about a court that does not have the authority to do

22       it enjoining another court, but yet, allowing the state court

23       action to proceed.

24                 And so this court is putting its thumbs on the

17:03:09 25      scales and allowing the state court action to proceed but
```

**APPENDIX PAGE 42**

1    stopping the Tribal court action from proceeding when that is

2    an issue of comity.  So --

3        THE COURT:  Let me make one point very clear,

4    Mr. Rasmussen.  I specifically did not enjoin the Tribal

17:03:23  5    court.  I only enjoined the defendants in the action from

6    taking any actions before the Tribal court until this issue is

7    fully resolved.

8        MR. RASMUSSEN:  Okay.

9        THE COURT:  No one has requested that I take any action

17:03:37 10    with respect to any of the parties in the state court case

11    proceeding, so your point is not well taken.

12        MR. RASMUSSEN:  Well, so the Court is interfering with

13    the Tribe's sovereign authority here.  The plaintiff is

14    interfering with the Tribe sovereign authority.  We would ask

17:03:55 15    that they have to post a substantial bond that would be

16    available once the Tribe sovereign authority regarding this

17    matter is vindicated.  We would ask for at least $500,000 in

18    bond before any stay would go into effect.

19        THE COURT:  Provide me some factual basis as to why a

17:04:16 20    bond in that amount would be appropriate.

21        MR. RASMUSSEN:  This is a substantial issue of the

22    Tribe's sovereign authority.

23        THE COURT:  But that's not a basis for setting the

24    amount of the bond.  I know you think it's an important issue,

17:04:29 25    and I concede it is an important issue.  But a bond is

1   designed to prevent any harm to you in the interim until the

2   issue can be fully resolved.

3       MR. RASMUSSEN:  Or to compensate us for harm in the case

4   that we'll win, which we expect to.  And, therefore, there

17:04:46  5   should be a substantial bond to -- so that when the Tribe

6   sovereign authority -- you can't give this back, you can't

7   give the Tribe sovereign authority that you're taking today,

8   you can't take it back.  And, therefore, what we're talking

9   about then is try to compensate the Tribe monetarily for harm

17:05:05 10   to its sovereign authority.

11           So that's where it should be something very

12   substantial to compensate the Tribe for the damage to its

13   sovereign authority that is going to be the fall of the Tribe

14   based upon this plaintiff's motion and based upon the stay

17:05:17 15   that this Court is granting.  So we would ask for a

16   substantial bond.

17       THE COURT:  Mr. Isom, what's your argument as to what

18   the bond or about the bond?

19       MR. ISOM:  Your Honor, they are only rearguing the

17:05:31 20   merits of the preliminary injunction.  They've shown no

21   damage.  This will help expedite the matter.  Mr. Becker's

22   been litigating for three and a half years.  This causes no

23   harm to them.  It allows this Court to adjudicate an important

24   matter that will make the issue less expensive, not more

17:05:57 25   expensive.  There's simply no need for a bond here.  They're

```
 1   just rearguing the substance of factors for the preliminary

 2   injunction.

 3        MR. RASMUSSEN:  Your Honor, when we're talking about a

 4   bond, that's what we're talking about is if we are to prevail,

 5   then the bond has to be set to compensate us for those

 6   damages.  That's what the bond is for.

 7        THE COURT:  We're waiting, Mr. Rasmussen, to have you

 8   tell what damages you've suffered.

 9        MR. RASMUSSEN:  We're suffering extreme damages to

10   sovereign authority.

11        THE COURT:  Well, I've heard that argument, and I'm

12   rejecting it.  Now tell me what other damages you have.

13        MR. RASMUSSEN:  We would have hundreds of hours of

14   attorney time spent on an appeal of this Court's decision.  We

15   would have hundreds of hours wasted in a state court

16   proceeding that does not have a contract before it.  And we're

17   also being, then the Tribe is being delayed in getting its

18   finality.

19        THE COURT:  If you choose to pursue an appeal before

20   this Court's had an argument -- an opportunity to fully have

21   the matter briefed, argued and decided, then that's a cost

22   that you're voluntarily deciding to assume yourself.  That's

23   not one that flows from this Court's decision.

24        MR. RASMUSSEN:  We would respectfully disagree with

25   that.  Our understanding is the Court has issued a preliminary
```

The timestamps in the left margin:
17:06:18 (line 5)
17:06:33 (line 10)
17:06:49 (line 15)
17:07:07 (line 20)
17:07:28 (line 25)

```
 1    injunction that is an appealable order.  And the way we then

 2    go about trying to reduce the Tribe's harm to its sovereign

 3    authority is by pursuing an immediate appeal.  We will be

 4    doing that from the Court's preliminary injunction that it has

17:07:46  5    issued here today.  And so that is, then, how we try to

 6    minimize our damages.  And it's still going to take a lot of

 7    time.

 8              The Court cannot, in deciding the bond cannot just

 9    assume that it is correct because the bond is to protect the

17:08:06 10    Tribe if the Court is wrong.  And I understand the Court

11    thinks it's right, but the bond is to protect the Tribe if the

12    Court is wrong.  And if the Court is wrong, it is seriously

13    harmed the Tribe's sovereign authority, and it has put to

14    tribe to enormous expense, and it has delayed the case and the

17:08:27 15    resolution of the case, and it has put its thumb on the scales

16    in favor of the state and against the Tribe.  Those are all

17    significant harm to the Tribe's sovereign authorities if the

18    Court is wrong.  And that's where the Court needs to then

19    figure out the bond that would compensate the Tribe for that

17:08:43 20    wrong.

21         THE COURT:  All right.  I'm going to revise my ruling.

22    I'm going to, rather than issue this as a preliminary

23    injunction, I am going to issue this as a temporary

24    restraining order.  And it will be in place for 14 days.  We

17:08:58 25    will set a hearing within the 14 days.  The parties will then
```

```
 1   fully brief it, and I'll hear and decide the issue within the
 2   14 days.  And I'm going to require the bond of $10,000 to be
 3   filed by the plaintiff in this case.
 4            Any questions or clarifications of the Court's
 5   ruling as I revised it?
 6        MR. ISOM:  No, Your Honor.
 7        MR. RASMUSSEN:  No, Your Honor.
 8        THE COURT:  And, Mr. Isom, I'll still require that you
 9   will submit the written proposed for the temporary restraining
10   order.  And I will expect that the parties now being on notice
11   of the temporary restraining order will be in compliance with
12   that order pending issuance of the written order.
13        MR. ISOM:  I will, Your Honor.
14        MR. RASMUSSEN:  Your Honor, our understanding is we
15   would not have to be in compliance until the bond is posted.
16        THE COURT:  Well, that is true.  But --
17        MR. RASMUSSEN:  Okay.
18        THE COURT:  But Mr. Isom will have to file the bond
19   immediately and give notice to you that he's filed the bond.
20        MR. RASMUSSEN:  Okay.  Thank you, Your Honor.
21        THE COURT:  Anything further before we recess?
22        MR. ISOM:  No, Your Honor.
23        MR. RASMUSSEN:  No, Your Honor.
24        THE COURT:  We'll be in recess.
25            (Whereupon, the court proceedings were concluded.)
                         *   *   *   *   *
```

Kelly Brown Hicken, CSR, RPR

**APPENDIX PAGE 47**

1    STATE OF UTAH          )

2                           ) ss.

3    COUNTY OF SALT LAKE  )

4              I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6              That as such reporter, I attended the hearing of

7    the foregoing matter on September 14, 2016, and thereat

8    reported in Stenotype all of the testimony and proceedings

9    had, and caused said notes to be transcribed into typewriting;

10   and the foregoing pages number from 3 through 37 constitute a

11   full, true and correct report of the same.

12             That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14             And hereby set my hand and seal, this _____ day of

15   _____ 2016.

16

17

18

19

20             _____

                KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25

Kelly Brown Hicken, CSR, RPR

**APPENDIX PAGE 48**

FILED
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**December 30, 2016**

Elisabeth A. Shumaker
Clerk of Court

LYNN D. BECKER,

     Plaintiff Counter Defendant
     Third-Party Defendant - Appellee,

v.

UTE INDIAN TRIBE OF THE UINTAH
AND OURAY RESERVATION, a
federally chartered corporation; UINTAH
AND OURAY TRIBAL BUSINESS
COMMITTEE; UTE ENERGY
HOLDINGS, LLC, a Delaware LLC,

     Defendant Counterclaimants
     Third-Party Plaintiffs - Appellants,

v.

JUDGE BARRY G. LAWRENCE,

     Third-Party Defendant - Appellee.

No. 16-4175
(D.C. No. 2:16-CV-00958-CW)
(D. Utah)

### ORDER

The district court entered a preliminary injunction prohibiting the Ute Indian Tribe

of the Uintah and Ouray Reservation and affiliated parties (collectively, the Tribe) from

pursuing a lawsuit against Lynn D. Becker in tribal court arising out of an Independent

Contractor Agreement (the Agreement) between Becker and the Tribe.  It ruled that the

Tribe "waived any requirement that any action about the Agreement must be or may be

brought in tribal court," and, relying on *Thlopthlocco Tribal Town v. Stidham*, 762 F.3d

1226, 1238 (10th Cir. 2014), held that Becker was not required to first exhaust his remedies in tribal court because it was clear that the tribal court lacked jurisdiction.

The Tribe has appealed, and moves to stay the injunction while the appeal is pending.  To determine whether to grant a stay, the court considers four factors:  (1) the Tribe's likelihood of success on the merits; (2) whether the Tribe will be irreparably injured without a stay; (3) whether Becker will be substantially injured if a stay is granted; and (4) the public interest.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009). These factors weigh in favor of granting a stay.

The Tribe has shown a likelihood of success on the merits.  The central issue is whether it is clear that the tribal court did not have jurisdiction over the Tribe's lawsuit against Becker.  Unless it is clearly absent, the issue of tribal-court jurisdiction must first be resolved in the tribal court.  The district court agreed that Becker's consensual relationship with the Tribe ordinarily would have subjected him to tribal-court jurisdiction.  But it held that the tribal court was deprived of jurisdiction by the Tribe's express waiver in the Agreement.

The court has two concerns with the district court's analysis.  First, it is not clear that the Agreement waived the Tribe's right to pursue its suit against Becker in tribal court.  The Agreement states:

> The Parties hereto unequivocally submit to the jurisdiction of the following courts: (i) U.S. District Court for the District of Utah, and appellate courts therefrom, and (ii) if, and only if, such courts also lack jurisdiction over such case, to *any court of competent jurisdiction* and associated appellate courts or courts with jurisdiction to review actions of such courts.  The court or courts so designated shall have, to the extent the Parties can so provide, original and exclusive jurisdiction, concerning all such Legal

2

**APPENDIX PAGE 50**

Proceedings, and the Tribe waives any requirement of Tribal law stating that Tribal courts have *exclusive* original jurisdiction over all matters involving the Tribe and waives any requirement that such Legal Proceedings be brought in Tribal Court or that Tribal remedies be exhausted.

Mot. for Stay App. Vol. 1 at 19 (emphasis added). The court cannot say that it is "clear" that a tribal court is not a "court of competent jurisdiction" within the meaning of the Agreement.

Second, the Tribe argued in district court that the Agreement is void for lack of federal approval, thus invalidating any waiver in the Agreement. This court's review of applicable law indicates that the argument is plausible.

Thus, it is *not* "clear that the tribal court lack[ed] jurisdiction." *Thlopthlocco Tribal Town*, 762 F.3d at 1238. The Tribe has shown a likelihood of success on the merits.

The court has also considered the risks of irreparable injury to the Tribe, substantial injury to Becker, and harm to the public interest. In light of the longstanding policy of promoting tribal self-government and self-determination, which includes giving the tribal court the first opportunity to evaluate its jurisdiction, *see Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 15-16 (1987), the court concludes these factors weigh in favor of granting a stay.

**APPENDIX PAGE 51**

Therefore, at the specific direction of the panel assigned to hear the merits of the case, the preliminary injunction prohibiting the Tribe from pursuing the tribal-court action is stayed pending this court's determination of the merits.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

4

**APPENDIX PAGE 52**

FEB 2 8 20~3

IN THE UTE INDIAN COURT OF THE UINTAH AND OURAY

RESERVATION, FORT DUCHESNE, UTAH

UTE INDIAN TRIBE OF THE UINTAH       Case No. CV 16-253
AND OURAY RESERVATION, et al.,

           Plaintiffs,

    v.                          OPINION AND ORDER

LYNN D. BECKER,

           Defendants.

## BACKGROUND

This is an action against defendant, Lynn Becker, that revolves around the employment of

Becker from 2003 through 2007 by plaintiffs. Plaintiffs are the Tribe, its Business Committee,

and a Tribal Limited Liability Company. Becker worked under an Independent Contractor

Agreement (IC Agreement) from 2005 until he resigned in October, 2007. App., Vol. I, 37.

Under that IC Agreement, he served as the Land Division Manager of the Tribe's Energy and

Minerals Department to manage and develop the Tribe's energy and mineral resources.

Plaintiffs moved this Court for partial summary judgment on whether the IC Agreement

was void ab initio under Federal or Tribal law and the Agreement waived sovereign immunity

under Tribal law. Plaintiffs asked for reconsideration of this Court's previous order denying

summary judgment on whether Tribal sovereign immunity had been waived by the IC

Agreement. Plaintiffs asked for expedited consideration of its motions. Defendant moved to

allow time to conduct additional discovery and to compel discovery. Defendant also renewed his

motion to dismiss and to defer to the action pending before the State Court in Utah on grounds of

comity.

**APPENDIX PAGE 53**

Oral argument was held on the motions on Friday, February 16, 2018. Plaintiffs were represented by Francis Bassett and Thomasine Real Bird. Defendant was represented by David Isom and Clark Allred.

In determining the motions before the Court references are to the Appendix to plaintiffs motions for summary judgment or to other materials made clear by there context. Parties may move for summary judgment on all or part of any claim, defense, or the entire lawsuit. Summary judgment is to be granted if the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment. See Beard v. Banks, 548 U.S. 521, 529 (2006); Celotek Corp. v. Catrett, 477 U.S. 317, 322 (1996). The material facts surrounding plaintiffs' motions are not in dispute. Defendant Becker is a non-Indian who entered into a consensual agreement with the Tribe to manage trust properties on the Reservation. The Agreement that Becker had with the Tribe and the circumstances leading up to it are not in dispute, nor is the fact that the Agreement was never approved by any person or agency of the United States. There is no dispute that no resolution by the Tribe waived sovereign immunity. The Federal and Tribal law pertaining to waiver of sovereign immunity and the Federal and Tribal law requiring approval of transfers, assignments, or conveyances of Tribal trust properties by the United States or its agency or designee is settled. Lastly, both parties have engaged in substantial and extensive discovery in this Court, the State Court, and the Federal Court. Further discovery is not required for the Court to rule on the present motions and the request of defendant to continue this matter to allow further discovery is denied.

## COMPLAINT

Defendant Becker as alleged in Plaintiff's Amended Complaint was paid an annual salary

-2-

of \$200,000 per year, 2% of net revenue from production of the Tribe's oil and gas revenue, \$68,000 from the purchase price of \$4,000,000 paid by a company to the Tribe to acquire a 10% interest in the Tribe's Ute Energy Holdings, LLC, and \$183,924 from the sale of Management Incentive Units (MIU). It is also alleged that Becker retained a proprietary mapping system and geoseismic and geological data with a total value of over \$1,000,000. Plaintiffs seek damages in the amount of \$1,251,924 and a ruling that Becker cannot claim millions of dollars representing 2% of the capital contributions and net value that Ute Energy, LLC distributed back to the Tribe upon the LLC's liquidation.

## TRIBAL COURT JURISDICTION

Defendant is a non-Indian doing business with the Tribe. Defendant was a tribal employee or independent contractor. He entered into an IC Agreement with the Tribe to manage and develop the Tribe's energy and mineral resources. The IC Agreement was negotiated and entered into on the Unitah and Ouray Indian Reservation. He was given an office in the Tribal business complex in Ft. Duchesne. The resources that were to be managed and developed were on land belonging to the Tribe and held in trust for the Tribe and its members by the United States. This Court clearly has jurisdiction over defendant under Title I, Chapter 2, §§ 1-2-1 to 1-2-4, Ute Indian Law and Order Code, Amended and Restated, Ordinance 13-010. Under the Montana exceptions, an Indian Tribe has jurisdiction over non-Indians who enter into consensual relationships with the Tribe or whose activities upon tribal lands imperil the Tribe's political integrity, economic security, or health and welfare. This Court has jurisdiction over defendant under the above exceptions. Montana v. U.S., 450 U.S. 544, 565-566 (1981) ("A tribe may regulate, through taxation, licensing, or other means, the activities of non-members who enter

-3-

consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements)." See Dollar General Corp. v. Mississippi Band of Choctaw Indians, 136 S.Ct. 2159 (2016), affirming 746 F3d 167 (5th Cir. 2014), by equally divided Court; Water Wheel Camp Recreational Area, Inc. v. LaRance, 642 F3d 802, 811-814 (9th Cir. 2011).

Defendant at oral argument asked the Court to reconsider its previously filed motion to dismiss for lack of jurisdiction. On March 7, 2017, this Court denied defendant's motion to dismiss the Tribe's suit against him for lack of jurisdiction. The United States District Court of Utah in Becker v. Ute Indian Tribe, Civ. 16-00958 (Judge Waddoups), also has ruled that this Court possesses jurisdiction over this Tribal Court action based on Becker's consensual relationship with the Tribe. Preliminary Injunction Order, September 28, 2016, Dkt. 50, page 5. No new law or facts have been presented that changes the Court's opinion that this Court possesses jurisdiction over this action for the reasons stated in the preceding paragraph and the Court's previous denial of the motion to dismiss.

On June 9, 2017, the Court declined to stay the suit in Tribal Court on grounds of comity. Defendant asks that the Court decline jurisdiction over this action on the grounds of comity. Comity is the recognition that one court affords to the decision of another not as a matter of obligation, but out of deference or respect, Black's Law Dictionary 242 (5th ed. 1979), and is limited to situations where two tribunals simultaneously possess concurrent jurisdiction. See Hilton v. Guyot, 159 U.S. 113 (1895) (refusal to grant comity to judgment against American citizen). Comity has no application where one tribunal lacks jurisdiction of a cause or where a contract is illegal under the laws of one jurisdiction. Id. at 205-206. There has been no final judgment by any court that it has jurisdiction over this action. The Federal Courts have directed

-4-

**APPENDIX PAGE 56**

this Court to consider whether Tribal jurisdiction exists. The facts of this case present a clear case of consensual jurisdiction in this Tribal Court. Moreover, this Court also finds, for the reasons stated below, that the IC Agreement at issue here is void ab initio for failure to be properly approved by the Department of Interior or Bureau of Indian Affairs. For these reasons, this Court declines, as it did and for the further reasons stated in its June 9, 2017, Order, to abstain from hearing this case or grant comity to any other jurisdiction to hear this matter.

## SOVEREIGN IMMUNITY

On April 27, 2005, the date that the IC Agreement was passed by the Unitah and Ouray Business Committee, Section 1-8-5 of the Tribe's Law and Order Code, governing the waiver of tribal sovereign immunity, provided that:

> Except as required by federal law, or the Constitution and Bylaws of
> the Ute Indian Tribe, or as specifically waived by a resolution or ordinance
> of the Business Committee specifically referring to such, the Ute Indian
> Tribe shall be immune from suit for any liability arising from the
> performance of their official duties.

App., Vol. III, 557.

The validity of an Indian tribe's waiver of sovereign immunity is governed by its tribal law. E.g., Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc., 585 F3d 917, 921-922 (6th Cir. 2009) (because the written resolution of the board of directors did not expressly authorize a waiver, there was no effective waiver of sovereign immunity); World Touch Gaming, Inc. v. Massena Mgmt., LLC, 117 F.Supp. 2d 271, 176 (N.D. N.Y. 2000) (holding that a senior vice president's signature to an agreement with an express waiver of sovereign immunity provision did not waive sovereign immunity because that right was reserved exclusively to the tribal council); Dilliner v. Seneca-Cayuga Tribe, 258 P3D 516-519-521 (Okla. 2011) (tribal law

-5-

controls the way sovereign immunity can be waived by the Tribe). Indeed, every court that has
considered the issue has ruled that a waiver of immunity that is invalid under tribal law is no
valid waiver at all. E.g., Native Am. Distrib. v. Seneca-Cayuga Tobacco Co., 546 F3d 1288 (10th
Cir. 2008); Sanderlin v. Seminole Tribe, 243 F3d 1282, 1288 (11th Cir. 2001); Calvello v.
Yankton Sioux Tribe, 584 NW2d 108, ¶ 12 (S.D. 1998) (waiver must issue from tribe's
governing body, not from some unapproved acts of tribal officials).

This Court has previously interpreted Section 1-8-5 to require that any waiver of
sovereign immunity must be expressly authorized within the text of the written resolution or
ordinance itself. Toole v. Ute Water Settlement Accounting Servs., LLC, Ute Indian Tribal
Court, case number CV-09-061, Ruling and Order dated August 10, 2010. Toole explained that
it was insufficient under Section 1-8-5 for a contract containing a waiver of immunity to be
simply appended to a resolution or ordinance if the resolution or ordinance does not itself
expressly authorize a waiver of sovereign immunity within the text of the resolution or
ordinance.

> The Business Committee authorized the hiring of Plaintiff, but nothing suggests that they
> contemplated a waiver of sovereign immunity. As the chief executive body, the Business
> Committee is called upon to authorize hiring on a usual basis. Thus, the [Ute Indian]
> Law and Order Code sets forth a very specific standard for when executive actions are
> accompanied by a waiver of the Tribe's immunity. No resolution was passed specifically
> authorizing the waiver. Nothing in the transaction resembled the normal process for
> waiving immunity. The actions of the Business Committee were not similar to those it
> undertakes when the Tribe waives immunity in matters involving Ute Oil, LLC. There,
> the Business Committee waives immunity by passing a resolution or ordinance which
> specifically refers to the express waiver as required by U.L.O.C. [Ute Law and Order
> Code] § 1-8-5 . . . How can the Court find a waiver when the record is bereft of evidence
> that the Business Committee considered immunity and elected to waive the same? A
> decision to hire is not the same as a deliberate choice to waive immunity.

Toole, Ruling and Order 7-9; App., Vol. III, 566.

-6-

In this case, there is nothing in the resolution approving the IC Agreement specifically waiving sovereign immunity and specifically referring to that waiver. A copy of 05-147, the resolution approving the IC Agreement, can be found at App., Vol. I, 35. A comparison of resolution 05-147 with § 1-8-5 shows the failure of the 05-147 to waive sovereign immunity in the manner required by Tribal law.   As the Eighth Circuit said in Am. Indian Ag. Credit Consortium, Inc. v. Standing Rock Sioux Tribe, 780 F2d 1374, 1379 (8th Cir. 1985), "persons dealing with... (Indians) long have known how to waive sovereign immunity when they wish to do so." A valid waiver of sovereign immunity must comply with the law of the Tribe. The normal process of the Tribe in waiving sovereign immunity is to set forth the waiver in the resolution or ordinance in which the Business Committee is taking such action. See resolutions 11-328 and 10-085, Appendix VIII, 568-572. And the IC Agreement itself at Article 23 specifically recognized that a resolution complying with § 1-8-5 was required: "The Tribe's limited waiver of sovereign immunity shall be further evidenced by a Tribal resolution... ." No such resolution complying with § 1-8-5 ever came into existence.

The IC Agreement in this case was signed by Maxine Natchees, Chairperson of the Tribe at the time. App., Vol. I, 46. Resolution 05-147 provides that the "Chairman, or in her absence, the Vice-Chair, is authorized to execute any and all documents necessary or appropriate to carry out the terms and intent of this resolution." But the resolution says nothing about any waiver of sovereign immunity, not alone giving the Chairman the authorization to waive such immunity even if she could under 05-147. A waiver of sovereign immunity must be expressed clearly and unequivocally.  It cannot be implied or made subject to official discretion. E.g., Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59 (1978); Hydrothermal Energy Corp. v. Fort Bidwell Indian

-7-

Cmty. Council, 216 Cal. Rptr. 59, 63 (1985) (tribal chairman could not waive tribe's immunity absent express delegation from tribe); Calvello v. Yankton Sioux Tribe, 584 NW2d 108, ¶ 12 (S.D. 1988) (without clear expression of waiver by tribal council, acquiescence of tribal officials cannot waive immunity because "waiver must be clear and unequivocal and must issue from a tribe's governing body, not unapproved acts of tribal officials"); Chance v. Coquille Indian Tribe, 963 P2d 638, 640-642 (1988)(rejecting apparent authority theory and holding that, even if contract's language waiving immunity was express, contract was not valid where the signing official lacked authority under tribal law to waive immunity); and MM&A Prods., LLC v. Yavapai-Apache Nation, 316 P3d 1248, 1252-1254 (Az. Ct. App. 2014). Chairperson Natchees had no authority under 05-147 to waive the sovereign immunity of the Tribe.

This Court on December 18, 2017, denied plaintiffs' motion for partial summary judgment claiming that the waiver of sovereign immunity in the IC Agreement is invalid under Tribal law as set forth above in this opinion. Plaintiffs ask for reconsideration. After reconsideration, this Court reverses its December 18, 2017, opinion for the following reasons. First, the Court relied upon Yazzie v. Ute Indian Tribe, Ute Indian Tribal Court, Case No. CV 09-118 (February 24, 2011). However, the Court in Yazzie found that it lacked subject matter jurisdiction but then proceeded to make substantive determinations. Thus, any rulings made by Yazzie is dicta at best. Second, if Yazzie is permitted to be the prevailing law incorporation by reference would be sufficient to allow sovereign immunity to be waived. In other words, a resolution stating nothing about the waiver of sovereign immunity but at the same time authorizing an agreement to be signed which contained a waiver would be sufficient under § 1-8-5. This result runs contrary to the requirements of § 1-8-5 and would essentially render § 1-8-5

-8-

meaningless.  Third, the Court assumed erroneously that the Business Committee knew about the purported waiver of sovereign immunity contained in the Becker IC Agreement and therefore knew it was waiving sovereign immunity by Resolution 05-147.  This assumption is speculation. There is nothing in the April 27, 2015, minutes to show the Business Committee read the IC Agreement.  App., Vol. I, 63-67.  The minutes are absent of any mention about sovereign immunity.  Four, Toole v. Ute Water Settlement Accounting Services, LLC, Case No. CV 09-061, Ute Indian Tribal Court, citing § 1-8-5, is clearly the more accurate statement of the law and interpretation of § 1-8-5.  For the reasons set forth in this paragraph and the reasons set forth above, plaintiffs' motion for partial summary judgment on the sovereign immunity issue is granted and the December 18, 2017, Order is reversed.  There was no waiver of sovereign immunity.

### FEDERAL APPROVAL

Plaintiffs have also moved for entry of partial summary judgment claiming that the Becker IC Agreement is invalid and void ab initio because it was never approved by the United States as required under Federal law or Tribal law.

Defendant Becker sent a letter dated December 30, 2003, to John Jurrius setting out the terms under which Becker would work for the Tribe.  App., Vol. I, 31.  Under that part of the letter dealing with a Participation and Growth, he asked for a percentage of the growth and energy related production, pipeline, and severance revenues, excluding lease based income.  He also wanted the ability to invest with the Tribe on the same terms as the Tribe up to 5% of the Tribe's interest on a carried basis.  His proposal, then, was to receive a share of the Tribe's oil and gas production from tribal properties.  Jurrius responded proposing by memo dated February

-9-

9, 2004, that Becker receive the right to participate for 2% in two projects on the same terms as the Tribe. Id., 26. If the Tribe had a 33% working interest under an exploration and development agreement (EDA), Becker could participate for 2% of that interest. An EDA is a real property interest that requires the approval of the Department of Interior. Becker accepted. A final IC Agreement was to be drafted with a 2% Participation Plan. Terms such as "participation interest" and "net revenue interest" have defined meanings in the oil and gas industry. App., Vol. II, 308, 311, 314. Becker had a right under his Agreement to a share of the Tribe's oil and gas production. The above letters leading up to the final IC Agreement and the IC Agreement itself are not disputed.

Under the Independent Contractor Agreement signed by Becker and the Tribal Chairperson, App., Vol. I, 37, there was an Exhibit B to the Agreement denominated as a Participation Plan, Id., 49, in which Becker was to receive a beneficial interest of 2% of net revenue distributed to Ute Energy Holding, LLC (and net of any administrative costs of Ute Energy Holdings) ("Contractor's Interest"). Section 1. In the future, if the Tribe participated in any projects involving the development, exploration and/or exploitation of minerals in which the Tribe had any participating interest and/or earning rights and Becker was providing services, and the Tribe elected not to place such interests in Ute Energy Holding, LLC, then Becker was to receive a 2 percent (2%) beneficial net revenue interests in such assets. Section 2. If Becker wished to sell his rights, he was required to notify the Tribe of his intentions and the Tribe had the right to meet the selling price. Section 4. This latter provision recognizes that the first two sections convey a freely alienable property interest to Becker, meaning the Tribe would have to reacquire the alienated interest at market value. Section 4 represents the sine qua non of a

-10-

property interest, not merely an undefined stream of revenue with no certain source as claimed by Becker. Expert Report of Michael Wozniak, App., Vol II, 304, § 10; 306, § 19.

It is undisputed that the revenue upon which Becker's 2% interest was to be calculated came from oil and gas production on land held in trust by the United States for the Ute Tribe on the Uintah and Ouray Indian Reservation. The Tribe has a tribal membership of almost four thousand individuals, over half of whom live on the Uintah and Ouray Indian Reservation. The Tribe operates its own tribal government and oversees approximately 1.3 million acres of Indian trust lands, some of which contain significant oil and gas deposits. Revenue from the development of these oil/gas deposits is the primary source of money that is used to fund the Tribe's government and its health and social welfare programs for tribal members. Irene Cuch affidavit, § 2; App., Vol. I, 2. The entities involved, Ute Energy Holdings, LLC, and Ute Energy, LLC, were capitalized with the Tribe's interest in exploration and development agreements (EDA's) with various oil and gas companies, where the Tribe not only leased its oil and gas minerals but had the option to participate as a working interest owner in the drilling and production of oil and gas from wells drilled on tribal lands under the EDAs. "The only way net revenue interest is distributed is through production from oil and gas wells." Declaration and Expert report of Michael J. Wozniak, App., Vol. II, 303, no. 6 and 306, no. 19. Under Becker's IC Agreement, his primary service was "the restructuring and development of the Tribe's energy and minerals development as set forth in Tribal Ordinance 03.003." Defendant has offered no reasonable or logical explanation of how the money that he was paid and is seeking from the Tribe could have been generated other than by the production of oil and gas.

It is also undisputed that Becker's IC Agreement was never authorized or approved by the

-11-

United States, Congress, Department of Interior, Secretary of Interior, Secretary's duly authorized designee, or Bureau of Indian Affairs or its designee. App., Vol. II, 261.

Under Tribal law, The Tribe's Constitution delegates specific powers to the Tribal Business Committee and those powers are "subject to any limitations imposed by the statutes or Constitution of the United States, and subject further to all express restrictions upon such power contained in the Constitution and Bylaws." Const., Ute Tribe, art. VI, § 1; App., Vol. III, 538. The Constitution further provides that the Business Committee may only "approve...any sale, disposition, lease, or encumbrance of Tribal lands, interests in Tribal lands, or other Tribal assets" that have been first "authorized or executed by the Secretary of the Interior, Commissioner of Indian Affairs, or any other official or agency of the government. Id., art VI, § 1 (c). The Tribe's Corporate Charter, § 5 (g), likewise indicates that the Business Committee has the corporate power "(t)o pledger or assign chattels or future tribal income due or to become due to the Tribe and provided that "any such pledge or assignment shall be subject to the approval of the Secretary of the Interior or his duly authorized representative." App., Vol. III, 552. Resolution 05-147 states that the Business Committee was acting pursuant to its authority to regulate the economic affairs of the Tribe when it agreed to enter into the IC Agreement. The IC Agreement Participation Plan creates a claim against the Tribe's new revenue from its mineral interests and participation rights and it constitutes a pledge or assignment of the Tribe's future income from its mineral interest. Without approval by the Department of Interior, Secretary of the Interior, Bureau of Indian Affairs or other official of the United States, the Business Committee could not assign, dispose, or otherwise encumbrance any interests in Tribal lands or other Tribal assets. See Pilar Thomas opinion, App., Vol. II, 359-360; Professor Miller, App.,

-12-

Vol. III, 522-525. Without the requisite approval the IC Agreement is void and unenforceable under Tribal law. See Wells Fargo, N.A. v. Lake of the Torches Econ. Dev. Corp., 658 F3d 684, 702 (7th Cir. 2011) (void agreement invalidates other provisions of the agreement); Central Transp. Co. v. Pullman Car Co., 139 U.S. 24, 23 (1891).

Federal law also imposes restraints on the ability of Indian tribes to alienate or encumber assets held in trust unless approved by the United States. E.g., Oneida Indian Nation v. Cty. of Oneida, 414 U.S. 661, 667-675 (1974), and Cty. Of Oneida v. Oneida Indian Nation, 470 U.S. 226 (1985) (conveyance of 100,000 acres was a nullity because never approved by federal government). This includes sale proceeds of trust property, Chippewa Cree Tribe v. U.S., 73 Fed. Cl. (2006) (proceeds from the sale of tribal property still remain tribal property despite their conversion to money); things grown and removed from trust property, Wooden-Ware Co. v. U.S., 106 U.S. 432, 435 (1882) (Indian timber at all stages of conversion remained trust property and its purchase by a third party did not divest title or right of possession); and minerals extracted and removed from trust property as in this case, U.S. v. Noble, 237 U.S. 74, 80-81 (1915) ("It is said that the (agreements) contemplate the payment of sums of money, equal to the agreed percentage of the market value of the minerals, and thus that the assignment was of these moneys; but the fact that rent is to be paid in money does not make it any less a profit issuing from the land)". See also Becker v. Ute Tribe, 868 F3d 1199, 1204 (10th Cir. 2017). The restraint on the alienation of tribal property rests on the "duty of the Federal Government to safeguard (Indian) interests and protect them against the greed of others and their own improvidence," and this power "justifies the interposition of the strong shield of federal law to the end that (Indians) not be overreached or despoiled in respect of their property of whatsoever

-13-

kind or nature. Sunderland v. U.S., 266 U.S. 226, 233-234 (1924).

When a contract with an Indian tribe or individual Indian requires federal approval, no portion of the unapproved contract is enforceable. "We think the better view is that, where an (Indian allottee) undertakes to negotiate a (forbidden mineral) lease...he enters the field where he must be regarded as without capacity or authority to negotiate or act, and the resulting lease is void." Smith v. McCullough, 270 U.S. 456, 463, 465 (1926) (it was beyond the power of the Indian allottee, on his own volition, to grant the mineral lease in dispute). An illegal and void transfer of trust property cannot be ratified even by the allottee owner or state statute. Bunch v. Cole, 263 U.S. 250, 254-255 (1923). See also Johnson v. M'Intosh, 8 Wheat 543, 573-574 (1823) (where the requisite federal approval was never obtained and the Indians annulled the agreement, we know of no tribunal that can enforce the annulled agreement); Ewert v. Bluejacket, 259 U.S. 129, 137 (1922)(the illegal alienation of Indian property confers no enforceable rights); Wells Fargo Bank N.A. v. Lake of the Torches Economic Dev. Corp, 658 F3d 684, 698-7000 (7th Cir. 2011)(trust indenture and waiver of sovereign immunity contained therein were void ab initio for lack of federal approval); Becker v. Ute Indian Tribe, 868 F3d 1199, 1205 (10th Cir. 2017); Catskill Dev., LLC v. Park Place Entm't. Corp., 547 F3d 115, 127-130 (2nd Cir. 2008) (contracts with Mohawk Indian Tribe were void ab initio for lack of federal approval); Black Hills Institute of Geological Research v. South Dakota School of Mines and Technology, 12 F3d 737, 742-743 (8th Cir. 1993)(holding that federal restraints on the alienation of Indian property apply not only to real property but also to interests in Indian land like fossils or minerals that become personal property when severed from the land); and Quantum Expl., Inc. v. Clark, 780 F2d 1457, 145901460 (9th Cir. 1986)(agreement not approved under the Indian

-14-

Mineral Development Act is not enforceable).

The principle that the United States is required to approve any extinguishment of Indian title and possessory interests in Indian property was first codified in the Indian Non-Intercourse Act of 1790 (NIA) at 25 USC § 177.

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or Tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

It is unlawful under the NIA to unlawfully induce any Indian to execute any contract, deed, mortgage, or other instrument purporting to convey any land or any interest therein held by the United States in trust for such Indian. 25 USC § 202. As between an Indian and non-Indian in a matter involving the right to property, the burden of proof rests upon the white person. 25 USC § 194.

Because the NIA is so exacting and straightforward on prohibiting the alienation of Indian property, the United States has subsequently enacted certain statutes that allow the NIA to be bypassed but only pursuant to the prior approval by the Secretary of Interior or the Secretary's duly authorized designee as expressly authorized by Congress. One such Congressional authorization is the Indian Mineral Development Act (IMDA), 25 USC § § 2101-2108. 25 USC § 2102 (a) requires federal approval for, inter alia, any joint venture, production sharing, service or managerial agreements, and any other agreements that involve the exploration, development, sale or other disposition of the production or products of Indian mineral resources. Tribes retain a great degree of flexibility in business arrangements surrounding production and development of their mineral interests subject to the approval of the Secretary of Interior. Absent federal

-15-

**APPENDIX PAGE 67**

approval, there is no enforceable agreement under IMDA. Quantum Exploration, Inc. v. Clark, 780 F2d 1457, 1459 (9ᵗʰ Cir. 1986).

It is immaterial that the Ute Tribe placed its oil/gas assets into one or more limited liability companies. The Federal government's trust responsibility followed the Tribe's oil/gas assets into Ute Energy, LLC, and Ute Energy Holdings, LLC. This point is made clear in Long Royalty Company, Appellant, MMS-87-0244-IND (FE), 1989 WL 1712513 (September 22, 1989), App., Vol. II, 338-340. In Long, the Department of Interior ruled that the Federal government's trust responsibility to Indians extends to the collection of revenues from Indian oil/gas minerals, even when an Indian tribe's oil/gas assets are placed into a joint venture with Indians. The Department soundly rejected Long's argument that the Federal government's trust responsibility to Indians does not extend and encompass revenue collection from oil/gas wells on Indian lands. Id., 339-340.

The experts presented by the Tribe on Indian mineral development or Federal Indian law have opined that the Becker IC Agreement was subject to federal review and approval, either under IMDA, or if not IMDA, then under 25 USC § 177. Absent such approval, the IC Agreement is void ab initio, including the purported waiver of sovereign immunity contained in the Agreement. See Pilar Thomas, App., Vol. II, 341-360; Kevin Gambrell, App., Vol. II, 404-428; Professor Alexander Tallchief Skibine, App., Vol. II, 445-479; and Professor Robert J. Miller, App., Vol. III, 500. With due deference to Becker's expert, it does not appear that Attorney Williams considered Federal law to be implicated by the Becker IC Agreement and she did not consider the IMDA because in her opinion it was not necessary to consider any Federal law or regulation. Williams' opinions are given no weight by the Court.

-16-

This Court finds and holds that the Becker IC Agreement was required under both Tribal and Federal law to be approved by the United States or the Department of Interior or its designee. No such required approval was ever given. The Agreement is therefore void ab initio and without effect.

Plaintiffs' motions for summary judgment are granted.

Dated February 28, 2018.

 

Terry L. Pechota
Judge
Ute Indian Tribal Court

ATTEST:

Clerk

(SEAL)

-17-

**APPENDIX PAGE 69**

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Monday, June 27, 2016

### Department of Justice Announces New Department-Wide Implicit Bias Training for Personnel

The Department of Justice announced today that it will train all of its law enforcement agents and prosecutors to recognize and address implicit bias as part of its regular training curricula.  The new training, based on the latest social science research and best practices in law enforcement, will begin across the department in the next few weeks.  Deputy Attorney General Sally Q. Yates sent a memo to all law enforcement agents and prosecutors today informing them of the new Implicit Bias Training Program and its importance to a strong and fair criminal justice system.

"Our officers are more effective and our communities are more secure when law enforcement has the tools and training they need to address today's public safety challenges," said Attorney General Loretta E. Lynch.  "At the Department of Justice, we are committed to ensuring that our own personnel are well trained in the core principles and best practices of community policing.  Today's announcement is an important step in our ongoing efforts to promote fairness, eliminate bias and build the stronger, safer, more just society that all Americans deserve."

"The Department of Justice has a responsibility to do everything we can to ensure that our criminal justice system is fair and impartial," said Deputy Attorney General Yates.  "Given that the research is clear that most people experience some degree of unconscious bias, and that the effects of that bias can be countered by acknowledging its existence and utilizing response strategies, it is essential that we provide implicit bias training to all of our prosecutors and law enforcement agents.  Along with the heads of our law enforcement agencies, I'm looking forward to participating in DOJ's very first training session tomorrow morning."

Through the new training, over 28,000 department employees will learn how to recognize and address their own implicit bias, which are the unconscious or subtle associations that individuals make between groups of people and stereotypes about those groups.  Implicit bias can affect interactions and decisions due to race, ethnicity, gender, sexual orientation, religion and socio-economic status, as well as other factors.  Social science has shown that all individuals experience some form of implicit bias but that the effects of those biases can be countered through training.

In the coming weeks, the department will begin rolling out the training to the more than 23,000 agents employed by the FBI,  Drug Enforcement Administration (DEA), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and U.S. Marshals Service (USMS), as well as the approximately 5,800 attorneys working in the 94 U.S. Attorney's Offices across the country.  As the project continues, the department will expand training to other personnel, including prosecutors in the department's litigating components and agents of the Office of the Inspector General.

**APPENDIX PAGE 70**

Since 2010, the department's Office of Community Oriented Policing Services has worked with state and local law enforcement to train over 2,600 law enforcement officers at both the line and supervisor level in its implicit bias program known as Fair and Impartial Policing. For the department's new internal training, curricula have been created to address the work of prosecutors and federal law enforcement and the different missions of the law enforcement components. Each law enforcement component's curriculum includes three levels of training based on how implicit bias may affect the duties for line personnel, supervisors and managers, and executive personnel.

In order to lead by example, on Tuesday, Deputy Attorney General Yates will be joined by the leadership of FBI, ATF, DEA and USMS to participate in the first part of the executive training under the new curricula. Over the coming months, training will begin with executive personnel, followed by supervisors and managers, and later line personnel, including agents and attorneys.

**Attachment(s):**
Download implicit_bias_training_memo.pdf
Download faqs.pdf

**Component(s):**
Office of the Deputy Attorney General

**Press Release Number:**
16-747

*Updated June 27, 2016*

# APPENDIX PAGE 71



**U. S. Department of Justice**

Office of the Deputy Attorney General

The Deputy Attorney General                    Washington, D.C. 20530

June 27, 2016

MEMORANDUM FOR ALL DEPARTMENT LAW ENFORCEMENT AGENTS AND
PROSECUTORS

FROM:        Sally Q. Yates
             Deputy Attorney General

SUBJECT:     Implicit Bias Training

Later today, the Justice Department will announce a new "implicit bias" training program
for its law enforcement officers, prosecutors, and other personnel.  I'd like to briefly explain why
we are doing this training and why I think the effort is so essential to the mission of our
Department.

Over the past several decades, social science research has revealed that we all experience
some degree of "implicit bias," the unconscious and often subtle associations we make between
groups of people and stereotypes about those groups.  This phenomenon is distinct from "explicit
bias," the overt prejudice that most people think of when we talk about racism, sexism, and other
forms of bigotry.  To some extent, implicit bias is part of human nature; a byproduct of our
diverse, multicultural society.  But implicit bias also presents unique challenges to effective law
enforcement, because it can alter where investigators and prosecutors look for evidence and how
they analyze it without their awareness or ability to compensate.  The good news is that research
suggests the vast majority of people can counter these effects if they are aware of which biases
they possess—and are trained to recognize when they creep into their reasoning or situational
awareness.

In recent years, state and local law enforcement agencies across the country have
integrated implicit bias education into their training programs, often with financial support from
the Department's Office of Community Oriented Policing Services (COPS).  These trainings
serve several purposes.  They help officers better understand how unconscious and unintentional
biases can affect their work.  They reinforce the qualities that so many great investigators and
attorneys already possess, including an ability to look past extraneous information, a willingness
to question one's core assumptions, and a relentless focus on finding those responsible for crimes

1

even in complicated operational environments.  And perhaps most importantly, these trainings reaffirm our commitment to a criminal justice system that is fair, impartial, and procedurally just. With implicit bias training, agencies across the country have taken an important step towards strengthening the relationship between law enforcement and the communities we serve.

For several years, agencies and offices across the Department have sought ways to raise awareness of implicit bias in their day-to-day work.  Today's announcement marks the beginning of our comprehensive effort to train the Department personnel who have the most direct involvement in our criminal justice system.  In the coming weeks, the Department will begin providing implicit bias training to the more than 23,000 agents serving our four law enforcement agencies and approximately 5,800 attorneys across our 94 U.S. Attorney's Offices.  In a later stage of the process, we will expand the training to Office of the Inspector General agents and all criminal prosecutors in the Department's other litigating components.  These trainings, based on the latest scientific research, will be tailored to your agency and to the type of work you do, recognizing, for example, that implicit bias can manifest itself differently for a line agent handling drug cases and a supervisory AUSA involved in hiring and promotion decisions.

I know that your time is valuable, and that you already devote many hours to various training requirements, but I would not have asked you to take on this additional responsibility unless I and other Department leaders were convinced of its value.  As a sign of our commitment, the Department's very first training will take place tomorrow morning, which will include not just me and my senior staff, but also the leadership of our law enforcement agencies, including the heads of the Federal Bureau of Investigation, Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the U.S. Marshals Service.

In the near future, you will receive additional details from your component regarding the training schedule.  It is my sincere hope that you find the trainings as worthwhile as so many other law enforcement officers already have.

Thank you, as always, for your tremendous work and your unceasing commitment to the cause of justice.

**APPENDIX PAGE 73**





Race & Ethnic Fairness in the Courts

# Implicit Bias

## A Primer for Courts

### Jerry Kang

Prepared for the National Campaign to Ensure the Racial and
Ethnic Fairness of America's State Courts

August 2009

©National Center for State Courts, 2009



## ABOUT THE PRIMER

This Primer was produced as part of the National Campaign to Ensure the Racial and Ethnic Fairness of America's State Courts. The Campaign seeks to mobilize the significant expertise, experience, and commitment of state court judges and court officers to ensure both the perception and reality of racial and ethnic fairness across the nation's state courts. The Campaign is funded by the Open Society Institute, the State Justice Institute, and the National Center for State Courts. Points of view or opinions expressed in the Primer are those of the author and do not represent the official position of the funding agencies. To learn more about the Campaign, visit www.ncsconline.org/ref.

## ABOUT THE AUTHOR & REVIEWERS

Jerry Kang is Professor of Law at UCLA School of Law. He has written and lectured extensively on the role of implicit bias in the law. For more information on Professor Kang, please visit jerrykang.net. The Primer benefited from the review and comments of several individuals working with the National Campaign, including Dr. Pamela Casey, Dr. Fred Cheesman, Hon. Ken M. Kawaichi, Hon. Robert Lowenbach, Dr. Shawn Marsh, Hon. Patricia M. Martin, Ms. Kimberly Papillon, Hon. Louis Trosch, and Hon. Roger K. Warren.

## Table of Contents

Implicit Bias: A Primer................................ 1

Schemas and Implicit Cognitions............... 1

Implicit Social Cognitions........................... 1

Asking about Bias........................................ 2

Implicit measurement devices.................... 2

Pervasive implicit bias................................ 3

Real-world consequences........................... 4

Malleability ................................................. 4

The big picture ........................................... 5

Glossary....................................................... 7

Bibliography ............................................. 10

# Implicit Bias: A Primer

## Schemas and Implicit Cognitions (or "mental shortcuts")

Stop for a moment and consider what bombards your senses every day. Think about everything you see, both still and moving, with all their color, detail, and depth. Think about what you hear in the background, perhaps a song on the radio, as you decode lyrics and musical notes. Think about touch, smell, and even taste. And while all that's happening, you might be walking or driving down the street, avoiding pedestrians and cars, chewing gum, digesting your breakfast, flipping through email on your smartphone. How does your brain do all this simultaneously?

It does so by processing through schemas, which are templates of knowledge that help us organize specific examples into broader categories. When we see, for example, something with a flat seat, a back, and some legs, we recognize it as a "chair." Regardless of whether it is plush or wooden, with wheels or bolted down, we know what to do with an object that fits into the category "chair." Without spending a lot of mental energy, we simply sit. Of course, if for some reason we have to study the chair carefully--because we like the style or think it might collapse--we can and will do so. But typically, we just sit down.

We have schemas not only for objects, but also processes, such as how to order food at a restaurant. Without much explanation, we know what it means when a smiling person hands us laminated paper with detailed descriptions of food and prices. Even when we land in a foreign airport, we know how to follow the crazy mess of arrows and baggage icons toward ground transportation.

These schemas are helpful because they allow us to operate without expending valuable mental resources. In fact, unless something goes wrong, these thoughts take place automatically without our awareness or conscious direction. In this way, most cognitions are implicit.

## Implicit Social Cognitions (or "thoughts about people you didn't know you had")

What is interesting is that schemas apply not only to objects (e.g., "chairs") or behaviors (e.g., "ordering food") but also to human beings (e.g., "the elderly"). We naturally assign people into various social categories divided by salient and chronically accessible traits, such as age, gender, race, and role. And just as we might have implicit cognitions that help us walk and drive, we have implicit social cognitions that guide our thinking about social categories. Where do these schemas come from? They come from our experiences with other people, some of them direct (i.e., real-world encounters) but most of them vicarious (i.e., relayed to us through stories, books, movies, media, and culture).

If we unpack these schemas further, we see that some of the underlying cognitions include stereotypes, which are simply traits that we associate with a category. For instance, if we think that a particular category of human beings is frail--such as the elderly--we will not raise our guard. If we think that another category is foreign--such as Asians--we will be surprised by their fluent English. These cognitions also include attitudes, which are overall, evaluative feelings that are positive or negative. For instance, if we identify someone as having graduated from our beloved alma mater, we will feel more at ease. The term "implicit bias"

1

includes both implicit stereotypes and implicit attitudes.

Though our shorthand schemas of people may be helpful in some situations, they also can lead to discriminatory behaviors if we are not careful. Given the critical importance of exercising fairness and equality in the court system, lawyers, judges, jurors, and staff should be particularly concerned about identifying such possibilities. Do we, for instance, associate aggressiveness with Black men, such that we see them as more likely to have started the fight than to have responded in self-defense? Or have we already internalized the lessons of Martin Luther King, Jr. and navigate life in a perfectly "colorblind" (or gender-blind, ethnicity-blind, class-blind, etc.) way?

### Asking about Bias (or "it's murky in here")

One way to find out about implicit bias is simply to ask people. However, in a post-civil rights environment, it has become much less useful to ask explicit questions on sensitive topics. We run into a "willing and able" problem.

First, people may not be willing to tell pollsters and researchers what they really feel. They may be chilled by an air of political correctness.

Second, and more important, people may not know what is inside their heads. Indeed, a wealth of cognitive psychology has demonstrated that we are lousy at introspection. For example, slight environmental changes alter our judgments and behavior without our realizing. If the room smells of Lysol, people eat more neatly. People holding a warm cup of coffee (versus a cold cup) ascribe warmer (versus cooler) personality traits to a stranger described in a vignette. The

experiments go on and on. And recall that by definition, implicit biases are those that we carry without awareness or conscious direction. So how do we know whether we are being biased or fair-and-square?

### Implicit measurement devices (or "don't tell me how much you weigh, just get on the scale")

In response, social and cognitive psychologists with neuroscientists have tried to develop instruments that measure stereotypes and attitudes, without having to rely on potentially untrustworthy self-reports. Some instruments have been linguistic, asking folks to write out sentences to describe a certain scene from a newspaper article. It turns out that if someone engages in stereotypical behavior, we just describe what happened. If it is counter-typical, we feel a need to explain what happened. (Von Hippel 1997; Sekaquaptewa 2003).

Others are physiological, measuring how much we sweat, how our blood pressure changes, or even which regions of our brain light up on an fMRI (functional magnetic resonance imaging) scan. (Phelps 2000).

Still other techniques borrow from marketers. For instance, conjoint analysis asks people to give an overall evaluation to slightly different product bundles (e.g., how do you compare a 17" screen laptop with 2GB memory and 3 USB ports, versus a 15" laptop with 3 GB of memory and 2 USB ports). By offering multiple rounds of choices, one can get a measure of how important each feature is to a person even if she had no clue to the question "How much would you pay for an extra USB port?" Recently, social cognitionists have adapted this methodology by creating "bundles" that include demographic attributes. For instance, how

2

**APPENDIX PAGE 77**

would you rank a job with the title Assistant Manager that paid $160,000 in Miami working for Ms. Smith, as compared to another job with the title Vice President that paid $150,000 in Chicago for Mr. Jones? (Caruso 2009).

Scientists have been endlessly creative, but so far, the most widely accepted instruments have used reaction times--some variant of which has been used for over a century to study psychological phenomena. These instruments draw on the basic insight that any two concepts that are closely associated in our minds should be easier to sort together. If you hear the word "moon," and I then ask you to think of a laundry detergent, then "Tide" might come more quickly to mind. If the word "RED" is painted in the color red, we will be faster in stating its color than the case when the word "GREEN" is painted in red.

Although there are various reaction time measures, the most thoroughly tested one is the Implicit Association Test (IAT). It is a sort of video game you play, typically on a computer, where you are asked to sort categories of pictures and words. For example, in the Black-White race attitude test, you sort pictures of European American faces and African American faces, Good words and Bad words in front of a computer. It turns out that most of us respond more quickly when the European American face and Good words are assigned to the same key (and African American face and Bad words are assigned to the other key), as compared to when the European American face and Bad words are assigned to the same key (and African American face and Good words are assigned to the other key). This average time differential is the measure of implicit bias. [If the description is hard to follow, try an IAT yourself at Project Implicit.]

## Pervasive implicit bias (or "it ain't no accident")

It may seem silly to measure bias by playing a sorting game (i.e. the IAT). But, a decade of research using the IAT reveals pervasive reaction time differences in every country tested, in the direction consistent with the general social hierarchies: German over Turk (in Germany), Japanese over Korean (for Japanese), White over Black, men over women (on the stereotype of "career" versus "family"), light-skinned over dark skin, youth over elderly, straight over gay, etc. These time differentials, which are taken to be a measure of implicit bias, are systematic and pervasive. They are statistically significant and not due to random chance variations in measurements.

These pervasive results do not mean that everyone has the exact same bias scores. Instead, there is wide variability among individuals. Further, the social category you belong to can influence what sorts of biases you are likely to have. For example, although most Whites (and Asians, Latinos, and American Indians) show an implicit attitude in favor of Whites over Blacks, African Americans show no such preference on average. (This means, of course, that about half of African Americans do prefer Whites, but the other half prefer Blacks.)

Interestingly, implicit biases are dissociated from explicit biases. In other words, they are related to but differ sometimes substantially from explicit biases--those stereotypes and attitudes that we expressly self-report on surveys. The best understanding is that implicit and explicit biases are related but different mental constructs. Neither kind should be viewed as the solely "accurate" or "authentic" measure of bias. Both measures tell us something important.

3

**APPENDIX PAGE 78**

## Real-world consequences (or "why should we care?")

All these scientific measures are intellectually interesting, but lawyers care most about real-world consequences. Do these measures of implicit bias predict an individual's behaviors or decisions? Do milliseconds really matter>? (Chugh 2004). If, for example, well-intentioned people committed to being "fair and square" are not influenced by these implicit biases, then who cares about silly video game results?

There is increasing evidence that implicit biases, as measured by the IAT, do predict behavior in the real world--in ways that can have real effects on real lives. Prof. John Jost (NYU, psychology) and colleagues have provided a recent literature review (in press) of ten studies that managers should not ignore. Among the findings from various laboratories are:

- implicit bias predicts the rate of callback interviews (Rooth 2007, based on implicit stereotype in Sweden that Arabs are lazy);
- implicit bias predicts awkward body language (McConnell & Leibold 2001), which could influence whether folks feel that they are being treated fairly or courteously;
- implicit bias predicts how we read the friendliness of facial expressions (Hugenberg & Bodenhausen 2003);
- implicit bias predicts more negative evaluations of ambiguous actions by an African American (Rudman & Lee 2002), which could influence decisionmaking in hard cases;
- implicit bias predicts more negative evaluations of agentic (i.e. confident, aggressive, ambitious) women in certain hiring conditions (Rudman & Glick 2001);

- implicit bias predicts the amount of shooter bias--how much easier it is to shoot African Americans compared to Whites in a videogame simulation (Glaser & Knowles 2008);
- implicit bias predicts voting behavior in Italy (Arcari 2008);
- implicit bias predicts binge-drinking (Ostafin & Palfai 2006), suicide ideation (Nock & Banaji 2007), and sexual attraction to children (Gray 2005).

With any new scientific field, there remain questions and criticisms--sometimes strident. (Arkes & Tetlock 2004; Mitchell & Tetlock 2006). And on-the-merits skepticism should be encouraged as the hallmark of good, rigorous science. But most scientists studying implicit bias find the accumulating evidence persuasive. For instance, a recent meta-analysis of 122 research reports, involving a total of 14,900 subjects, revealed that in the sensitive domains of stereotyping and prejudice, implicit bias IAT scores better predict behavior than explicit self-reports. (Greenwald et al. 2009).

And again, even though much of the recent research focus is on the IAT, other instruments and experimental methods have corroborated the existence of implicit biases with real world consequences. For example, a few studies have demonstrated that criminal defendants with more Afro-centric facial features receive in certain contexts more severe criminal punishment (Banks et al. 2006; Blair 2004).

## Malleability (or "is there any good news?")

The findings of real-world consequence are disturbing for all of us who sincerely believe that we do not let biases prevalent in our culture infect our individual decisionmaking. Even a little bit. Fortunately, there is evidence

4

that implicit biases are malleable and can be changed.

- An individual's motivation to be fair does matter. But we must first believe that there's a potential problem before we try to fix it.
- The environment seems to matter. Social contact across social groups seems to have a positive effect not only on explicit attitudes but also implicit ones.
- Third, environmental exposure to countertypical exemplars who function as "debiasing agents" seems to decrease our bias.
  - In one study, a mental imagery exercise of imagining a professional business woman (versus a Caribbean vacation) decreased implicit stereotypes of women. (Blair et al. 2001).
  - Exposure to "positive" exemplars, such as Tiger Woods and Martin Luther King in a history questionnaire, decreased implicit bias against Blacks. (Dasgupta & Greenwald 2001).
  - Contact with female professors and deans decreased implicit bias against women for college-aged women. (Dasgupta & Asgari 2004).
- Fourth, various procedural changes can disrupt the link between implicit bias and discriminatory behavior.
  - In a simple example, orchestras started using a blind screen in auditioning new musicians; afterwards women had much greater success. (Goldin & Rouse 2000).
  - In another example, by committing beforehand to merit criteria (is book smarts or street smarts more important?), there was less gender

discrimination in hiring a police chief. (Uhlmann & Cohen 2005).
  - In order to check against bias in any particular situation, we must often recognize that race, gender, sexual orientation, and other social categories may be influencing decisionmaking. This recognition is the opposite of various forms of "blindness" (e.g., color-blindness).

In outlining these findings of malleability, we do not mean to be Pollyanish. For example, mere social contact is not a panacea since psychologists have emphasized that certain conditions are important to decreasing prejudice (e.g., interaction on equal terms; repeated, non-trivial cooperation). Also, fleeting exposure to countertypical exemplars may be drowned out by repeated exposure to more typical stereotypes from the media (Kang 2005).

Even if we are skeptical, the bottom line is that there's no justification for throwing our hands up in resignation. Certainly the science doesn't require us to. Although the task is challenging, we can make real improvements in our goal toward justice and fairness.

## The big picture (or "what it means to be a faithful steward of the judicial system")

It's important to keep an eye on the big picture. The focus on implicit bias does not address the existence and impact of explicit bias--the stereotypes and attitudes that folks recognize and embrace. Also, the past has an inertia that has not dissipated. Even if all explicit and implicit biases were wiped away through some magical wand, life today would still bear the burdens of an unjust yesterday. That said, as careful stewards of the justice system, we

5

should still strive to take all forms of bias seriously, including implicit bias.

After all, Americans view the court system as the single institution that is most unbiased, impartial, fair, and just. Yet, a typical trial courtroom setting mixes together many people, often strangers, from different social backgrounds, in intense, stressful, emotional, and sometimes hostile contexts. In such environments, a complex jumble of implicit and explicit biases will inevitably be at play. It is the primary responsibility of the judge and other court staff to manage this complex and bias-rich social situation to the end that fairness and justice be done--and be seen to be done.

6

**APPENDIX PAGE 81**

# Glossary

Note: Many of these definitions draw from Jerry Kang & Kristin Lane, A Future History of Law and Implicit Social Cognition (unpublished manuscript 2009)

## Attitude

An attitude is "an association between a given object and a given evaluative category." R.H. Fazio, et al., Attitude accessibility, attitude-behavior consistency, and the strength of the object-evaluation association, 18 J. EXPERIMENTAL SOCIAL PSYCHOLOGY 339, 341 (1982). Evaluative categories are either positive or negative, and as such, attitudes reflect what we like and dislike, favor and disfavor, approach and avoid. See also stereotype.

## Behavioral realism

A school of thought within legal scholarship that calls for more accurate and realistic models of human decision-making and behavior to be incorporated into law and policy. It involves a three step process:

 First, identify advances in the mind and behavioral sciences that provide a more accurate model of human cognition and behavior.

Second, compare that new model with the latent theories of human behavior and decision-making embedded within the law. These latent theories typically reflect "common sense" based on naïve psychological theories.

Third, when the new model and the latent theories are discrepant, ask lawmakers and legal institutions to account for this disparity. An accounting requires either altering the law to comport with more accurate models of thinking and behavior or providing a transparent explanation of "the prudential, economic, political, or religious reasons for retaining a less accurate and outdated view." Kristin Lane, Jerry Kang, & Mahzarin Banaji, Implicit Social Cognition and the Law, 3 ANNU. REV. LAW SOC. SCI. 19.1-19.25 (2007).

## Dissociation

Dissociation is the gap between explicit and implicit biases. Typically, implicit biases are larger, as measured in standardized units, than explicit biases. Often, our explicit biases may be close to zero even though our implicit biases are larger.

There seems to be some moderate-strength relation between explicit and implicit biases. See Wilhelm Hofmann, A Meta-Analysis on the Correlation Between the Implicit Association Test and Explicit Self-Report Measures, 31 PERSONALITY & SOC. PSYCH. BULL. 1369 (2005) (reporting mean population correlation r=0.24 after analyzing 126 correlations). Most scientists reject the idea that implicit biases are the only "true" or "authentic" measure; both explicit and implicit biases contribute to a full understanding of bias.

## Explicit

Explicit means that we are aware that we have a particular thought or feeling. The term sometimes also connotes that we have an accurate understanding of the source of that thought or feeling. Finally, the term often connotes conscious endorsement of the thought or feeling. For example, if one has an explicitly positive attitude toward chocolate, then one has a positive attitude, knows that one has a positive attitude, and consciously endorses and celebrates that preference. See also implicit.

7

## Implicit

Implicit means that we are either unaware of or mistaken about the source of the thought or feeling. R. Zajonc, Feeling and thinking: Preferences need no inferences, 35 AMERICAN PSYCHOLOGIST 151 (1980). If we are unaware of a thought or feeling, then we cannot report it when asked. See also explicit.

## Implicit Association Test

The IAT requires participants to classify rapidly individual stimuli into one of four distinct categories using only two responses (for example, in a the traditional computerized IAT, participants might respond using only the "E" key on the left side of the keyboard, or "I" on the right side). For instance, in an age attitude IAT, there are two social categories, YOUNG and OLD, and two attitudinal categories, GOOD and BAD. YOUNG and OLD might be represented by black-and-white photographs of the faces of young and old people. GOOD and BAD could be represented by words that are easily identified as being linked to positive or negative affect, such as "joy" or "agony". A person with a negative implicit attitude toward OLD would be expected to go more quickly when OLD and BAD share one key, and YOUNG and GOOD the other, than when the pairings of good and bad are switched.

The IAT was invented by Anthony Greenwald and colleagues in the mid 1990s. Project Implicit, which allows individuals to take these tests online, is maintained by Anthony Greenwald (Washington), Mahzarin Banaji (Harvard), and Brian Nosek (Virginia).

## Implicit Attitudes

"Implicit attitudes are introspectively unidentified (or inaccurately identified) traces of past experience that mediate favorable or unfavorable feeling, thought, or action toward social objects." Anthony Greenwald & Mahzarin Banaji, Implicit social cognition: attitudes, self-esteem, and stereotypes, 102 Psychol. Rev. 4, 8 (1995). Generally, we are unaware of our implicit attitudes and may not endorse them upon self-reflection. See also attitude; implicit.

## Implicit Biases

A bias is a departure from some point that has been marked as "neutral." Biases in implicit stereotypes and implicit attitudes are called "implicit biases."

## Implicit Stereotypes

"Implicit stereotypes are the introspectively unidentified (or inaccurately identified) traces of past experience that mediate attributions of qualities to members of a social category" Anthony Greenwald & Mahzarin Banaji, Implicit social cognition: attitudes, self-esteem, and stereotypes, 102 Psychol. Rev. 4, 8 (1995). Generally, we are unaware of our implicit stereotypes and may not endorse them upon self-reflection. See also stereotype; implicit.

## Implicit Social Cognitions

Social cognitions are stereotypes and attitudes about social categories (e.g., Whites, youths, women). Implicit social cognitions are implicit stereotypes and implicit attitudes about social categories.

## Stereotype

A stereotype is an association between a given object and a specific attribute. An example is "Norwegians are tall." Stereotypes may support an overall attitude. For instance, if one likes tall people and Norwegians are tall, it is likely that this attribute will contribute toward a positive orientation toward Norwegians. See also attitude.

8

**APPENDIX PAGE 83**

## Validities

To decide whether some new instrument and findings are valid, scientists often look for various validities, such as statistical conclusion validity, internal validity, construct validity, and predictive validity.

- Statistical conclusion validity asks whether the correlation is found between independent and dependent variables have been correctly computed.
- Internal validity examines whether in addition to correlation, there has been a demonstration of causation. In particular, could there be potential confounds that produced the correlation?
- Construct validity examines whether the concrete observables (the scores registered by some instrument) actually represent the abstract mental construct that we are interested in. As applied to the IAT, one could ask whether the test actually measures the strength of mental associations held by an individual between the social category and an attitude or stereotype
- Predictive validity examines whether some test predicts behavior, for example, in the form of evaluation, judgment, physical movement or response. If predictive validity is demonstrated in realistic settings, there is greater reason to take the measures seriously.

APPENDIX PAGE 84

# Bibliography

Allen R. McConnell & Jill M. Leibold, Relations Among the Implicit Association Test, Discriminatory Behavior, and Explicit Measures of Racial Attitudes, 37 J. Experimental Soc. Psychol. 435 (2001)

Anthony G. Greenwald, et al., Understanding and Using the Implicit Association Test: III. Meta-Analysis of Predictive Validity, 97 J. Personality & Soc. Psychol. 17 (2009)

Brian D. Ostafin, & Tibor P. Palfai, Compelled to Consume: The Implicit Association Test and Automatic Alcohol Motivation, 20 Psych. of Addictive Behav. 322 (2006)

Claudia Goldin & Cecilia Rouse, Orchestrating Impartiality: The Impact of "Blind" Auditions on Female Musicians, 90 Am. Econ. Rev. 715 (2000)

Dan-Olof Rooth, Implicit Discrimination in Hiring: Real World Evidence (Institute for the Study of Labor, Discussion Paper No. 2764, April 2007)

Denise Sekaquaptewa, et al., Stereotypic Explanatory Bias: Implicit Stereotyping as a Predictor of Discrimination, 39 J. Experimental Soc. Psychol.75 (2003).

Dolly Chugh, Societal and Managerial Implications of Implicit Social Cognition: Why Milliseconds Matter, 17 Soc. Just. Res. 203 (2004)

Elizabeth A. Phelps, et. al., Performance on Indirect Measures of Race Evaluation Predicts Amygdala Activation, 12 J. Cog. Neuroscience 729 (2000).

Eric Luis Uhlmann & Geoffrey L. Cohen, Constructed Criteria: Redefining Merit to Justify Discrimination, 16 Psychol. Sci. 474 (2005)

Eugene M. Caruso, Dobromir A. Rahnev, & Mahzarin Banaji, Using Conjoint Analysis to Detect Discrimination: Revealing Covert Preferences from Overt Choices, 27 Soc. Cognition 128 (2009)

Gregory Mitchell & Philip E. Tetlock, Antidiscrimination Law and the Perils of Mindreading, 67 Ohio St. L.J. 1023 (2006)

Hal R. Arkes & Philip E. Tetlock, Attributions of Implicit Prejudice, or "Would Jesse Jackson 'Fail' the Implicit Association Test?," 15 Psychol. Inquiry 257 (2004)

Irene V. Blair et al, The Influence of Afrocentric Facial Features in Criminal Sentencing, 15 Psychol. Sci. 674 (2004)

Irene V. Blair, Jennifer E. Ma, & Alison P. Lenton, Imagining Stereotypes Away: The Moderation of Implicit Stereotypes Through Mental Imagery, 81 J. Person. & Soc. Psych. 828 (2001)

Jerry Kang, Trojan Horses of Race, 118 Harv. L. Rev. 1491 (2005)

Kurt Hugenberg & Galen V. Bodenhausen, Facing Prejudice: Implicit Prejudice and the Perception of Facial Threat. 14 Psychol. Sci. 640 (2003)

Laurie A. Rudman & Matthew R. Lee, Implicit and Explicit Consequences of Exposure to Violent and Misogynous Rap Music, 5 Group Processes & Intergroup Rel. 133 (2002)

**APPENDIX PAGE 85**

Laurie A. Rudman & Peter Glick, Prescriptive Gender Stereotypes and Backlash Toward Agentic Women, 57 J. Soc. Issues 743 (2001)

Luciano Arcuri et al., Predicting the Vote: Implicit Attitudes as Predictors of the Future Behavior of Decided and Undecided Voters, 29 Political Psychology369

Matthew K. Knock & Mahzarin R. Banaji, Prediction of Suicide Ideation and Attempts Among Adolescents Using a Brief Performance-Based Test, 75 J. Clinical & Consulting Psychology 707 (2007).

Nicola S. Gray, et al., An Implicit Test of the Associations Between Children and Sex in Pedophiles, 114 J. Abnormal Psych. 304 (2005)

Nilanjana Dasgupta & Anthony G. Greenwald, On the Malleability of Automatic Attitudes: Combating Automatic Prejudice with Images of Admired and the Disliked Individuals, 81 J. Person. & Soc. Psych.800 (2001)

Nilanjana Dasgupta & Shaki Asgari, Seeing is Believing: Exposure to Counterstereotypic Women Leaders and Its Effect on the Malleability of Automatic Gender Stereotyping, 40 J. Experimental Soc. Psychol. 642 (2004)

R. Richard Banks, Jennifer L. Eberhardt, Lee Ross, Discrimination and Implicit Racial Bias in a Racially Unequal Society. 94 Calif. Law Rev. 1169 (2006)

William Von Hippel et al., The Linguistic Intergroup Bias As an Implicit Indicator of Prejudice, 33 J. Experimental Soc. Psychol. 490 (1997)

**APPENDIX PAGE 86**

## Behavioral Legal Ethics

Behavioral science, law, and ethical decision-making

---

# New Implicit Bias Video and Jury Instructions for Federal Courts

Posted on June 26, 2017 by Tigran Eldred | Leave a comment

We've posted before about implicit bias, including the Department of Justice's training on implicit bias, the ABA's video and related work on the subject and the role that implicit bias plays in Batson challenges. In a fascinating new development, the United States District Court for the Western District of Washington (which includes Seattle) has produced a video for jurors to watch. As noted by the Marshall Project in this article discussing the initiative (originally posted here), the video is being shown to potential jurors as they wait to be called for service. The court has also posted a set of pattern jury instructions that can be used at a judge's discretion during a trial. Will other federal courts follow suit? And will there be some form of rigorous evaluation to assess the effectiveness of this innovative approach? Developments to follow . . .

ADVERTISEMENT

Privacy & Cookies: This site uses cookies. By continuing to use this website, you agree to their use.
To find out more, including how to control cookies, see here: Cookie Policy

Close and accept

APPENDIX PAGE 87

Home › ABA Groups › Section of Litigation › Good Works Initiatives › Implicit Bias Initiative

## Implicit Bias Initiative

### Implicit Bias Initiative

To help combat implicit bias in the justice system, the ABA Section of Litigation has launched a landmark website offering critical information and resources for ABA members and other stakeholders. "Our vision is that the web site will serve as 'one-stop shopping'—the 'go-to' repository for anyone who wants to know more about implicit bias in the justice system or in the ranks of the legal profession. Most importantly, it is intended to provide bar associations and other groups the resources they need to duplicate educational sessions for their groups.

The centerpiece of the website is a video, "The Neuroscience of Implicit Bias" (an edited version of a film by the Judicial Council of California). In addition, the website offers a virtual "toolbox" designed to help bar leaders, legal educators, judges, other justice system stake-holders, and community leaders in general present programming on implicit bias in their own communities. Other key elements of the website include a bibliography of select articles on the topic of implicit bias in the justice system, links to key websites, and more handy resources.

Through the virtual "toolbox" on the website, the Section is supporting the presentation of programming on the topic by judges, bar leaders, and others across the country.

### Mission Statement

The problem of implicit bias affects all participants in the justice system, including civi and criminal attorneys. By raising awareness, we hope combat and ultimately eliminate the problem.

An attorney who understand the implications and effects implicit bias will be better equipped to deal with its personal impact as well as th impact on his or her clients. other words, an attorney wh understands the implications and effects of implicit bias w be a more effective advocate

Case 2:18-cv-00314-HCN   Document 29-1   Filed 10/09/18   PageID.1027   Page 92 of 140

Home › ABA Groups › Section of Litigation › Good Works Initiatives › Implicit Bias Initiative › What Is Implicit or Unconscious Bias?

## What Is Implicit or Unconscious Bias?

For the legal profession, understanding implicit bias and ways to debias one's approach to law-related issues and decisions is critical to a fair and representative perception and reality of access to justice and equity.

The problem of implicit bias has been described by one researcher as follows:

> We naturally assign people into various social categories divided by salient and chronically accessible traits, such as age, gender, race, and role. And just as we might have implicit cognitions that help us walk and drive, we have implicit social cognitions that guide our thinking about social categories. Where do these schemas come from? They come from our experiences with other people, some of them direct (i.e., real-world encounters) but most of them vicarious (i.e., relayed to us through stories, books, movies, media, and culture).

> If we unpack these schemas further, we see that some of the underlying cognitions include stereotypes, which are simply traits that we associate with a category. For instance, if we think that a particular category of human beings is frail—such as the elderly—we will not raise our guard. If we think that another category is foreign—such as Asians—we will be surprised by their fluent English. These cognitions also include attitudes, which are overall, evaluative feelings that are positive or negative. For instance, if we identify someone as having graduated from our beloved alma mater, we will feel more at ease. The term "implicit bias" includes both implicit stereotypes and implicit attitudes.

> Though our shorthand schemas of people may be helpful in some situations, they also can lead to discriminatory behaviors if we are not careful. Given the critical importance of exercising fairness and equality in the court system, lawyers, judges, jurors, and staff should be particularly concerned about identifying such possibilities.

Jerry Kang, Implicit Bias: A Primer for Courts, prepared for the National Campaign to Ensure the Racial and Ethnic Fairness of America's State Courts, Aug. 2009.

**APPENDIX PAGE 89**

Malcolm Gladwell discusses implicit bias in his bestseller, *Blink*, this way:

> All of us have implicit biases to some degree. This does not necessarily mean we will act in an inappropriate or discriminatory manner, only that our first "blink" sends us certain information. Acknowledging and understanding this implicit response and its value and role is critical to informed decision-making and is particularly critical to those whose decisions must embody fairness and justice.

Blink: The Power of Thinking Without Thinking (2005).

# DISPARITIES IN DISCIPLINE:

## A Look at School Disciplinary Actions for Utah's American Indian Students



Percent of Student Demographic Referred to Law Enforcement



THE UNIVERSITY OF UTAH
**S.J. QUINNEY**
**COLLEGE OF LAW**

Public Policy Clinic

**APPENDIX PAGE 91**

DISPARITIES IN DISCIPLINE:
A Look at School Disciplinary Actions
for Utah's American Indian Students

This report was produced by Vanessa Walsh, J.D. candidate and member
of the Public Policy Clinic at the S. J. Quinney College of Law, under the
supervision of Associate Professor Emily Chiang. The contents of the report
do not reflect the opinion, expertise, or advice of the University of Utah, the
S. J. Quinney College of Law, or any of their employees.

Cover artwork by Isabelle Pitcher, ©2014

The University of Utah
S.J. Quinney College of Law
332 South 1400 East
Salt Lake City, Utah 84112
801-581-6833
law.utah.edu

## TABLE OF CONTENTS

Executive Summary ..................................................................................................................... 3

Introduction ............................................................................................................................... 5

Methodology ............................................................................................................................... 5

I. The School to Prison Pipeline Across the Nation ................................................................. 6

II. History and Factors Contributing to American Indian Student Vulnerabilities ................. 7

III. Findings: Discipline of American Indian Students in Utah ................................................ 8

    A. Elementary School Rates ................................................................................................. 10

    B. Suspensions ..................................................................................................................... 12

    C. Expulsions ....................................................................................................................... 13

    D. Referrals to Law Enforcement ....................................................................................... 15

    E. School-Related Arrests .................................................................................................... 16

    F. Students with Disabilities ............................................................................................... 17

    G. District Specific Data ..................................................................................................... 18

IV. Conclusion ......................................................................................................................... 20

Appendices ............................................................................................................................... 21

    Appendix A – Location of American Indians and American Indian Students in Utah ......... 21

    Appendix B – Districts with the Highest Disparity ............................................................. 23

    Appendix C – Schools with Highest Disparity By Action Type ........................................... 25

**APPENDIX PAGE 93**

## TABLE OF FIGURES

Figure 1      Four Year Graduation Rate ...................................................................................8

Figure 2      Percent of Actions Received .................................................................................9

Figure 3      Likelihood of Receiving Action Compared to White Students..........................9

Figure 4      Percent of Elementary School Actions Compared to White Students.................11

Figure 5      Disciplinary Actions for American Indian Students in Elementary School...........11

Figure 6      Suspension Rates for American Indian Students ..............................................13

Figure 7      Percent of American Indian Population Receiving Action.................................14

Figure 8      Expected Actions Compared to Actual Actions................................................14

Figure 9      Percent of Populations Referred to Law Enforcement.....................................15

Figure 10     American Indian Referrals to Law Enforcement...............................................16

Figure 11     Percent of Student Populations Arrested at School..........................................17

Figure 12     American Indian Students with Disabilities Receiving Action .........................18

Figure 13     Districts With Greatest Disparity for Referrals to Law Enforcement ...............19

Figure 14     Districts with Greatest Disparity: Total Actions...............................................23

Figure 15     Districts With Greatest Disparity: Suspensions................................................23

Figure 16     Districts with Greatest Disparity:  School Related Arrests ..............................24

Figure 17     Districts with Greatest Disparity: Suspensions ...............................................25

Figure 18     Schools with Greatest Disparity: Expulsions...................................................25

Figure 19     Schools with Greatest Disparity: Referrals to Law Enforcements....................26

Figure 20     Schools with Greatest Disparity: School Related Arrests.................................26

**APPENDIX PAGE 94**

## EXECUTIVE SUMMARY

A number of recent studies and reports have examined the school-to-prison pipeline (STPP) and its impact on students of color.  Few, if any, of these documents have focused on the troubling and undeniable effects of the pipeline on American Indian students. Nationally, 22% of all American Indian students receive disciplinary action at school, compared to 14.1% of all white students.[1] In Utah, these students are almost four times (3.8) more likely to receive a school disciplinary action compared to their white counterparts.

American Indians occupy a unique place in our country's history. Past policies of assimilation removed a generation of American Indian children from their families.[2] This community continues to rank at or near the bottom of nearly every social, health, and economic indicator.[3]  These factors have resulted in unique vulnerabilities for this student population that demand focus and additional resources.

This Report is the first to analyze publicly available data from the U.S. Department of Education, collected for the 2011 school year, with a focus on American Indian students in Utah.

Utah is pushing American Indian students into the pipeline at alarming rates. In 2011, the most recent year for which data is available, this student population comprised the smallest student demographic in the state and the was most frequently expelled, referred to law enforcement, and arrested for school related incidents—all the most severe forms of school disciplinary action. When students are removed from their traditional learning environments due to suspensions and expulsions, they are more likely to enter the juvenile justice system, the adult criminal justice system, and/or to drop out of school.[4]  In 2014, 31% of American Indian students in Utah dropped out of high school, compared to a state average of 15%.[5]

The data also indicates that:

- Fifty-five American Indian students in kindergarten through sixth grade were referred to law enforcement in 2011. In comparison, not a single white student in elementary school received this action.

- American Indian students are almost four times more likely to receive school discipline than their white counterparts.

- American Indian students are seven and a half times more likely to be expelled compared to white students.

- American Indian students are the single most likely student population in Utah to be referred to law enforcement. They are 3 times more likely to receive this action than all other students of color and almost 8 times more likely than white students.

3

- American Indian students are the single most likely student population in Utah to be arrested at school. They are almost 4 times more likely to receive this action than all other students of color and more than 6 times more likely than white students.

- Thirty percent of American Indians diagnosed with a disability under the Individuals with Disabilities Education Act (IDEA) or Section 504 of the Rehabilitation Act of 1973 received a disciplinary action.

This information should be of great concern to those who care about the continued vitality of Utah's education system and its ability to prepare all students to grow into contributing and productive members of our community.

4

**APPENDIX PAGE 96**

## INTRODUCTION

*Referral to Law Enforcement – Safe School Violation: Two [American Indian] boys entered the teacher's lounge looking for a teacher and finding it empty decided to look in the refrigerator. They saw two bottles of Dr. Pepper took them and drank them. This is a theft and the boys will be referred to law enforcement.*

   – School disciplinary report, San Juan school district.

This scenario played out in a Utah middle school in 2014. Taking a soda from a faculty refrigerator was labeled a safe school violation for two American Indian students. Across the nation, American Indian students are more than one and a half times more likely to receive a school disciplinary action than their white counterparts.[6] The likelihood is even higher for more severe forms of school disciplinary action, such as referrals to law enforcement and school related arrests. Nationally, 22% of all American Indian students receive a school disciplinary action. In Utah, students in this population are expelled, referred to law enforcement and arrested at school at alarming rates. They are almost four times more likely than white students to be disciplined.[7] They are the smallest student demographic in the state and yet have the highest percentage of students who are expelled, referred to law enforcement and arrested at school.[8]

This Report will provide an overview of the school-to-prison pipeline generally, with a focus on the disproportionality of school disciplinary actions for American Indian students. Part I will provide a brief introduction to the school-to-prison pipeline. Part II provides a summary of the unique history and factors that contribute to the vulnerabilities of this student population. Part III will present a detailed analysis of the disparity in school disciplinary actions in Utah. This analysis includes elementary school discipline rates and a statewide examination of disproportionality in suspensions, expulsions, referrals to law enforcement and school related arrests. It will also present data for American Indian students identified as having a disability. Generally speaking, the data for this student population will be compared to data for the white student population.

## METHODOLOGY

Since 1968, the federal Department of Education has collected data from our nation's public schools through its Civil Rights Data Collection ("CRDC"). The data is intended for use by the department's Office of Civil Rights in its enforcement and monitoring efforts regarding equal educational opportunity.[9] The CRDC collects a variety of information including student enrollment, educational programs and services. It disaggregates the data by race/ethnicity, gender, limited English proficiency and disability.[10]

The numbers on which this Report relies are the most comprehensive and recent nation-wide statistics available and were released to the public in the spring of 2014 for the 2011 school year. The 2011-12 CRDC collected data from a universe of all public schools and school districts, including juvenile justice facilities, charter schools, alternative schools, and schools serving students with disabilities.[11] Among other things, the data tracks the number of disciplinary actions at these schools. Categories of disciplinary actions reported include: in-school suspension, only one out-of-school suspension, more than one out-of-school suspension, expulsion with educational services, expulsion without educational services, expulsion under a zero tolerance policy, referral to law enforcement, and school related arrest.

Analysis in this report focuses primarily on the percentage of each student demographic receiving a disciplinary action at school and draws comparisons between those populations. It is important to note that students can receive more than one action. Out-of-school suspensions are broken out into only

5

one out-of-school suspension and more than one out-of-school suspension. All other actions are not cumulative. For example, if one student is referred to law enforcement on two different occasions, n=2. If two students are each referred to law enforcement once, n=2. In both cases, there were two referrals in that student group. Although this may inflate the reported percentage of total population receiving action, the raw number of actions in the student population is accurate and comparisons can still be accurately drawn.[12]

This Report sometimes uses the same methodology as *From Fingerpaint to Fingerprints: The School to Prison Pipeline in Utah*, which focused primarily on expected actions compared to actual actions.[13] This was accomplished by comparing the number of students enrolled to the number of disciplinary actions given to arrive at a predicted value. For example, if there are 80 white students in a 100 student population and 10 students were disciplined, it's predicted that 8 of these students would be white. Some numbers are different from those in that report however, because the majority of analysis in From *Fingerpaint to Fingerprints* included only the student population without disabilities. This report includes all students in the population, both with and without disabilities.

The charts, graphs and statistics presented below are based upon independent analysis of the raw data made available by the CRDC. That data, along with a searchable school and district database, is available at www.ocrdata.ed.gov.

## I.  The School to Prison Pipeline Across the Nation

The school to prison pipeline is the collection of education and public safety policies and practices that push our nation's schoolchildren out of the classroom and into the juvenile justice system, or the criminal justice system.[14] For example, many schools have "zero-tolerance" policies for drug-related and other activities that have caused a dramatic shift away from traditional in-school discipline towards greater reliance on juvenile justice interventions for common school misbehavior.[15] This comes at a significant cost to state agencies and takes students out of the normal education process, where they are less likely to receive adult supervision and more likely to be exposed to other students who have committed violent offenses, gang members, or other bad influences.[16]

Today, nearly half of all public schools have assigned police officers.[17] School-based police officers, frequently referred to as school resource officers or SRO's, are the fastest growing segment of law enforcement.[18] The National Association of School Resource Officers estimates that more than 10,000 police officers serve in schools nationwide.[19] These officers' roles vary significantly across schools, with some charged primarily with enforcement of criminal laws, while others are focused on mentoring, counseling, and teaching duties.[20] A recent study by a professor at the Levin College of Law found that a key, yet understudied, component of the pipeline is the increased presence of law SRO's.[21] The study shows clear, visible differences in the rates of referrals to law enforcement, suggesting that a SRO's weekly presence increases the number of students who will be involved in the justice system.[22] It suggests the most glaring difference is the rate of referral for lower-level offenses, such as fighting without using a weapon or making a threat without using a weapon, more than doubles when a school has regular contact with an SRO.[23] The placement of SRO's often inadvertently feeds the pipeline.[24]

Recent estimates are that one in three students will be suspended at some point between kindergarten and 12th grade.[25] New research shows that suspension rates are closely correlated with dropout and delinquency rates, and they have tremendous economic costs for the suspended students.[26] When students are removed from their traditional learning environments due to suspensions and expulsions, they are more

6

**APPENDIX PAGE 98**

likely to enter the juvenile justice system, the adult criminal justice system, and/or to drop out of school.[27] The exclusion of students from school for disciplinary reasons is directly related to lower attendance rates, increased course failures, and can set a student on a path of disengagement from school.[28] Dropping out of high school has serious consequences for the income and employment potential of the students who do so, and for the communities they live in. There is no direct link between the decision to drop out and prison but there is evidence that dropouts are exposed to many of the same socioeconomic forces that are often gateways to crime.[29]

## II. History and Factors Contributing to American Indian Student Vulnerabilities

Although there has been increased focus on the school-to-prison pipeline and its impact on students of color, little has been written on its impact on American Indians.[30] American Indians occupy a unique place in this country.[31] They are classified by sociologists as among those "involuntary minorities" who were coercively incorporated into American society.[32] They are separated by culture, language, polity, and religion.[33] A small number of Indian nations have experienced remarkable success in their economic development endeavors, but a significant number of tribes remain mired in poverty and dependent on federal assistance.[34]

In the nineteenth and twentieth centuries, the federal government had a policy of assimilation that resulted in Indian children being removed from their Indian homes and placed in non-Indian homes or boarding schools.[35] A primary example of this policy was the federal boarding school system, in which Native American children were taken from their homes and placed in federal and church-run institutions around the country.[36] Once there, they were denied the right to speak their language, practice their religion, or partake in any cultural practices.[37] In the late 60's and 70's conservative estimates indicated that one-third of all American Indian children were being separated from their families and placed in foster care, adoptive homes, or educational institutions.[38]

American Indians are regularly identified as among the poorest communities in the United States.[39] As the United States Civil Rights Commission explains, "Native Americans still suffer higher rates of poverty, poor educational achievement, substandard housing, and higher rates of disease and illness."[40] They continue to rank at or near the bottom of nearly every social, health, and economic indicator:[41]

- About one in four American Indians and Alaska Natives were living in poverty in 2012.[42] Nine states—including Utah—have poverty rates of 30 percent or more for American Indians and Alaska Natives.[43]

- Because most of the land owned by individual Indians on reservations is generally held in trust by the Federal government for the benefit of tribes or their members, they cannot mortgage it for loans like other Americans.[44]

- In 2013, the overall unemployment rate for the United States was 7.4 percent; the rate for American Indians and Alaska Natives was 12.8 percent.[45]

- Drug abuse exacts a heavy toll on Native Americans and Alaskan Natives in the U.S. In 2009, 18.3% of American Indians or Alaska Natives age 12 or older were current users of illicit drugs, compared to 8.8% of whites.[46]

- Adequate roads and housing, clean water and sanitation, telephones and electricity are in short supply on many reservations.[47]

7

**APPENDIX PAGE 99**

Six Indian tribes in Utah are recognized as official entities across twelve reservations. According to the 2010 Census, there are 50,064 people in Utah who reported as American Indian alone or in combination with another race.[48] Of this total, 7,853 are students and account for 1.3% of the total student population.[49] These students are spread throughout Utah in both rural and urban areas.  Approximately 40% of American Indian students were in enrolled in rural schools, with the remaining 60% in urban schools.[50] Unfortunately, the schools near reservations in Utah are ranked among the worst in Utah, with over one fifth of the total American Indian student population in schools identified as the lowest performing in the state.[51]

Together, these factors create a student population already extremely vulnerable to low graduation rates. As the section below shows, the data indicates that these vulnerabilities are being compounded by the frequent use of school discipline and law enforcement, instead of being mitigated by positive behavioral interventions and supports.

## III. Findings: Discipline of American Indian Students in Utah

The school-to-prison pipeline is thriving in Utah, particularly among American Indian students, who are actively and disproportionately being pushed out of school by suspensions, expulsions, referrals to law enforcement and school related arrests.

In 2014, the Utah State Office of Education reported an 83% graduation rate.[52] Although the rate for American Indian students has been increasing in recent years, only 65% of this population is graduating compared to 86% of white students.[53] Graduation rates for other racial groups are shown below.

Figure 1 Four Year Graduation Rate

| | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| All students | 75% | 76% | 78% | 81% | 83% |
| Asian | 75% | 72% | 78% | 79% | 85% |
| Black | 60% | 61% | 61% | 68% | 66% |
| American Indian | 55% | 57% | 61% | 65% | 65% |
| White | 79% | 80% | 82% | 85% | 86% |
| Hispanic/Latino | 55% | 57% | 63% | 68% | 72% |
| Pacific Islander | 69% | 69% | 73% | 77% | 82% |
| Students with disabilities | 55% | 59% | 61% | 65% | 67% |

Across every category of punishment, students of color in Utah are more likely to receive a school disciplinary action than their white counterparts. American Indian students feel the brunt of this inequity. This student population comprises 1.3% of the total student population in Utah. All things being equal, it is expected that this demographic would account for 1.3% of all disciplinary actions. Instead, this student group received three times as many disciplinary actions than expected, with expulsions, referrals to law enforcement and school related arrests accounting for the most severe disproportionality.

8

**Figure 2** Percent of Actions Recieved

## Percent of Actions Received Compared to % of Student Population



Moreover, when compared to their white counterparts, the likelihood of receiving school discipline is distressing. Three point nine percent of all white students in Utah received a school disciplinary action compared to 14.8% of all American Indian students, making them 3.8 times more likely to receive an action. In every category, American Indian students are significantly more likely to be disciplined compared to white students.

**Figure 3** Likelihood of Receiving Action Compared to White Students

## American Indian Students Likelihood to Receive Action Compared to White Students



9

Nationwide, American Indian students are roughly 3 times more likely to be expelled and to be referred to law enforcement than their white counterparts.[54] The disparity in Utah is even worse, where American Indian students are 7.5 times more likely to be expelled than white students and nearly 8 times more likely[55] to be referred to law enforcement than white students.

*Times More Likely than White Students to Receive a Disciplinary Action*

|                           | Utah | Nationwide |
|---------------------------|------|------------|
| Suspension                | 3.3  | 1.8        |
| Expulsion                 | 7.5  | 3.0        |
| Referral to Law Enforcement | 7.1 | 2.6        |
| School Related Arrest     | 6.2  | 0.5        |

The disparity in school discipline rates begins in elementary school. It continues into middle and high school, with statewide disproportionality in suspensions, expulsions, referrals to law enforcement and school related arrests.

## A. Elementary School Rates

The school-to-prison pipeline for American Indian students in Utah starts in elementary school. There is evidence that expulsion or suspension early in a child's education is associated with expulsion or suspension in later school grades. Young students who are expelled or suspended are as much as 10 times more likely to drop out of high school, experience academic failure and grade retention, hold negative school attitudes, and face incarceration than those who have not.[57] Arguably, no student in this grade range should be expelled, referred to law enforcement or arrested at school except in the most extreme cases.

Utah has 545 schools that serve students from kindergarten to grade six.[58] Students in this grade range received 7,767 disciplinary actions.[59] In every category of punishment, American Indian students received a disproportionate amount of actions compared to white student population.

Nearly three hundred (293) American Indian students in elementary schools received a school disciplinary action, meaning roughly seven percent (7.3%) of all American Indian students enrolled in elementary school were disciplined. Compared to white students, American Indian students in elementary school are almost four times[60] more likely to receive an action. Perhaps the most alarming comparison is in referrals to law enforcement. Fifty-five American Indian students in kindergarten through sixth grade were referred to law enforcement in 2011. In comparison, not a single white student received this action. Four American Indian students in this grade range were arrested at school and two were expelled.

10

**Figure 4**  Percent of Elementary School Actions Compared to White Students



American Indian students in Utah's elementary schools account for 1.3% of the total elementary school population, yet in every category, received more than 1.3% of the actions given.  It is expected that 102 American Indian students would receive actions, however 293 were given to American Indian students, making them almost three times more likely to receive an action than expected.[64] In all discipline categories, American Indian students received more actions than expected. Most alarming is that 1.3% of the total student population received 12.5% of all expulsions under a zero tolerance policy, 12.2% of all referrals to law enforcement and 8.7% of all school related arrests.

**Figure 5**  Disciplinary Actions for American Indian Students in Elementary School



**APPENDIX PAGE 103**

## B. Suspensions

The available data tracks three types of school suspension: in-school suspensions, only one out-of-school suspension and more than one out-of-school suspension. An in-school suspension is an instance in which a child is temporarily removed from his or her regular classroom(s) for at least half a day but remains under the direct supervision of school personnel. Out-of-school suspension means excluding a student from school for disciplinary reasons for one school day or longer. This does not include students who served their suspension in the school.

American Indian students are 2.7 times more likely than white students to receive an in-school suspension. When looking at the more severe form of out-of-school suspensions, American Indian students are 2.7 times more likely than all other students to receive an out-of-school suspension and 3.6 times more likely to receive an out-of-school suspension compared to white students. Overall, 10.8% of all American Indian students received a suspension. The table below shows a comparison to other student demographics:

| | American Indian | Asian | Hispanic | Black | White | Pacific Islander | 2 or More Races |
|---|---|---|---|---|---|---|---|
| In School Suspension | 3.2% | 1.0% | 2.3% | 4.0% | 1.2% | 2.1% | 2.0% |
| Only one Out of School Suspension | 4.6% | 1.6% | 2.6% | 5.2% | 1.3% | 3.4% | 2.6% |
| More than One Out of School Suspension | 3.0% | 0.8% | 2.1% | 4.3% | 0.8% | 1.8% | 1.6% |
| Total Out of School Suspension | 7.6% | 2.4% | 4.7% | 9.5% | 2.1% | 5.2% | 4.2% |
| Total Suspensions (in & out) | 10.8% | 3.4% | 7.0% | 13.5% | 3.3% | 7.3% | 6.2% |

This student population comprises 1.3% of the total student population in Utah. All things being equal, it is expected that this demographic would account for 1.3% of all disciplinary actions. This is not the case. Instead, this student group received two and a half times as many disciplinary actions than expected. The chart below shows the percentage of the student population compared to the percentage of actions this group received by suspension type.

**APPENDIX PAGE 104**



**Figure 6**  Suspension Rates for American Indian Students

## Percent of Population Compared to Percent of Actions Received

## C. Expulsions

The data tracks two kinds of expulsion, those in which the student receives educational services, and those in which they do not. There is a third reported category, expulsions under zero tolerance policies.  An expulsion under a zero tolerance policy is the removal of a student from the school setting for an extended length of time because a policy that results in mandatory expulsion of any student who commits one or more specified offenses ( for example, offenses involving guns, or other weapons, or violence, or similar factors, or combinations of these factors). These may be with or without services and are reflected in each of those categories.[62]

American Indian students are 11 times more likely to be expelled with educational services than white students. For both expulsion types combined, American Indian students are seven and a half times more likely to be expelled.  All of the expulsions given to American Indian students in 2011 were given under zero tolerance policies.

13

**Figure 7** Percent of American Indian Population Receiving Action



Based on the 265 expulsions given in Utah schools, it is expected that 3 American Indian students would receive this action.  Instead, this demographic received 22, making them six times more likely than expected to be expelled.  All expulsions were given under a zero tolerance policy, and all were expulsions with educational services.

**Figure 8** Expected Actions Compared to Actual Actions



14

## D. Referrals to Law Enforcement

Referral to law enforcement is an action by which a student is reported to any law enforcement agency or official, including a school police unit, for an incident that occurs on school grounds, during school-related events, or while taking school transportation, regardless of whether official action is taken.[63] Students receiving a referral to law enforcement can face a variety of consequences, including being detained, having to miss school to go to court, being fined, having to agree to other sanctions such as probation, and possibly being suspended or expelled by their school.[64]

American Indian students are the single most likely student population in Utah to be referred to law enforcement. As shown below, 3.2% of all American Indian students were referred to law enforcement. This student population is 3 times more likely to receive this action than all other students of color and almost 8 times[65]  more likely than white students.

**Figure 9**  Percent of Populations Referred to Law Enforcement

Percent of Student Demographic Referred to Law Enforcement



In total, there were 3,317 referrals to law enforcement in Utah schools in 2011. This number, by itself, is alarming.  American Indians, which account for 1.3% of the total student population, were predicted to receive 44 of these actions.[66] Instead, this group received 249, accounting for 7.5% of all referrals to law enforcement. This is 205 more referrals than expected.

15

APPENDIX PAGE 107

**Figure 10** American Indian Referrals to Law Enforcement



Referrals to Law Enforcement: American Indian

### E. School-Related Arrests

A school-related arrest is an arrest of a student for any activity conducted on school grounds, during off-campus school activities (including while taking school transportation), or due to a referral by any school official.

American Indian students are the single most likely student population to be arrested at school. They are almost 4 times more likely[67] to receive this action than all other students of color and more than 6 times more likely[68] than white students.  In total, there were 591 school-related arrests in Utah schools in 2011.  Based on the percentage of American Indians in the student population, it is expected this group would receive 8 of these actions.[69]  Instead, this group received 42, accounting for more than 7% of all school-related arrests.[70]

16



**Figure 11** Percent of Student Populations Arrested at School

## F. Students with Disabilities

American Indian students identified with disabilities fare even worse than American Indian students who have not been identified with a disability. This is particularly alarming because these students are protected by the Individuals with Disabilities Education Act (IDEA.) IDEA is a federal statute designed to ensure children with disabilities have access to a free and appropriate public education that addresses their unique educational needs and to ensure states, parents, and educators have sufficient resources to carry out the goals and policies of the IDEA.[71] It affords protection to students with disabilities facing disciplinary action in public schools.[72] Students with identified disabilities are provided an Individual Education Plan ("IEP").[73] Children with IEP's are, under the law, guaranteed a manifestation review—a process in which a team decides whether the behavior that resulted in discipline was a manifestation of that child's disability and, if so, whether the school was providing adequate services to help prevent the misconduct.[74]

Disabilities that qualify students to receive services within their school under the IDEA include learning disabilities, vision and hearing impairments, speech and language impairments, traumatic brain injuries, and emotional disturbances, among others.[75] Emotional disturbances are particularly hard to evaluate, but often lead to the type of disruptive behavior that results in disciplinary action.[76]

In 2011, Utah 74,307 students were identified as students with disabilities under IDEA and Section 504 of the Rehabilitation Act.[77] American Indian students accounted for 1.2% of this total, yet received 4% of all actions, making them 3.3 times more likely than expected to receive an action. More troubling, is that 30% of this student population received an action. When compared to white students identified as having a disability, they are 4.3 times more likely to be disciplined at school.

17

**Figure 12** American Indian Students with Disabilities Receiving Action

## American Indian Students with Disabilites

These students feel the brunt of the inequality in expulsions under a zero tolerance policy. This demographic is almost 14 times more likely[78] than expected to be expelled under such a policy. Thirty-three American Indian students identified as having a disability were referred to law enforcement, making them almost 5 times more likely[79] to receive this action than white students. Ten were arrested at school, making them 8.5 times more likely to receive this action compared to white students identified as having a disability.

### G. District Specific Data

There is a marked difference in student populations in referrals to law enforcement and school related arrests, with American Indian students in rural areas being much more likely than American Indian students in urban schools to receive this action. In urban locations, 1.2% of all American Indian students were referred to law enforcement. In rural schools, the number is much higher, with 6.6% of this student population being referred. In urban areas, American Indian students are 3.6 times more likely to be arrested at school, compared to American Indian students in rural areas, which are 15 times more likely.

Some school districts in Utah are excluding American Indians from school through disciplinary actions at much higher rates than others.

- In 2011, the South Sanpete district gave 23.8% of the American Indian student population a disciplinary action.[80] In comparison, 3.7% of white students received an action.

- The San Juan district, with the highest number of American Indians students in Utah, gave 22.5% of all American Indian students an action compared to just 5.3% of white students, making them 4.2 times more likely to receive an action.[81]

- American Indian students in the Davis district were 49 times more likely to be expelled than white students, and in the Iron district, they were 15 times more likely.

18

The rate at which some districts refer American Indian students to law enforcement is disturbing.

- In the San Juan district, more than 1 in 10 American Indian students received this action, making them 8 times more likely to receive this action than white students.[82]

- In one high school in the San Juan district, almost 30% of American Indian students[83] are referred to law enforcement.[84]  An elementary school in that same district referred over 17% of all American Indian students.[85]

- In the Canyons district, American Indian students are 6.8 times more likely than white students to be referred to law enforcement.

- In the Davis district, American Indian students are 6.7 times more likely than white students to be referred to law enforcement.

**Figure 13** Districts With Greatest Disparity for Referrals to Law Enforcement



Referral to Law Enforcement:
Districts with Highest Disparity

Statistics for the most disproportionate districts for school related arrests include:

- In the Iron district, 1.7% of all American Indian students were arrested at school compared to 0.3% of white students, making them 5 times more likely to receive this action.

- In the San Juan district, 1.5% of all American Indian students received this action, compared to no white students.

- In the Uintah district, this student population was 6.3 times more likely than white students to be arrested at school.

19

**APPENDIX PAGE 111**

## IV. Conclusion

The data present by this Report is deeply troubling.  If we are to begin to reverse these alarming trends in dropout rates and disproportionality in disciplinary actions among American Indians we must begin the conversation now, with the data as a starting point.  The extent and magnitude of the discipline disparity must be made known to educators, administrators, policymakers and community members in Utah.

20

# APPENDICES

### Appendix A  - Location of American Indians and American Indian Students in Utah

Six Indian tribes in Utah are recognized as official entities: Confederated Tribes of the Goshute Reservation, Northwestern Band of Shoshoni Nation, Paiute Indian Tribe of Utah, Skull Valley Band of Goshute Indians in Utah, Navajo Nation and the Utah Navajo Chapters, and Ute Indian Tribe of the Uintah & Ouray Reservation.[86]

Indian country in Utah consists of twelve reservations, the largest[87] of which are the Uintah & Ouray reservation located in Duchesne, Uintah and Grand[88] counties, and the Navajo Nation reservation located in San Juan County.[89]  Other reservations are the Shivwits Indian reservation[90] in St. George, Utah; the Goshute reservation,[91]  located approximately seventy miles southeast of Wendover, Utah; Skull Valley reservation[92]  in Toole County; Koosharem Band reservation[93] in Sevier county; the Kanosh Band reservation[94] in Milliard county; White Mesa Ute reservation[95] in San Juan county; Northwestern Band of Shoshone[96] in Box Elder County; and three reservations in Iron county, the Cedar Band reservation,[97] Indian Peaks Reservations[98] and the Piute Indian reservation.[99]

The school districts that serve these students on these reservations are:

| District | Reservation | # of American Indian students | % of American Indian students |
|---|---|---|---|
| San Juan | Navajo Nation White Mesa Ute | 1,487 | 47.7% |
| Uintah County | Uintah and Ouray | 529 | 7.5% |
| Duchesne County | Uintah and Ouray | 280 | 6.8% |
| Sevier | Koosharem Band Kanosh Band Sevier | 167 | 3.5% |
| Iron County | Piute Indian | 242 | 2.8% |
| Kane | Navajo Nation | 32 | 2.4% |
| Washington County | Shivwits Indian | 489 | 1.8% |
| Carbon | Uintah and Ouray | 41 | 1.2% |
| Tooele | Skull Valley | 154 | 1.1% |
| Beaver County | Cedar Band Indian Peaks | 17 | 1.0% |
| Box Elder | Northwestern Band of Shoshone | 94 | 0.8% |

21

Other school districts with a large American Indian enrollment that are not located near a reservation are:

| District | Location | # of American Indian Students | % of American Indian Students |
|---|---|---|---|
| Granite School District | Salt Lake City, Utah | 1,076 | 1.6% |
| Salt Lake District | Salt Lake City, Utah | 368 | 1.5% |
| Weber District | Ogden, Utah | 152 | 1.2% |
| Logan District | Logan, Utah | 75 | 1.2% |
| Murray District | Murray, Utah | 83 | 1.1% |
| Canyons District | Sandy, Utah | 275 | 0.8% |
| Nebo District | Spanish Fork, Utah | 184 | 0.6% |
| Davis District | Farmington, Utah | 399 | 0.6% |
| Alpine District | American Fork, Utah | 379 | 0.6% |
| Jordan District | West Jordan, Utah | 279 | 0.6% |

22

**APPENDIX PAGE 114**

## Appendix B – Districts with the Highest Disparity

All Actions Combined (Suspension, Expulsion, Referral to Law Enforcement, School Related Arrest)

**Figure 14** Districts with Greatest Disparity: Total Actions

Percent of Student Population Receiving Action: Total Actions



**Figure 15** Districts with Greatest Disparity: Suspensions

Percent of Student Population Receiving Action: Suspensions



23

**APPENDIX PAGE 115**



**Figure 16** Districts with Greatest Disparity: School-Related Arrests

24

## Appendix C - Schools with Highest Disparity By Action Type

**Figure 17** Schools with Greatest Disparity: Suspensions

Percent of Student Population Receiving Action: Suspensions



**Figure 18** Schools with Greatest Disparity: Expulsions

Percent of Student Population Receiving Action: Expulsions



25

**Figure 19** Schools with Greatest Disparity: Referrals to Law Enforcements

## Percent of Student Population Receiving Action: Referrals to Law Enforcements



**Figure 20** Schools with Greatest Disparity: School-Related Arrests

## Percent of Student Population Receiving Action: School-Related Arrests



26

[1] The statistics presented in this Report are based upon independent analysis of the raw data made available by the Civil Rights Data Collection.  That data, along with a school by school searchable database, is available at http://ocrdata.ed.gov/.  Additional information on methodology available in the Methodology section of this report.

[2] Cheyañna L. Jaffke, *The "Existing Indian Family" Exception to the Indian Child Welfare Act: The States' Attempt to Slaughter Tribal Interests in Indian Children*, 66 La. L. Rev. 733, 734 (2006).

[3] U.S. Comm'n on Civil Rights, A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country, ix (July 2003), available at http://www.usccr.gov/pubs/na0703/na0204.pdf.

[4] Deborah N. Archer, *Introduction: Challenging the School-to-Prison Pipeline*, 54 N.Y.L. Sch. L. Rev. 867, 868 (2010).

[5] Utah State Office of Educ., 2014 *Cohort Graduation and Dropout Rate Report*, available at http://www.schools.utah.gov/data/Superintendents-Annual-Report/2014/GraduationReport.aspx.

[6] The numbers in this paragraph are based on independent analysis of the OCR data.

[7] 3.8 times.

[8] In 2011, American Indian students comprised 1.3% of the student population.  Three point two percent (3.2%) of this demographic were referred to law enforcement and 0.5% were arrested at school and 0.3% were expelled.

[9] Office for Civil Rights, U.S. Department of Education, http://www2.ed.gov/about/offices/list/ocr/data.html. (Last visited 4/6/2015)

[10] *Id.*

[11] Office for Civil Rights, U.S. Department of Education, 2011-12 Civil Right Data Collection Questions and Answers, http://ocrdata.ed.gov/downloads/FAQ.pdf.

[12] In both scenarios, assuming a student population of 100, the percentage would be 2%, even though one student received two actions.

[13] *From Fingerpaint to Fingerprints* was issued by the Public Policy Clinic in the Fall of 2014 and is available at https://app.box.com/s/7ylyziug6ims8ahuwa06 or http://www.law.utah.edu/projects/public-policy-practicum/.

[14] Archer, *supra* n. 4 at 868.

[15] N.C. v. Com., 396 S.W.3d 852, 863 (Ky. 2013) (citing Marc Levin, Texas Public Policy Foundation, *Schooling a New Class of Criminals? Better Disciplinary Alternatives for Texas Students, Policy Perspective* 7 (March 2006).

[16] *Id.*

[17] Barbara Raymond, *Assigning Police Officers to Schools*, U.S. Department of Justice, Community Oriented Policing Services Office, Problem-Oriented Guides for Police Response Guides Series No. 10, p. 1, Washington, DC, (April 2010),  *available* at http://ric-zai-inc.com/Publications/cops-p182-pub.pdf.

[18] National Association of School Resource Officers, https://nasro.org/. (Last Visited 4/6/2015).

[19] *Id.*

[20] Peter Finn & Jack McDevitt, *National Assessment of School Resource Officer Programs*, 43 (Feb. 2005), available at https://www.ncjrs.gov/pdffiles1/nij/grants/209273.pdf.

[21] Jason P. Nance, *Students, Police and the School-to-Prison Pipeline*, Wash. U. L. Rev. (March 2015) forthcoming.

[22] *Id.* at 41.

[23] *Id.*

[24] *See* Civil Rights Project at Harvard University & The Advancement Project, *Opportunities Suspended: The Devastating Consequences of Zero Tolerance and School Discipline* (Jun. 2000); *see also* New York Civil Liberties Union & American Civil Liberties Union, *Criminalizing the Classroom: The Over-Policing of New York City Schools*, 6 (2007).

27

**APPENDIX PAGE 119**

[25] Dan Losen, *Are We Closing the School Discipline Gap?* The Center for Civil Rights Remedies, (Feb. 2015), available at  http://civilrightsproject.ucla.edu/resources/projects/center-for-civil-rights-remedies/school-to-prison-folder/federal-reports/are-we-closing-the-school-discipline-gap/losen-are-we-closing-discipline-gap-2015-summary.pdf.

[26] *Id.*

[27] Archer, *supra* n. 4 at 868.

[28] Robert Balfanz, Vaughan Byrnes, and Joanna Fox, *Sent Home and Put Off-Track: The Antecedents, Disproportionalities, and Consequences of Being Suspended in the Ninth Grade* (Dec. 2012), *available* at http://civilrightsproject.ucla.edu/resources/projects/center-for-civil-rights-remedies/school-to-prison-folder/state-reports/sent-home-and-put-off-track-the-antecedents-disproportionalities-and-consequences-of-being-suspended-in-the-ninth-grade/balfanz-sent-home-ccrr-conf-2013.pdf

[29] Andrew Sum, Ishwar Khatiwada, Joseph McLaughlin et.al. *The Consequences of Dropping Out of High School; Joblessness and Jailing for High School Dropouts and the High Cost to Taxpayers*, (October 2009), *available* at  http://www.northeastern.edu/clms/wp-content/uploads/The_Consequences_of_Dropping_Out_of_High_School.pdf.

[30] Chauncee D. Smith, *Deconstructing the Pipeline: Evaluating School-to-Prison Pipeline Equal Protection Cases Through A Structural Racism Framework*, 36 Fordham Urb. L.J. 1009 (2009); Deborah N. Archer, *Introduction: Challenging the School-to-Prison Pipeline*, 54 N.Y.L. Sch. L. Rev. 867 (2009/2010); Jeffrey D. Spitzer-Resnick, *Children in School: Student Discipline and the School-to-Prison Pipeline*, Wis. Lawyer, (Sep. 2014); Lia Epperson, *Brown's Dream Deferred: Lessons on Democracy and Identity from Cooper v. Aaron to the "School-to-Prison Pipeline"*, 49 Wake Forest L. Rev. 687 (2014).

[31] Willard Hughes Rollings, *Citizenship and Suffrage: The Native American Struggle for Civil Rights in the American West*, 1830-1965, 5 Nev. L.J. 126 (2004).

[32] *See* Brackette F. Williams, *A CLASS ACT: Anthropology and the Race to Nation Across Ethnic Terrain*, 18 Ann. Rev. Anthropology 401-44 (1989).

[33] Rollings, *supra* n. 31 at 126.

[34] Joseph P. Kalt & Stephen Cornell, *The Redefinition of Property Rights in American Indian Reservations: A Comparative Analysis of Native American Economic Development*, 121-150 in *American Indian Policy: Self-Governance and Economic Development* 121, 126-27, edited by  L.H. Leglers and F.J. Lyden, Westport, CT, Greenwood Press (1994).

[35] Cheyañna L. Jaffke, *The "Existing Indian Family" Exception to the Indian Child Welfare Act: The States' Attempt to Slaughter Tribal Interests in Indian Children*, 66 La. L. Rev. 733, 734 (2006).

[36] Lorie M. Graham, *Reparations, Self-Determination, and the Seventh Generation*, 21 Harv. Hum. Rts. J. 47, 51-52 (2008).

[37] *See* Peter Farb, Man's Rise To Civilization 257-68 (1968).

[38] *See, e.g.*, Hon. James Abourezk, *The Role of the Federal Government: A Congressional View, in The Destruction Of American Indian Families*, 1, 12 (Steven Unger ed., 1977); H.R. Rep. No. 1386, 95th Cong., 2d Sess. 9, 11 (1978), reprinted in 1978 U.S.C.C.A.N. 7530.

[39] Armen H. Merjian, *An Unbroken Chain of Injustice: The Dawes Act, Native American Trusts, and Cobell v. Salazar*, 46 Gonz. L. Rev. 609, 611 (2011).

[40] U.S. Comm'n on Civil Rights, *supra* n.3.

[41] *Id.*

[42] Pew Research Center, June 2014, http://www.pewresearch.org/. (Last Visited 4/6/2015).

[43] *See, e.g.*, U.S. Dep't of Commerce, U.S. Census Bureau, *Poverty Rates for Selected Detailed Race and Hispanic Groups by State and Place: 2007–2011*, issued February 2013.

[44] *Id.*

[45] United States Department of Labor, Bureau of Labor Statistics, *Labor Force Characteristics by Race and Ethnicity: 2013*, issued August 2014.

**APPENDIX PAGE 120**

[46] Office of National Drug Control Policy, 2009 National Survey on Drug Use and Health (September 2010) *available* at http://www.whitehouse.gov/sites/default/files/ondcp/issues-content/native-americas/fig1_lg.jpg.

[47] Energy Info. Admin., *Energy Consumption and Renewable Energy Development Potential on Indian Lands*, ix (Apr. 2000) (noting that 14.2% of Indian homes on reservations have no access to electricity, compared to 1.4% for all U.S. households).

[48] People who responded to the 2010 census survey indicating race alone are referred to as "race alone." People who reported more than one tribe, such as Navajo and Ute would also be included in race alone. This can be viewed as the minimum number of people reporting as American Indian or Alaska Native. Individuals who chose more than one of the six race categories on the census are referred to as "in combination."

[49] Office for Civil Rights, U.S. Department of Education, http://ocrdata.ed.gov/. (Last Visited 4/6/2015).

[50] Schools located in cities with a general population under 30,000.

[51] According to the Utah State Office of Education, Utah had a total of 316 Title 1 schools in 2014, a designation made based on socio-economic demographics that qualify schools for supplemental federal funding. Each year, the State Office of Education identifies Title 1 schools in three categories: priority, focus and reward. The lowest performing 5 percent of Title 1 schools in the state are identified as "priority" schools, with the next 10 percent of lowest-performing schools identified as "focus" schools. Both priority and focus schools are required to implement school improvement strategies. There are ten priority schools, which have 1,054 American Indian students.  There are 31 focus schools, which have 621 American Indian students.

[52] Utah State Office of Educ., *supra* n. 5.

[53] *Id.*

[54] 3.0 times more likely to be expelled and 2.6 times more likely to be referred to law enforcement.

[55] 7.7 times.

[56] L.R. Mendez, *Predictors of suspension and negative school outcomes: A longitudinal investigation*, New Directions for Youth Development, 17-33, Issue 99, 12 Van Egeren, L.A., Kirk, (2003).

[57] Lamont, J. H., Devore, et.al, *Out-of-school suspension and expulsion.* Pediatrics, 131(3), e1000-e1007 (2013); Petras, H., Masyn, et al, *Who is most at risk for school removal? A multilevel discrete-time survival analysis of individual- and context-level influences.* Journal of Educational Psychology, 103, 223 (2011); American Psychological Association, *Zero Tolerance Task Force Report An evidentiary review and recommendations*, (2008).

[58] Utah has 77 additional schools that serve grades 1-6 along with additional grades in 7-12. These schools were not included in the total, as the disciplinary actions are not broken out by grade.  Generally speaking, these students range in age from 5 to 12 years old.

[59] *From Fingerpaint to Fingerprints* reported 1,230 actions in school with "elementary" in the title. This means that "elementary" is actually in the name of the school.  If a school name is "Smith Elementary School," it is included, but a school named "Smith School" is not.  This analysis looked at the grades served in each school, as reported to the CRDC.

[60] 3.9 times.

[61] 2.9 times.

[62] For example, assume fifteen students are expelled, ten of which were a result of a zero tolerance policy, and five of which were expelled with educational services for other reasons. Further assume that two of those expelled under a zero tolerance received educational services while the other eight did not. Expulsions under zero tolerance would be reported as 10. The "expelled with services" count would be 7, the expelled without services would be 8, totaling the 15.

29

**APPENDIX PAGE 121**

[63] Office for Civil Rights, U.S. Department of Education, http://www2.ed.gov/about/offices/list/ocr/data.html. (Last Visited 4/6/2015).

[64] The Advancement Project, *Opportunities Suspended: The Devastating Consequences of Zero Tolerance and School Discipline*, 12, (June 2000).

[65] 7.7 times.

[66] 1.3% of 3,315 = 44

[67] 3.8 times.

[68] 6.2 times.

[69] There were 591 total actions.  American Indians account for 1.3% of the population.  All things being equal, it is expected they would receive 1.3% of the actions.

[70] 7.1%.

[71] 20 U.S.C. §1400(d) (2012).

[72] Mark McWilliams and Mark P. Fancher, *Undiagnosed Students with Disabilities Trapped in the School-to-Prison Pipeline*, 89-Aug Mich. B.J. 28, 29 (2010).

[73] 34 C.F.R. § 300.530 (2013).

[74] McWilliams, *supra* n. 72 at 29.

[75] 20 U.S.C. §1401(3)(A)(i) (2012).

[76] 34 C.F.R. §300.8(c)(4)(i) (2013).

[77] Section 504 of the Rehabilitation Act of 1973 is a national law that protects qualified individuals from discrimination based on their disability. Under this law, individuals with disabilities are defined as persons with a physical or mental impairment which substantially limits one or more major life activities. People who have a history of, or who are regarded as having a physical or mental impairment that substantially limits one or more major life activities, are also covered.

[78] 13.8 times.

[79] 4.6 times.

[80] Ten disciplinary actions were given to a population of 42 American Indian students.

[81] 1,484 white students received 79 actions. 1,487 American Indian students received 335 actions.

[82] 10.8% of the American Indian student population referred to law enforcement in 2011.

[83] 29.7 percent.

[84] San Juan High school had an American Indian population of 148 students. Forty four referrals went to this student population in 2011. In comparison, the school had a white population of 391 students, receiving 7 referrals.

[85] TSE' BII' NIDZISGAI Elementary has an American Indian population of 256 students.  Forty-four referrals were given to this student population in 2011.

[86] http://www.bia.gov/cs/groups/public/documents/text/idc002652.pdf. (Last Visited 4/6/2015)

[87] As measured in square miles.

[88] Duchesne, Uintah and Grand Counties are located in the Northeast portion of Utah.

[89] San Juan County is located in the Northwest portion of Utah along the Arizona border. The Navajo Indian reservation spans the corners of Utah, Arizona and New Mexico.

[90] Utah Division of Indian Affairs; information can be found at http://heritage.utah.gov/Utah-indian-affairs/Utah-tribes.

[91] Utah Division of Indian Affairs.

[92] *Id.*

[93] Piute Indian Tribe of Utah website; www.utahpiautes.org. (Last Visited 4/6/2015)

[94] *Id.*

[95] Utah Division of Indian Affairs.

[96] *Id.*

[97] Piute Indian Tribe of Utah website; www.utahpiautes.org. (Last Visited 4/6/2015).

[98] *Id.*

[99] *Id.*

30

**APPENDIX PAGE 122**

## The University of Utah S. J. Quinney College of Law Clinical Program

The College of Law's Clinical Program allows students to gain hands-on experience while earning academic credit in a wide range of diverse settings, from judicial chambers and civil rights organizations to business, technology and environmental placements, in local community agencies and in international arenas. The program was recently ranked second in the nation by the National Jurist magazine for the number of opportunities it provides for clinical experiences in the community.

Clinics include a classroom component, which helps students prepare for their legal work and offers a forum for students to reflect on their experiences. Clinical placements help students to develop a range of practice-related skills and to gain insights into their strengths and career preferences. Clinic students donated 40,000 hours of service in 2012-2013.

The Public Policy Clinic provides second and third year law students at the S. J. Quinney College of Law with an opportunity to effect public policy change through public education, the legislative process, and litigation. The Clinic is currently focused on helping to put an end to the school-to-prison pipeline in Utah.

For more information, visit law.utah.edu

U.S. Department of Commer

## QuickFacts
Utah

QuickFacts provides statistics for all states and counties, and for cities and towns with a *population of 5,000 or more.*

## Table

| ALL TOPICS | Utah |
|---|---|
| Population estimates, July 1, 2017, (V2017) | 3,101,833 |
| 👤 PEOPLE | |
| **Population** | |
| Population estimates, July 1, 2017, (V2017) | 3,101,833 |
| Population estimates base, April 1, 2010, (V2017) | 2,763,889 |
| Population, percent change - April 1, 2010 (estimates base) to July 1, 2017, (V2017) | 12.2% |
| Population, Census, April 1, 2010 | 2,763,885 |
| **Age and Sex** | |
| Persons under 5 years, percent | ▲ 8.2% |
| Persons under 18 years, percent | ▲ 29.9% |
| Persons 65 years and over, percent | ▲ 10.8% |
| Female persons, percent | ▲ 49.7% |
| **Race and Hispanic Origin** | |
| White alone, percent  (a) | ▲ 90.9% |
| Black or African American alone, percent  (a) | ▲ 1.4% |
| American Indian and Alaska Native alone, percent  (a) | ▲ 1.5% |
| Asian alone, percent  (a) | ▲ 2.6% |
| Native Hawaiian and Other Pacific Islander alone, percent  (a) | ▲ 1.0% |
| Two or More Races, percent | ▲ 2.5% |
| Hispanic or Latino, percent  (b) | ▲ 14.0% |
| White alone, not Hispanic or Latino, percent | ▲ 78.5% |
| **Population Characteristics** | |
| Veterans, 2012-2016 | 129,748 |
| Foreign born persons, percent, 2012-2016 | 8.3% |
| **Housing** | |
| Housing units, July 1, 2017, (V2017) | 1,084,631 |
| Owner-occupied housing unit rate, 2012-2016 | 69.6% |
| Median value of owner-occupied housing units, 2012-2016 | $224,600 |
| Median selected monthly owner costs -with a mortgage, 2012-2016 | $1,429 |
| Median selected monthly owner costs -without a mortgage, 2012-2016 | $394 |
| Median gross rent, 2012-2016 | $912 |
| Building permits, 2017 | 24,679 |
| **Families & Living Arrangements** | |
| Households, 2012-2016 | 918,367 |
| Persons per household, 2012-2016 | 3.16 |
| Living in same house 1 year ago, percent of persons age 1 year+, 2012-2016 | 82.9% |
| Language other than English spoken at home, percent of persons age 5 years+, 2012-2016 | 14.7% |
| **Education** | |
| High school graduate or higher, percent of persons age 25 years+, 2012-2016 | 91.5% |
| Bachelor's degree or higher, percent of persons age 25 years+, 2012-2016 | 31.7% |
| **Health** | |
| With a disability, under age 65 years, percent, 2012-2016 | 6.8% |
| Persons without health insurance, under age 65 years, percent | ▲ 10.1% |

**APPENDIX PAGE 124**

**Value Notes**

1. Includes data not distributed by county.

▲ Estimates are not comparable to other geographic levels due to methodology differences that may exist between different data sources.

Some estimates presented here come from sample data, and thus have sampling errors that may render some apparent differences between geographies statistically indistinguishable. Click the Q left of each row in TABLE view to learn about sampling error.

The vintage year (e.g., V2017) refers to the final year of the series (2010 thru 2017). *Different vintage years of estimates are not comparable.*

**Fact Notes**

(a)  Includes persons reporting only one race
(b)  Hispanics may be of any race, so also are included in applicable race categories
(c)  Economic Census - Puerto Rico data are not comparable to U.S. Economic Census data

**Value Flags**

| | |
|---|---|
| D | Suppressed to avoid disclosure of confidential information |
| F | Fewer than 25 firms |
| FN | Footnote on this item in place of data |
| NA | Not available |
| S | Suppressed; does not meet publication standards |
| X | Not applicable |
| Z | Value greater than zero but less than half unit of measure shown |
| - | Either no or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the interval of an open ended distribution. |

QuickFacts data are derived from: Population Estimates, American Community Survey, Census of Population and Housing, Current Population Survey, Small Area Health Insurance Estimates, Sm Poverty Estimates, State and County Housing Unit Estimates, County Business Patterns, Nonemployer Statistics, Economic Census, Survey of Business Owners, Building Permits.

**ABOUT US**
Are You in a Survey?
FAQs
Director's Corner
Regional Offices
History
Research
Scientific Integrity
Census Careers
Diversity @ Census
Business Opportunities
Congressional and Intergovernmental
Contact Us

**FIND DATA**
QuickFacts
American FactFinder
2010 Census
Economic Census
Interactive Maps
Training & Workshops
Data Tools
Developers
Catalogs
Publications

**BUSINESS & INDUSTRY**
Help With Your Forms
Economic Indicators
Economic Census
E-Stats
International Trade
Export Codes
NAICS
Governments
Longitudinal Employer-Household Dynamics (LEHD)
Survey of Business Owners

**PEOPLE & HOUSEHOLDS**
2020 Census
2010 Census
American Community Survey
Income
Poverty
Population Estimates
Population Projections
Health Insurance
Housing
International
Genealogy

**SPECIAL TOPICS**
Advisors, Centers and Research Programs
Statistics in Schools
Tribal Resources (AIAN)
Emergency Preparedness
Statistical Abstract
Special Census Program
Data Linkage Infrastructure
Fraudulent Activity & Scams
USA.gov

**NEWSROOM**
News Releases
Release Schedule
Facts for Features
Stats for Stories
Blogs

**CONNECT WITH US**

Accessibility | Information Quality | FOIA | Data Protection and Privacy Policy | U.S. Department of Commerce

Is this page helpful?   ✕
👍 Yes   👎 No

**APPENDIX PAGE 125**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| UTE INDIAN TRIBE OF THE | ) | |
| UINTAH AND OURAY | ) | |
| RESERVATION a federally | ) | |
| recognized Indian Tribe, | ) | |
| and a federally | ) | |
| chartered corporation, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 2:16-CV-00579CW |
| JUDGE BARRY G. LAWRENCE, | ) | |
| District Judge, Utah | ) | |
| Third Judicial District | ) | |
| Court, in his Individual | ) | |
| and Official Capacity, | ) | |
| and LYNN D. BECKER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE THE HONORABLE CLARK WADDOUPS

February 28, 2018

Motion Hearing

Laura W. Robinson, RPR, FCRR, CSR, CP
351 South West Temple
8.430 U.S. Courthouse
Salt Lake City, Utah 84101
(801)328-4800

1

**APPENDIX PAGE 126**

**Appearances of Counsel:**

For the Plaintiffs:        Frances C. Bassett
Thomasina Real Bird
Attorneys at Law
Fredericks Peebles & Morgan
1900 Plaza Drive
Louisville, CO 80027

J. Preston Stieff
Attorney at Law
J. Preston Stieff Law Offices
110 S. Regent Street
Suite 200
Salt Lake City, Utah 84111

For Lynn D. Becker:      David K. Isom
Attorney at Law
Isom Law Firm
299 S. Main Street
Suite 1300
Salt Lake City, Utah  84111

For Judge Barry Lawrence:  Nancy Sylvester
Attorney at Law
Administrative Office of
the Courts
PO Box 140241
Salt Lake City, Utah 84114

2

**APPENDIX PAGE 127**

```
                        I N D E X
```

Examinations                                              Page

  **MICHAEL J. WOZNIAK**                                    111
  DIRECT EXAMINATION                                        112
  BY MS. BASSETT
  CROSS-EXAMINATION                                         124
  BY MR. ISOM
  REDIRECT EXAMINATION                                      130
  BY MS. BASSETT
  **PILAR THOMAS**                                          131
  DIRECT EXAMINATION                                        132
  BY MS. REAL BIRD
  CROSS-EXAMINATION                                         143
  BY MR. ISOM
  REDIRECT EXAMINATION                                      152
  BY MS. REAL BIRD

```
                      E X H I B I T S
```

No.          Description                                   Page

        Plaintiff's Exhibit 1                              123
        Plaintiff's Exhibit 2                              161

**APPENDIX PAGE 128**

1    power and so it would require an act of congress.  And so an

2    Act like IMDA is taken to be with -- some of the courts have

3    described that power under the Constitution as plenary

4    authority in the congress and so that's what -- it has been

5    accepted that in the exercise of that plenary authority,

6    congress is able to enact statutes such as the Indian

7    Mineral Development Act, 25 USC Section 81, and a handful of

8    others.

9         THE COURT:  So 177 really becomes irrelevant because

10   there is no contention that there is a treaty or some other

11   act other than the specific acts you have referred to?

12        MS. BASSETT:  I think the way that our experts have

13   explained it to us, their understanding is that if approval

14   was not required under IMDA, Mr. Becker's contract would be

15   subject to 177.

16        THE COURT:  That is your legal experts.

17        MS. BASSETT:  Indian Law experts, yes, Your Honor.

18        THE COURT:  Yeah.  But it wouldn't be a question of

19   Indian Law, it would be a question of federal law.

20        MS. BASSETT:  Dealing with Indians, yes.  Federal law

21   dealing with Indians.

22        THE COURT:  Mr. Isom, do you have -- what do you think

23   that language means?

24        MR. ISOM:  I don't have anything to add but the

25   language itself and the language seems clearly to say that,

**APPENDIX PAGE 129**



1617 Sheridan Lake Rd
Rapid City, SD 57702
605.341.4400
605.341.4400

- Home
- Terry Pechota
- Contact
- Practice



Welcome to the Pechota Law Office web site.

Terry Pechota was born in Winner, SD and was raised in nearby Colome. He has more than 40 years of experience in private law practice in South Dakota since receiving his Juris Doctorate from the University of Iowa Law School in 1972. He received a Bachelor's of Science Degree in Education from Black Hills State University in 1969.

He was admitted to the South Dakota Bar in 1972; the United States Court of Appeals, Eighth Circuit in 1973; the United States Supreme Court in 1974; the United States Court of Appeals,

**APPENDIX PAGE 130**

Ninth Circuit in 1983; the United States Claims Court in 1984; and the United States Court of Appeals, Federal Circuit in 1985.

He has been admitted to various tribal courts including Rosebud Tribal Court; Oglala Sioux Tribal Court; Yankton Sioux Tribal Court; Crow Creek Tribal Court; and Standing Rock Tribal Court.

Mr. Pechota is a member of the State Bar of South Dakota; the Colorado State Bar; Pennington County Bar Association; American Trial Lawyers Association; South Dakota Trial Lawyers Association and the American Indian Attorneys Association.

Mr. Pechota, an enrolled member of the Rosebud Sioux Tribe, is widely considered a pioneer as a Native American practicing law in the United States. He is one of the first 13 Native Americans to argue Federal Indian law cases before the United States Supreme Court. He was the first Sioux Indian to be named a U.S. District Attorney.

While his practice has involved a good deal of Indian law cases, he has a successful record in other areas of the law including: criminal defense; personal injury-plaintiff; medical malpractice; civil rights and federal tort claims. A more complete list can be found on the Practice page.

Mr. Pechota is an attorney dedicated to his clients' success. If you have a need for an attorney qualified in the areas of law described on the Practice page of this website you are encouraged to contact Pechota Law Offices.

© 2016 Pechota Law Office

site designed by Sanborn Advertising and Black Hills Computer Consulting, Inc.

**APPENDIX PAGE 131**



NATIVE AMERICAN RIGHTS FUND

**NARF ATTORNEYS AMONG "THE FIRST THIRTEEN"**

February 16, 2012
Categories: Uncategorized



## NARF Attorneys among "The First Thirteen"

The First Thirteen Native attorneys who argued before the U.S. Supreme Court will be coming together to discuss their experiences in a symposium on Friday, March 16, 2012, at the University of New Mexico School of Law in Albuquerque, NM. Native American Rights Fund (NARF) Senior Staff Attorneys Melody McCoy and Heather Kendall Miller are two of the thirteen. (Two others of the 13, Arlinda Locklear and Jeanne Whiting, were NARF attorneys at the time of their arguments. Two more, Terry Pechota and Ray Cross, had been NARF attorneys prior to making their arguments.)

The symposium will begin with Rodney Lewis who argued the *Central Machinery Co. v. Arizona Tax Commission* case in 1980 and continue through James Anaya who argued *Nevada v. Hicks* in 2001, a case in which NARF also represented a party. Instead of the more usual lecture format, Dale White (*California v. U.S.*, 1989) will sit down with several of these attorneys at a time to have a conversation about their preparations, the day itself, and its impact on their careers and on Federal Indian Law.

This historic event will be sponsored by the American Indian Law Center, Inc. (AILC), UNM's Law and Indigenous Peoples Program, the Indian Legal Program at ASU's Sandra Day O'Connor College of Law, and the New Mexico Indian Bar Association. In addition, the NM Indian Bar Association will host a reception on Thursday evening before the event to honor the thirteen ground-breaking attorneys.

Proceeds from the symposium will benefit the Pre-Law Summer Institute (PLSI). PLSI, which the AILC has been running since 1967, is an intensive two-month program which prepares American Indian and Alaska Native individuals for the rigors of law school by essentially replicating the first semester of law school. Likened to boot camp by many former participants, the PLSI concentrates its content into eight weeks of instruction, research and study, teaching students the unique methods of law school research, analysis, and writing.

## The NARF Cases

In January, 1997, Melody McCoy argued that tribal civil jurisdiction should extend to the actions of everyone who comes within tribal territory, whether they are Native American or not. The case, **Strate v. A-1 Contractors**, involved a car accident on a state highway that is on a federal right-of-way crossing federal Indian trust land in North Dakota. Neither motorist was Indian, but one driver was a resident of the reservation, and had adult children who were members of the tribe. NARF argued that tribal courts should have jurisdiction along with state courts over motor vehicle torts that threaten the reservation community, even if they occur on state highways. Relying heavily on an earlier case, **Montana v. United States**, the Supreme Court ruled that the tribal court lacked jurisdiction. **Montana** established that for jurisdiction over non-Indians within reservations but on non-Indian land, there must either be a consensual relationship or a direct threat to the tribe's political integrity, economic security, health or welfare.

Heather Kendall-Miller represented the respondent, the Native Village of Venetie, in **Alaska v. Native Village**

**APPENDIX PAGE 132**

not Indian country under the Alaska Native Claims Settlement Act of 1971, and therefore the Tribe lacked jurisdiction to impose the tax. (The State of Alaska, the petitioner, was represented by John G. Roberts, who later became the Chief Justice of the United States.)

Melody McCoy joined the Native American Rights Fund as a staff attorney in 1986. At NARF, Melody works primarily in the areas of tribal jurisdiction, tribal education rights, tribal trust funds, and tribal intellectual property rights. She received her undergraduate degree from Harvard University (1981) and law degree from the University of Michigan (1986). Melody is admitted to practice law in Colorado and Massachusetts. She is an enrolled member of the Cherokee Nation of Oklahoma.

Heather Kendall-Miller is a senior staff attorney in the NARF Anchorage, Alaska office. A lawyer, teacher, and mentor, her legal experience includes cases involving subsistence, tribal sovereignty, human rights, and taxation. Prior to joining NARF, Heather worked with Sonosky, Chambers, Sasche & Miller in Anchorage, Alaska and Washington, DC doing legislative research and writing memoranda for litigation. From 1992 to 1994, Heather was a Skadden Fellow. Heather is Athabascan. She received a history degree, magna cum laude, from the University of Alaska, Fairbanks, Alaska (1988). She received her M.A. and J.D. from Harvard University (1991).

For more information click here and also here.



Boulder CO (main) – 303-447-8760 Anchorage AK – 907-276-0680 Washington DC – 202-785-4166

**APPENDIX PAGE 133**

**University of Colorado Law School**
## Colorado Law Scholarly Commons

Articles                                                   Colorado Law Faculty Scholarship

2013

# Lawyering for Groups: The Case of American Indian Tribal Attorneys

Kristen A. Carpenter
*University of Colorado Law School*

Eli Wald
*University of Denver Sturm College of Law*

Follow this and additional works at: http://scholar.law.colorado.edu/articles

 Part of the Indian and Aboriginal Law Commons, Legal Ethics and Professional Responsibility Commons, and the Legal Profession Commons

Citation Information

Kristen A. Carpenter and Eli Wald, *Lawyering for Groups: The Case of American Indian Tribal Attorneys*, 81 FORDHAM L. REV. 3085 (2013), *available at* http://scholar.law.colorado.edu/articles/95.

Copyright Statement

Copyright protected. Use of materials from this collection beyond the exceptions provided for in the Fair Use and Educational Use clauses of the U.S. Copyright Law may violate federal law. Permission to publish or reproduce is required.

This Article is brought to you for free and open access by the Colorado Law Faculty Scholarship at Colorado Law Scholarly Commons. It has been accepted for inclusion in Articles by an authorized administrator of Colorado Law Scholarly Commons. For more information, please contact erik.beck@colorado.edu.

**APPENDIX PAGE 134**

# LAWYERING FOR GROUPS:
# THE CASE OF AMERICAN INDIAN
# TRIBAL ATTORNEYS

*Kristen A. Carpenter\* & Eli Wald\*\**

*Lawyering for groups, broadly defined as the legal representation of a client who is not an individual, is a significant and booming phenomenon. Encompassing the representation of governments, corporations, institutions, peoples, classes, communities, and causes, lawyering for groups is what many, if not most, lawyers do. And yet, the dominant theory of law practice—the Standard Conception, with its principles of zealous advocacy, nonaccountability, and professional role-based morality—and the rules of professional conduct that codify it, continue to be premised on the basic antiquated assumption that the paradigmatic client-attorney relationship is between an individual client and an individual attorney. The result is a set of rules and a theory of law practice that often ill fit the practice of group lawyers.*

*This Article explores the theoretical and practical challenges of group lawyering through the study of lawyers for American Indian tribes. We believe that a focus on tribal lawyers furthers two important goals. First, the individualistic impulse of the dominant theory of law practice is so ingrained that it forecloses the possibility of challenging and imagining genuine group-based alternatives. In order to truly see the shortcomings of the Standard Conception and conceive of alternatives to it, one must start not with an abstract theory of group representation, but with a detailed study of the meaning, needs, interests, and realities of actual groups and build a corresponding theory from the ground up. Second, the story of tribal lawyers, an important narrative of both the legal profession and of tribes, is still largely untold. This Article thus aims to challenge the homogeneity of the Standard Conception of law practice and to begin the process of imagining group-based alternatives to it, while at the same time telling part of the story of tribal lawyers.*

---

\* Associate Dean for Faculty Development, Associate Professor of Law, and Director, American Indian Law Program, University of Colorado Law School.
\*\* Charles W. Delaney Jr. Professor of Law, University of Denver Sturm College of Law. The authors would like to thank Deborah Cantrell, Rick Collins, Howie Erichson, Matthew Fletcher, Bruce Green, Peter Huang, Alexi Lahav, Nancy Moore, Sarah Krakoff, Russ Pearce, Wenona Singel, Teddy Rave, Angela Riley, David Wilkins, Charles Wilkinson, and Ben Zipursky for helpful comments and conversations about this Article.

**APPENDIX PAGE 135**

3086                    *FORDHAM LAW REVIEW*                    [Vol. 81

TABLE OF CONTENTS

INTRODUCTION ......................................................................... 3086

I. LAWYERING FOR GROUPS: A PRACTICE IN SEARCH OF A THEORY ... 3089

II. A SHORT HISTORY OF AMERICAN INDIAN TRIBAL LAWYERING ....... 3096

    *A. Origins* ............................................................... 3096
    *B. Power and the Legal System* ................................. 3097
    *C. Loyalty and Conflicts* ......................................... 3100
    *D. Legal and Political Empowerment* ........................ 3104
    *E. The Contemporary Tribal Lawyer* ........................ 3109

III. PROFESSIONAL IDEOLOGY, ROLE, AND RULES
    MEET TRIBAL LAWYERING ........................................... 3113

    *A. The Dominant Professional Ideology and Role of American
       Lawyers* ............................................................. 3113
    *B. The Dominant Ideology and Tribal Lawyering* ...... 3115
    *C. From Ideology to Role and Rules* ......................... 3121
       1. Competence ................................................. 3122
       2. Allocation of Authority Between Client and Attorney .... 3131
       3. Conflicts of Interest ..................................... 3135
       4. Organization As Client ................................. 3140

IV. THE EXPERIENCE OF AMERICAN INDIAN TRIBAL LAWYERS AS A
    MEANS OF QUESTIONING LAWYERING FOR GROUPS ................. 3143

    *A. From "Zealous Advocacy" to "Effective Representation"* .... 3145
    *B. From "Nonaccountability" to "Client Empowerment"* ......... 3149
    *C. Challenging the Primacy of Professional Identity over
       Nonprofessional Identity* .................................... 3152
    *D. Some Models from Indian Country* ...................... 3157

CONCLUSION ........................................................................ 3162

INTRODUCTION

Today's scholars of the legal profession are asking profound questions about what changes in the practice of law mean for global governance, including issues of corporate power, state sovereignty, and human rights.[1] This conversation necessarily entails consideration of the many forms of client organization, and indeed human association, comprising our profession and society. And, yet, the conversation is stymied by the absence of theoretical and descriptive accounts capturing the phenomenon of lawyering for groups. Instead, the professional obligations of lawyers remain largely conscripted to a model of individual lawyering, envisioning a lawyer representing a singular person or entity in litigation, that fails to

---

1. *See, e.g.*, David B. Wilkins & Mihaela Papa, *The Rise of the Corporate Legal Elite in the BRICS: Implications for Global Governance* 36 B.C. INT'L & COMP. L. REV. (forthcoming 2013) (manuscript at 1–3).

including Rennard Strickland, Ralph Johnson, Monroe Price, Reid Chambers, and many others were developing federal Indian Law into a discrete field of study attracting both Indian and non-Indian students who intended to practice in the field.[99]

From 1988 to 2001, thirteen members or descendants of tribes, namely S. James Anaya, Raymond Cross, Heather Kendall-Miller, Rodney Lewis, Arlinda Locklear, Melody McCoy, Marilyn Miles, Terry Pechota, G. William Rice, Martin Seneca, Dale White, Jeanne Whiteing, and Susan Williams, appeared as counsel for tribal interests before the Supreme Court in major American Indian cases that determined tribal rights in tax, water, property, religion, jurisdiction, and other areas.[100]   Many others participated in major legislative movements, such as the notable Pawnee attorney, Walter Echo-Hawk, whose advocacy for American Indian human remains and religious freedoms, contributed to the passage of several major statutes. Time and time again, these attorneys recounted a personal dimension of their advocacy.   As Echo-Hawk said after the burial of hundreds of thousands of Indian remains, "Many of them were likely my own relatives."[101]   Tom Fredericks, a member of the Mandan, Hidatsa, and Arikara Nation, who has shared the indelible childhood memory of losing the family ranch to government condemnation of reservation lands, went on to represent tribes in government, regulatory, and transactional matters,

education of English and Indian youth. Caleb Cheeshahteaumuck of the Wampanoag Tribe, Class of 1665, was the first Native American to graduate from Harvard. . . . Despite the University's pledge in its Charter to actively facilitate the education of American Indian youth, it was not until 1970 that a program was established to specifically address Native American issues."). Dozens of American Indian graduates of Harvard Law School have gone on to prominent careers as tribal lawyers. *See, e.g.*, Emily Dupraz, *For the Next Generation: Two Brothers Advocate for the Sovereignty of Their People*, HARV. L. BULL., Summer 2008, *available at* http://www.law.harvard.edu/news/bulletin/cn_02 .php (describing the careers of Steve Emery and Mark Van Norman, Cheyenne River Sioux tribal members and Harvard Law School graduates who have devoted their work to Indian law at the tribal and federal levels); *see also* Patrice Kunesh, *Living the Lessons We Have Learned: A Native American Student Ponders the Lives of Her Harvard*, HARV. GAZETTE (Apr. 29, 2010), http://news.harvard.edu/gazette/story/2010/04/living-the-lessons-we-have-learned/.

99. *See* Rennard Strickland & Gloria Valencia-Weber, *Observations on the Evolution of Indian Law in the Law Schools*, 26 N.M. L. REV. 153, 158–59 (1996) (identifying early teachers and scholars of federal Indian law).

100. *See* Diane J. Schmidt, *"The First 13" Brings Together Indian Law Pioneers*, NAVAJO TIMES, Apr. 5, 2012, *available at* http://navajotimes.com/politics/2012/0412/040512 law.php; *see also* Press Release, Am. Indian Law Ctr., Inc., First 13 Native American Attorneys To Argue Before the U.S. Supreme Court Unite at Legal Symposium (Mar. 12, 2012), *available at* http://www.ailc-inc.org/PDF%20files/AILC%20-%20First%20Thirteen %20Press%20Release.pdf .

101. Janet Varnum, *Walter Echo-Hawk II: Fighting for Justice*, STATE, http://state magazine.okstate.edu/content/profile-walter-echo-hawk-ii (last visited Apr. 19, 2013) ("Echo-Hawk's work on groundbreaking legislation includes the American Indian Religious Freedom Act of 1978, the National Museum of American Indians Act of 1989, the Native American Graves Protection and Repatriation Act of 1990 and the American Indian Religious Freedom Act Amendments of 1994."); *see also* Jack F. Trope and Walter R. Echo-Hawk, *The Native American Graves Protection And Repatriation Act:  Background and Legislative History*, 24 ARIZ. ST. L.J. 35 (1992).