## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY RESERVATION,<br><br>Plaintiff,<br><br>v.<br><br>GREGORY D. MCKEE; T&L LIVESTOCK INC.; MCKEE FARMS, INC.; and GM FERTILIZER, INC.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND RESOLVING OTHER PENDING MOTIONS**<br><br>Case No. 2:18-cv-000314-HCN-DBP<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff, the Ute Indian Tribe of the Uintah and Ouray Indian Reservation, seeks to enforce a judgment of its Tribal Court against Defendants: Gregory D. McKee and three companies with which he is associated, T&L Livestock, McKee Farms, and GM Fertilizer. Both the Tribe and Defendants have moved for summary judgment. The court grants Defendants' motion and denies the Tribe's motion.

## I.

The Tribe sued Defendants in Tribal Court, alleging that they are misappropriating water that the United States owns in trust for the Tribe. *See* Dkt. No. 2-2 at 3–17. The Tribe alleged

that some water is taken pursuant to an alleged agreement with the United States, and that other

water is taken without any authorization. *See, e.g.*, Oral Argument at 12:20-15:00.[1]

---

[1] The disputed water is carried by canals as part of the Uintah Indian Irrigation Project (UIIP), which was established by the Act of June 21, 1906, ch. 3504, 34 Stat. 375. *See* Dkt. No. 55 at 7. The Tribe's position appears to be that all of the disputed water and the waterways that carry it are held in trust by the United States for the Tribe. *See, e.g.*, *id.* at 32–33.

The court has some doubt that the waterways are held in trust *solely* for the Tribe, however. By its terms, the 1906 Act appropriated money "[f]or constructing irrigation systems to irrigate *the allotted lands* of the Uncompahgre, Uintah, and White River Utes in Utah." 34 Stat. 375 (emphasis added). And as the 10th Circuit has explained, under the 1906 Act, the UIIP is held "in trust for the Indians." *Hackford v. Babbitt,* 14 F.3d 1457, 1468 (10th Cir. 1994). But "the phrase[] 'in trust for the Indians' in the 1906 Act is not coextensive with 'in trust for the tribe'. . . . The 1906 Act's purpose was to provide irrigation for the allotted, not tribal lands." *Id.* Many of the allotted lands—including the McKee Property—were eventually transferred to non-Indians. Indeed, "[t]oday, more than one-third of the land served by the [UIIP] is held in fee by non-Indian successors to Indian allottees." *Id.* at 1461 n.2.

And while the court has no doubt that at least *some* of disputed water is held in trust for the Tribe, it is far from clear that *all* of the water is so held. Much like the 1906 Act, the 1923 Decree and Permanent Injunction in *United States v. Cedarview Irrigation Co.,* No. 4427 (D. Utah 1923), on which the Tribe relies, determined that that the United States held the water in question "as Trustees of the *Indians* on the former Uintah and Ouray Indian Reservation." Dkt. No. 55-1 at 96–97. And although *Winters v. United States* held that when the United States establishes an Indian Reservation, it impliedly reserves enough water to fulfill the purpose of the reservation, *see* 207 U.S. 564, 576–77 (1908), it does not follow that *all* of the UIIP waters are held in trust for the Tribe.

Indeed, as Defendants explain, it appears that the portion of the water that belongs to the Tribe is currently a matter of dispute and litigation among the United States, the State of Utah, and the Tribe:

> although the Tribe is entitled to a yet to be determined amount of water to fulfill the original purposes of its reservation, *Winters v. United States*, 207 U.S. 564 (1908), that amount of water has, despite the efforts of Congress and the State of Utah, never been quantified. For instance, the Tribe contends that, under the Ute Indian Water Compact, the water at issue here is part of the Tribe's reserved water. However, the Tribe has failed and refused to ratify the Ute Indian Water Compact precluding quantification. In fact, the Tribe recently filed a lawsuit in the United States District Court for the District of Columbia alleging that the Tribe is entitled to more water than what is allocated in the Ute Indian Water Compact.

2

Mr. McKee is not a member of the Tribe. *See*, *e.g.*, Dkt. No. 55-1 at 46. Although the land on which the Defendants use the disputed water is located within the exterior boundaries of the Tribe's Reservation, it is no longer tribal land—that is, it is neither owned by, nor held in trust for, the Tribe. *See* Dkt. No. 55-1 at 49. As the Tribal Court found, "[t]he McKee Property is land that was diminished from the Uintah Valley Reservation, *i.e.*, 'lands that passed from trust to fee status.'" *Id.*; *see also id.* (finding that "[t]he McKee Property is situated in a checker-board area of the Reservation"); *Hagen v. Utah*, 510 U.S. 399, 414 (1994); *Ute Indian Tribe of the Uintah and Ouray Reservation v. State of Utah*, 114 F.3d 1513, 1529–31 (10th Cir. 1997). Until 2018, Mr. McKee also leased "40.000 acres, more or less" of tribal land through the Bureau of Indian Affairs. Dkt. No. 55-4 at 138. It appears that the leased land was located approximately three miles from the McKee Property. *See* Dkt. No. 60 at 25; Dkt. No. 60-1 at 93. The Tribe does not argue, and the Tribal Court did not find, that Defendants used the water at issue here on this leased land. *See* Dkt. No. 64 at 18.

The Tribe maintains that the Deep Creek Canal and Lateral 9, the waterways from which Defendants divert the disputed water, "carr[y] the Ute Indian Tribe's waters through a parcel of [] McKee's property." Dkt. No. 55 at 23. The Tribe neither argues nor presents evidence that the points from which Defendants divert water are located on tribal land or that the Defendants otherwise enter tribal land to divert the water. A report attached to the Tribe's motion for summary judgment states that the points of diversion are located on the McKee Property (which

---

Dkt. No. 60 at 17 n.2 (cleaned up); *see also id.* at 9; *Ute Indian Tribe of the Uintah and Ouray Reservation v. United States*, No. 1:18-cv-00546-CJN (D.D.C.). For purposes of resolving the motions here, the court finds it unnecessary to attempt to unravel or fully understand the thorny issues relating to the precise nature and scope of the Tribe's interest in the disputed water and waterways.

Mr. McKee owns in fee) as well as on a parcel located immediately north of the McKee

Property. *See* Dkt. No. 55-1 at 194. But the Tribe does not argue, and the Tribal Court did not

find, that the parcel immediately north of McKee's property is tribal land. *Cf.* Dkt. No. 55-1 at 49

(finding that McKee's property "is immediately adjacent to tribal trust lands *to the east and*

*south*.") (emphasis added).

In concluding that it had jurisdiction over the Tribe's suit against the McKee Defendants,

the Tribal Court reasoned as follows:

> The Court has subject matter jurisdiction pursuant to the Ute Tribe's
> inherent sovereign right to regulate activities of all non-Indians who willingly
> enter into a consensual relationship with the Tribe or whose conduct imperils the
> Tribe's political integrity, economic security, or health and welfare. *See Montana*
> *v. United States*, 450 U.S. 544 (1981). The Court also has subject matter
> jurisdiction pursuant to the Tribe's inherent sovereign right to (*i*) manage the use
> of its territory and natural resources by both members and nonmembers, *see New*
> *Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 335–36 (1983), and (*ii*) to
> exclude nonmembers from the Tribe's lands and waters, including the irrigation
> ditches and canals that transport tribal waters. *See Water Wheel Camp*
> *Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 811–14 (9th Cir. 2011).

Dkt. No. 55-1 at 67. On the merits, the Tribal Court found that Defendants had not proved

their right to use the disputed water. *See id*. The Tribal Court awarded the Tribe $142,718

in damages for the water misappropriated between 1999 and 2015. *See id.* at 67–68.

The Tribe then sued in this court to enforce the Tribal Court's judgment. The Tribe seeks

> [a] finding that the Ute Tribal Court judgment is entitled to recognition,
> registration, and enforcement in accordance with federal law; [a]n order
> recognizing, registering, and making enforceable the [tribal] court judgment in
> this Court as a judgment of this Court; [a] writ of execution commanding the
> United States Marshal to seize the nonexempt portion of the property of
> Defendants sufficient to satisfy the judgment; [a]n order permitting post-judgment
> discovery for the purpose of identifying property from which the judgment can be
> satisfied; [a]n order forbidding any person from transferring, disposing, or
> interfering with property of the Defendants from which the judgment can be
> satisfied; [c]osts and disbursements of this proceeding, including without

limitation, attorneys' fees, expenses, expert costs and all other costs; and [s]uch
other and further relief as the Court shall deem just and proper.

Dkt. No. 2 at 7–8.

The Tribe also seeks leave to amend its complaint to make clear that the Tribal Court's

decision is at least partially rooted in a 1923 decree and permanent injunction entered by this

court in *United States v. Cedarview Irrigation Co.*, No. 4427 (D. Utah 1923). *See* Dkt. No. 78 at

2. That ruling established the United States' ownership of the water rights at issue in that

litigation, which apparently encompass the water at issue here. *See* Dkt 55 at 8–9. The Tribe was

not a party to that litigation, though it contends that the ruling established that the United States

owns the water in trust for the Tribe. *Cf. supra* n.1.

Based on its review of the Motion and the proposed Amended Complaint, the court finds

that its discussion of the 1923 decree is intended only to buttress the Tribe's jurisdictional

allegations. While the proposed complaint does add to the prayer for relief a request for "[a]n

order enjoining the Defendants from diverting water from the Deep Creek Canal in violation of

the federal court decree and permanent injunction entered in *United States v. Cedarview

Irrigation Co.*, No. 4427 (D. Utah 1923)," Dkt. No. 71-1 at 10, it does not assert any claims

arising out of the 1923 decree. Rather, it remains "an action to recognize, register, and enforce a

tribal court money judgment under principles of comity." Dkt. No. 71-1 at 3. As the Tribe

explains in its briefing, the proposed amended complaint seeks to "enforce the *Cedarview* Decree

*via* this Court's enforcement of the Tribal Court's enforcement of the *Cedarview* Decree through

the Tribal Court suit," Dkt. No. 78 at 3 (emphasis in original), not to assert a free-standing claim

that is independent of the Tribal Court's judgment. *See also* Oral Argument at 1:30-2:00; 11:30-

12:00; 22:00–26:00.

Defendants and the Tribe have both moved for summary judgment. *See* Dkt. Nos. 55, 60.

5

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).

## III.

Defendants contend that this court lacks subject matter jurisdiction over this action because the Tribe's claims do not "aris[e] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The court disagrees.

To be sure, jurisdiction under Section 1331 turns on the well-pleaded complaint rule, which generally "requires that the federal question appear on the face of the plaintiff's properly pleaded complaint." *Garley v. Sandia Corp.*, 236 F.3d 1200, 1207 (10th Cir. 2001); *see also*, *e.g.*, *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152–54 (1908). And as Defendants note, the complaint here seeks only recognition and enforcement of the Tribal Court's judgment. *See* Dkt. No. 2 at 7-8. But that is enough to confer federal-question jurisdiction under Tenth Circuit precedent. As that court explained in *MacArthur v. San Juan County*, "bound up in the decision to enforce a tribal court order" is "[t]he question of the regulatory and adjudicatory authority of the tribes," which "is a matter of federal law giving rise to subject matter jurisdiction under 28 U.S.C. § 1331." 497 F.3d 1057, 1066 (10th Cir. 2007).

6

Defendants attempt to distinguish the Tenth Circuit's holding in *MacArthur* based on language in footnote four of that opinion:

> In this case, Plaintiffs argue that federal law has not divested the Navajo Nation of its civil jurisdiction over Defendants' activities—*in fact, they allege federal law has granted it such jurisdiction and seek a declaratory judgment saying as much*. As a result, we agree with the district court's observation that "the action . . . is one arising under federal law because it turns on substantial questions of federal law."

497 F.3d at 1066 n.4 (emphasis added) (alteration in original). While the import of this footnote is debatable, the court does not read it to limit the Tenth Circuit's clear analysis and explicit conclusion, in the text of its opinion, that a suit to enforce a Tribal Court judgment necessarily raises questions of federal law "giving rise to subject matter jurisdiction under 28 U.S.C. § 1331." *Id.* at 1066. *See also Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008) (noting that "whether a tribal court has adjudicative authority over nonmembers is a federal question"); *Coeur d'Alene Tribe v. Hawks*, 933 F.3d 1052, 1059 & n. 7 (9th Cir. 2019). The court accordingly concludes that it has subject matter jurisdiction.

## IV.

This court will recognize and enforce the Tribal Court's judgment only if that court had jurisdiction to decide the dispute before it. As the Tenth Circuit has explained, "recognition of a tribal court judgment must be refused where . . . the tribal court lacked either personal or subject matter jurisdiction." *McArthur*, 497 F.3d at 1067.

Under governing Supreme Court precedent, "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Plains Commerce Bank,* 554 U.S. at 330 (internal quotation marks omitted). "[T]ribal court jurisdiction"—the Tribe's "adjudicative" power—thus "'turns upon whether the actions at issue in the litigation are regulable by the tribe'" — the Tribe's "regulatory" power. *Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 862 F.3d

1236, 1245 (10th Cir. 2017) (*quoting Nevada v. Hicks*, 533 U.S. 353, 367 n.8 (2001)). The Tribal

Court's jurisdiction in this case thus turns on whether the Tribe had authority to regulate

Defendants' use of the water at issue here.[2] For the reasons that follow, the court concludes that

the Tribe lacked such authority.

## A.

Tribal sovereignty "centers on the land held by the tribe and on tribal members within the

reservation. *Plains Commerce Bank*, 554 U.S. at 327. While "[a] tribe's power to prescribe the

conduct of tribal members has never been doubted," *New Mexico v. Mescalero Apache Tribe*,

462 U.S. 324, 332 (1983), Mr. McKee is not a member of the Tribe. The Tribe's power to

regulate Defendants' use of the water at issue here thus turns on its authority to regulate

nonmembers. As explained below, that authority turns on where that conduct occurs and is

closely related to the Tribe's control over "land held by the tribe."

As this case illustrates, Indian reservations may contain two types of land. The first is

land that "belong[s] to the Tribe or [is] held by the United States in trust for the Tribe." *Montana

v. United States*, 450 U.S. 544, 557 (1981). Courts frequently refer to such land as "tribal land."

*E.g.*, *Plains Commerce Bank*, 554 U.S. at 328. The second is land within the reservations that is

owned in fee simple by non-Indians. As the Supreme Court has explained, "[i]n the late 19th

century, the prevailing national policy of segregating lands for the exclusive use and control of

---

[2] The parties also dispute whether the Tribal Court had authority under its own rules to
issue the judgment in this case. Although its initial brief appeared to suggest otherwise, *see* Dkt.
No. 55 at 21, the Tribe clarified in subsequent briefing and conceded at oral argument that the
Tribal Court's rules cannot confer jurisdiction over Defendants if the Tribe lacks authority to
regulate their use of the disputed water, *see* Dkt. No. 64 at 10–11; Oral Argument at 28:00 –
30:00. The Tribal Court did not hold otherwise. *See* Dkt. No. 55-1 at 66–67. While any such
contention or holding would raise questions of federal law warranting review by this court, the
court will not otherwise second-guess the Tribal Court's interpretation of its own rules.

the Indian tribes gave way to a policy of allotting those lands to tribe members individually." *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 253–54 (1992). "Some of these allotted lands were subsequently acquired by persons not members of [the tribes]." *South Dakota v. Bourland*, 508 U.S. 679, 682 (1993). "Non–Indians also acquired fee title to some of the unallotted and 'surplus' lands on the reservation" in other ways as well, including "pursuant to the Indian General Allotment Act of 1887." *Id.* As a result, there are now "millions of acres of non-Indian fee land located within the contiguous borders of Indian tribes." *Plains Commerce Bank*, 554 U.S. at 328.

"A tribe's power to exclude nonmembers entirely" from land that belongs to, or is held in trust for, the tribe is "well established." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983). And because "[n]onmembers who lawfully enter tribal lands remain subject to the tribe's power to exclude them[,] this power necessarily includes the lesser power to place conditions on entry, on continued presence, or on reservation conduct." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982).

But the Supreme Court's "cases have made clear that once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it." *Plains Commerce Bank*, 554 U.S. at 328. As the Court has explained, "when the tribe or tribal members convey a parcel of fee land '*to non-Indians*, [the tribe] loses any former right of absolute and exclusive use and occupation of the conveyed lands'" *Id.* (quoting *South Dakota*, 508 U.S. at 689) (emphasis in original). "This necessarily entails 'the loss of regulatory jurisdiction over the use of the land by others.'" *Id.* (quoting *South Dakota*, 508 U.S. at 689). "As a general rule, then, the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land." *Id.* (internal quotation marks omitted). And because a Tribe's power to regulate nonmembers'

conduct arises from its right to exclude, it likewise follows that there is a "general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation." *Strate v. A-1 Contractors*, 520 U.S. 438, 446 (1997).

The Supreme Court has, however, "recognized two exceptions to this principle"—that is, two "circumstances in which tribes *may* exercise 'civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.'" *Plains Commerce Bank*, 554 U.S. at 329 (emphasis added) (quoting *Montana*, 450 U.S. at 565). "First, '[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.'" *Id.* (quoting *Montana*, 450 U.S. at 565) (alteration in original). "Second, a tribe may exercise 'civil authority over the conduct of non-Indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 329–30 (quoting *Montana*, 450 U.S. at 566). "These rules have become known as the *Montana* exceptions, after the case that elaborated them." *Id.*

## B.

As the Tribal Court recognized, the McKee Property is owned by Defendants in fee simple. *See* Dkt. No. 55-1 at 42. And although the Tribal Court found that the land immediately "to the east and south" of McKee's Property is held in trust for the Tribe, Dkt. No. 55-1 at 49, it made no such finding regarding the land immediately to the north of the McKee property, where the Tribe's evidence indicates some of the water diversion occurs, *see id.* at 194. Nor has the Tribe argued or submitted evidence that the land immediate to the north of the McKee property is tribal land.

Although there is thus no evidence that Defendants' diversion or use of the disputed water took place on land owned by, or held in trust for, the Tribe, the Tribe argues that "[t]he Deep Creek Canal and Lateral 9 are trust property of the Tribe running on the Tribe's easement (a real property interest), placing Defendants' entry and water theft from the Canal and Lateral 9 within the purview of the Tribe's inherent sovereign power to exclude." Dkt. No. 55 at 30 (emphasis removed); *see also id*. at 32–33 (arguing that diversion "occurred from tribal property on an easement held in trust for the Tribe by the United States, thereby implicating the Tribe's inherent sovereign power to exclude").

To the extent the Tribe's argument rests on the existence of an easement, the court rejects it. As the Supreme Court held just this year, "easements are not land, they merely burden land that continues to be owned by another." *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1845 (2020). The fact that land owned in fee by nonmembers is burdened by an easement does not change the ownership of that land or convert it into tribal property.[3]

---

[3] Although the Tribe cites the Supreme Court's decision in *Strate v. A-1 Contractors* elsewhere in its briefing, it does not cite this decision in support of this argument. *Strate* does, however, provide at least superficial support for the Tribe's argument: in that case the Court addressed tribal jurisdiction over an accident that occurred on a state highway built on a right-of-way within a reservation. *See* 520 U.S. at 454–56. Although the land burdened by the right-of-way was held in trust for the tribes, the Court nevertheless "align[ed] the right-of-way, for the purpose at hand, with land alienated to non-Indians" and thus held that the tribes could exercise jurisdiction only pursuant to the *Montana* exceptions. *Id*. at 456. As the Court explained,

> [f]orming part of the State's highway, the right-of-way is open to the public, and traffic on it is subject to the State's control. The Tribes have consented to, and received payment for, the State's use of the 6.59-mile stretch for a public highway. They have retained no gatekeeping right. So long as the stretch is maintained as part of the State's highway, the Tribes cannot assert a landowner's right to occupy and exclude.

*Id*. at 455–56.

The irrigation ditches that cross the McKee property are a far cry from a highway that is open to and traveled by the public and thus requires regular maintenance and policing. In

The Tribe also contends that just as it has the absolute right to exclude nonmembers from tribal lands, it also has the right to exclude them from tribal resources. Although the Tribe's briefing is not entirely clear on this point, it appears that the tribal resources to which it refers are the canals from which the water is taken and possibly the diverted water as well. *See* Dkt. No. 55 at 30–33; Dkt. No. 64 at 14–15.

Like the Tribal Court, *see* Dkt. No.55-1 at 67, the Tribe invokes the Supreme Court's decision in *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983), in support of its position. To be sure, the Court in that case stated "that tribes have the power to manage the use of its territory *and resources* by both members and nonmembers." *Id*. at 335 (emphasis added). But the Court in *New Mexico* was addressing only the Tribe's broad power to prohibit or regulate hunting and fishing by nonmembers on "lands belonging to the Tribe or held by the United States in trust for [a] Tribe." *Id*. at 331 (internal quotation marks omitted). Indeed, it expressly distinguished—and recognized the continued vitality—of the Court's holdings in other cases, including *Montana*, that tribes lack such power to prohibit or regulate hunting and fishing by

---

addition, unlike the State, which maintained, policed, and exercised sole regulatory control of the highway in *Strate*, it appears that neither the United States as trustee nor the Tribe exercises exclusive regulatory control over the irrigation ditches and the water they carry. The 1906 statute that authorized their creation stated "[t]hat such irrigation systems shall be constructed and completed and held and operated, and water therefor appropriated under the laws of the State of Utah," 34 Stat. 375, and it appears that the State may retain at least some role in the allocation of the water today, *see* Dkt. No. 60 at 9–10. In addition, while the State in *Strate* was undoubtedly the sole owner of the right of way, the irrigations ditches here were constructed "to irrigate *the allotted lands* of the Uncompahgre, Uintah, and White River Utes in Utah," 34 Stat. 375 (emphasis added), and it is at least disputed whether they are held in trust exclusively for the Tribe today. *See supra* n.1.

For all of these reasons, the court finds *Strate*'s analysis inapplicable to the easement here.

nonmembers on "lands located within the reservation but *not* owned by the Tribe or its members." *Id.* at 330–32 (emphasis in original).

Nor do the decisions invoked by the Tribal Court and cited by the Tribe support a plenary right to exclude nonmembers from, or regulate their use of, tribal resources located on land owned in fee by nonmembers. To the contrary, these cases address regulation of nonmembers *on tribal land. See, e.g.*, *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 896 (9th Cir. 2017), as amended (Aug. 3, 2017) (concerning "claims against two public school districts operating schools on leased tribal land."); *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 811-14 (9th Cir. 2011) ("[T]he non-Indian activity in question occurred on tribal land."); *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Mississippi in Iowa*, 609 F.3d 927, 940 (8th Cir. 2010) (addressing tribe's authority to "regulate [a non-Indian entity's] entry and conduct upon tribal land"). Indeed, the court has found no authority for the proposition that a tribe may assert regulatory authority over nonmembers' use of tribal resources on land held in fee by nonmembers except pursuant to the *Montana* exceptions.

The Tribe also raises policy arguments in support of its asserted authority to exclude nonmembers from tribal resources as well as from tribal land. *See* Dkt. No. 64 at 14–15. These arguments are not unreasonable, but the court concludes that they are unsupported by legal authority and cannot be reconciled with Supreme Court precedent.

For all of these reasons, the court rejects the Tribe's argument that it possesses plenary regulatory power over Defendants' diversion of the disputed water based on its power to exclude.

## C.

It follows that the Tribe has authority to regulate Defendants' conduct only to the extent permitted under the two *Montana* exceptions. The Tribe maintains that both exceptions apply here.

Under the first *Montana* exception, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565. The Tribe argues that this exception applies because "McKee's land was conveyed to his predecessors in interest under an original U.S. Patent" which provided that the property rights conveyed were "subject to any vested and accrued water rights . . . and the rights to ditches and reservoirs used in connection with such water rights" and reserved "a right of way thereon for ditches or canals constructed by the authority of the United States." Dkt. No. 55 at 23 (emphasis removed). According to the Tribe, because this patent subjects the McKee Property to "the vested and accrued water rights of the Tribe and the rights-of-way for ditches and canals" it creates a "consensual relationship" between Defendants and the Tribe. *Id.* at 24.

The court rejects this argument. As the Tribe explains, the patent was granted by the United States to Defendants' predecessors in interest. Neither Defendants nor the Tribe were parties to the conveyance. To be sure, the patent appears to subject the McKee Property to an easement that no doubt binds Defendants today. But Defendants are not bound because they have entered into an agreement with the Tribe. Indeed there is no evidence that they have ever entered into any agreement with the Tribe relating to the easement. Rather, Defendants are bound because the easement reserved by the patent is a property right that runs with and burdens the land they now own. The Tribe cites no authority applying the first *Montana* exception based on

14

analogous circumstances and the court is aware of none. For all of these reasons, the court finds

that the rights reserved by the patent do not establish a "consensual relationship" between

Defendants and the Tribe. *Cf. Burlington Northern R.R. Co. v. Red Wolf*, 196 F.3d 1059, 1064

(9th Cir. 1999) ("A right-of-way created by congressional grant is a transfer of a property interest

that does not create a continuing consensual relationship between a tribe and the grantee."); *State*

*of Mont. Dept. of Transp. V. King*, 191 F.3d 1108, 1113 (9th Cir. 1999) ("[T]ransfers of property

interest between governmental entities create property rights; they generally do not create

continuing consensual relationships.").

The Tribe also argues that Defendants' lease of a different parcel of land from the Tribe

supports its authority to regulate Defendants' conduct under the first *Montana* exception. But the

Tribe neither argues nor presents any evidence that Defendants used the disputed water on the

leased land. And the Supreme Court has held that "[a] nonmember's consensual relationship in

one area . . . does not trigger tribal civil authority in another—it is not 'in for a penny, in for a

Pound.'" *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 656 (2001). It follows that "[t]he

mere fact that a nonmember has some consensual commercial contacts with a tribe does not

mean that the tribe has jurisdiction over all suits involving that nonmember, or even over all such

suits that arise within the reservation; the suit must also arise out of those consensual contacts."

*Philip Morris USA, Inc. v. King Mountain Tobacco Co., Inc.*, 569 F.3d 932, 941–42 (9th Cir.

2009); *see also MacArthur v. San Juan Cty.*, 309 F.3d 1216, 1223–24 (10th Cir. 2002) (holding

that an attorney was not subject to suit in the Navajo Nation court merely because he was

admitted to practice there). To be sure, the lease was "subject to the lessee (Defendant McKee)

complying with 'all applicable laws, ordinances, rules, regulations, and other legal requirements,

including tribal laws and leasing policies.'" Dkt. No. 55 at 25 (emphasis removed). By signing

15

this agreement, Mr. McKee no doubt consented to broad Tribal jurisdiction over his use of the leased property. But under binding Supreme Court precedent, this court cannot construe the lease to confer tribal jurisdiction over conduct wholly unrelated to the lease. The court thus concludes that first *Montana* exception does not support jurisdiction here.

Under the second *Montana* exception, a tribe may exercise "civil authority over the conduct of non-Indians on fee lands within [the] reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. "The second *Montana* exception may be invoked only if the challenged conduct could 'fairly be called catastrophic for tribal self-government.'" *Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 862 F.3d 1236, 1246 (10th Cir. 2017) (quoting *Plains Commerce Bank*, 554 U.S. at 341).[4] In *Plains Commerce Bank*, the Supreme Court gave one example of what is not considered catastrophic: "[t]he sale of formerly Indian-owned fee land to a third party is quite possibly disappointing to the Tribe, but cannot fairly be called 'catastrophic' for tribal self-government." 554 U.S. at 341.

The court does not doubt the vital importance of water in the arid lands on which the Reservation is located. *See, e.g.*, *Winters v. United States,* 207 U.S. 564, 576 (1908). But

---

[4] Noting the Supreme Court's observation in *Plains Commerce Bank* that "[n]either the District Court nor the Court of Appeals relied for its decision on the second *Montana* exception," the Tribe seeks to dismiss the Court's narrow formulation of the scope of the second exception in that case as dicta. Dkt. No. 64 at 19 (quoting *Plains Commerce Bank*, 554 U.S. at 340–41). But regardless of what the lower courts may have done, the Supreme Court squarely held this exception did not apply. *See Plains Commerce Bank,* 554 U.S. at 341 ("Accordingly, we hold the second *Montana* exception inapplicable in this case."). In addition, the Tenth Circuit followed this formulation in *Norton* in accepting one claim and rejecting another. Even if the Court's formulation were "dicta all the way down," moreover, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1400 (2020), lower courts are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements," *Utah Republican Party v. Cox*, 892 F.3d 1066, 1079 (10th Cir. 2018) (cleaned up).

applying the standard from *Plains Commerce Bank* and *Norton,* the court cannot say that the diversion of a total of $142,718 worth of water over the course of sixteen years can "fairly be called catastrophic for tribal self-government."[5]

*   *   *

Because the Tribe lacks authority to regulate Defendants' diversion of the disputed water, the Tribal court lacked jurisdiction over this dispute. Defendants' motion for summary judgment is accordingly granted, and Plaintiff's motion is denied.

## V.

In addition to moving for summary judgment, the Tribe has filed two other motions. As mentioned earlier, the Tribe seeks leave to amend its complaint to clarify that, by enforcing the Tribal Court's decision, it will also be enforcing a decree and permanent injunction entered by this court in 1923. *See supra* at 4–5. These allegations regarding the 1923 Decree are unnecessary to establish this court's subject matter jurisdiction, however—as this court has already held, it has federal question jurisdiction here because the Tribe seeks to enforce a Tribal Court judgment. Conversely, these allegations do not cure the Tribal Court's lack of jurisdiction over the conduct at issue here—nothing in the *Montana* exceptions (or any other source of law of which the court is aware) authorizes a Tribal Court to enforce a federal court judgment in a case in which it otherwise lacks jurisdiction. And as discussed above, the proposed amended complaint does not allege any freestanding claims arising out of the 1923 Decree—rather, it remains an "an action to recognize, register, and enforce a tribal court money judgment under principles of comity." Dkt. No. 71-1 at 3. Even if the Tribe were permitted to amend its

---

[5] It is not clear that the Tribe seriously contends otherwise. In all of the Tribe's filings in this case, the court has found the word "catastrophic" only once—in a paragraph arguing that the Supreme Court's use of this word should be disregarded as dicta. *See* Dkt. No. 64 at 19.

complaint, then, summary judgment for Defendants would still be appropriate. The court

accordingly denies the motion for leave to amend as futile. *See Bylin v. Billings*, 568 F.3d 1224,

1229 (10th Cir. 2009).

The Tribe also filed a motion to clarify Defendants' diversion and use of the disputed

water. *See* Dkt. No. 83. The court grants this motion and has relied on the Tribe's clarification in

this opinion. Although the Tribe's clarifications were helpful, they ultimately did not change the

court's analysis of the Tribal Court's authority.

## VI.

The court emphasizes the limited scope of this decision. The court holds only that the

Tribal Court lacked jurisdiction to adjudicate the dispute between the Tribe and Defendants. It

does not hold, and should not be understood to suggest, that Defendants' use of the water is

lawful or justified. The court simply does not reach that issue. The court's decision also does not

bar the Tribe from bringing suit against Defendants in state or federal court. Nor is it the

province of this court to evaluate the wisdom or justice of the United States' past and present

stewardship of the water on which the Tribe depends for its existence and livelihood or of the

limitations the Supreme Court and Tenth Circuit have imposed on tribal jurisdiction. Rather, this

court's role is to apply the controlling decisions of those superior tribunals as faithfully as it is

able to the facts presented here.

\*     \*     \*

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

Plaintiff's Motion for Summary Judgment is DENIED. Plaintiff's Motion for Leave to Clarify is

GRANTED, but its Motion for Leave to Amend is DENIED. This action will be DISMISSED

WITH PREJUDICE.

**IT IS SO ORDERED.**

DATED this 28th day of August, 2020.

BY THE COURT:

Howard C. Nielson, Jr.
United States District Judge